## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EPIC! CREATIONS, INC., | Case No. 24-11161 (___) |
| Alleged Debtor. | |
| Tax I.D. No. 46-1689113 | |
| In re: | Chapter 11 |
| NEURON FUEL, INC., | Case No. 24-11162 (___) |
| Alleged Debtor. | |
| Tax I.D. No. 87-1778758 | |
| In re: | Chapter 11 |
| TANGIBLE PLAY, INC., | Case No. 24-11163 (___) |
| Alleged Debtor. | **Hearing Date: TBD** |
| Tax I.D. No. 46-1719331 | **Objection Deadline: TBD** |

**MOTION OF THE PETITIONING CREDITORS UNDER 11 U.S.C. §§ 105(a) AND 303(f) FOR ENTRY OF AN ORDER (A) PROHIBITING THE ALLEGED DEBTORS FROM USING ESTATE ASSETS FOR NON-ORDINARY COURSE PURPOSES AND (B) REQUIRING THE ALLEGED DEBTORS TO PROVIDE WEEKLY DISCLOSURES**

The petitioning creditors (the "Petitioning Creditors")[1] of the above-captioned alleged debtors and debtors in possession (collectively, the "Alleged Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion") for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to Sections 105(a) and 303(f) of Title 11 of the U.S. Code (the "Bankruptcy Code") prohibiting Alleged

---

[1] The "Petitioning Creditors" are comprised of (i) GLAS Trust Company LLC, in its capacity as administrative and collateral agent ("GLAS") under the Credit Agreement (as defined herein) and (ii) certain lenders under the Credit Agreement (each a "Petitioning Lender Creditor" and collectively, the "Petitioning Lender Creditors").

Debtors Epic! Creations, Inc. ("Epic"), Neuron Fuel, Inc. ("Neuron Fuel"), and Tangible Play, Inc.

("Tangible Play") from disposing of their cash and other estate assets for purposes other than those

directly related to the operation of their businesses in the ordinary course.  In support of this

Motion, the Petitioning Creditors submit the *Declaration of Irena Goldstein* (the "Goldstein

Declaration") attached hereto as **Exhibit B** and the *Declaration of Michael Gallo* (the "Gallo

Declaration") attached hereto as **Exhibit C**.  In further support of the relief requested, the

Petitioning Creditors state as follows:

**PRELIMINARY STATEMENT**

1.      Pursuant to this Motion, the Petitioning Creditors seek an order restricting the

Alleged Debtors' use of their cash and other estate assets during the period between the filing of

these chapter 11 cases and any subsequent entry of an order for relief (the "Gap Period") for

purposes other than those directly related to the operation of their businesses in the ordinary course.

As set forth below, the relief should be granted under 11 U.S.C. §§ 105(a) and 303(f) because the

proposed restriction is appropriate, is not burdensome in any respect, and will in no way interfere

with the normal business operations of the Alleged Debtors.

2.      Each of the Petitioning Creditors and Alleged Debtors is a party to that certain

Credit and Guaranty Agreement, effective as of November 24, 2021, pursuant to which various

Lenders issued terms loans to the borrower, BYJU's Alpha, in the initial amount of $1.2 billion.

The obligations under the Credit Agreement are unconditionally guaranteed by the three Alleged

Debtors, each of which is a former affiliate of the borrower under the common control of their

ultimate corporate parent, Think and Learn Private Limited, an Indian entity, and its founder Byju

Raveendran.

3.      As of the date hereof, the undisputed obligations due and owing to the Lenders

under the Credit Agreement are approximately $1.5 billion.  This amount is secured by liens on,

2

and security interests in, substantially all of the Alleged Debtors' assets and properties (and/or the proceeds thereof)—the value of which is woefully less than the amounts presently due and owing. The Term Loans were fully and validly accelerated on March 3, 2023, as the Delaware Court of Chancery held in its bench ruling of November 2, 2023, which remains in full force and effect today.  Yet not a single payment has been made on the Term Loans in over 14 months.

4.      The Petitioning Creditors do not seek to unduly restrict the Alleged Debtors' use of their cash and other assets, which, pursuant to the Credit Agreement and other Loan Documents, constitute the Lenders' cash collateral.  Rather, pursuant to this Motion, and consistent with the intent and purpose of Sections 105(a) and 303(f) of the Bankruptcy Code, the Petitioning Creditors seek to restrict the Alleged Debtors' assets for purposes other than those directly related to the normal course operation of their businesses and to monitor the Alleged Debtors' compliance with that restriction.

5.      As the Petitioning Creditors and the Court unfortunately have seen with BYJU's Alpha, T&L and Raveendran have a sordid history of unlawfully concealing millions of dollars and then refusing to disclose what happened to shield their misconduct.  As with BYJU's Alpha, history is repeating itself with its U.S. guarantors—the Alleged Debtors.  For months, T&L and Raveendran rejected every one of the Petitioning Creditors' efforts to understand the Alleged Debtors' true financial picture, in the process breaching the Credit Agreement's robust information covenants.

6.      So the Petitioning Creditors undertook their own investigation, and what they learned is frightening:  the Alleged Debtors are in financial distress and money is being siphoned out of them.  Specifically, a former Epic manager shared information about Epic's movement of money to affiliates, including copies of Epic's bank statements.  From January 2024 to March

3

2024, Epic made at least 45 separate transfers to affiliates totaling **$10,013,580.29**.  Discovery is sure to uncover more improper transfers.

7.      Moreover, in addition to the massive debt owed to the Petitioning Creditors, there has been mounting litigation against the Alleged Debtors for their failure to pay their other debts as they come due.  A detailed summary of those lawsuits is enclosed as **Exhibit D**.  As one example, Tangible Play did not contest its eviction from its then-principal place of business (at 195 Page Mill Road, Suite 105 in Palo Alto, California) in March 2024, after failing to pay close to $750,000 in rent for March to December 2023.[2]  As another example, Neuron Fuel's three co-founders each sued the company for unpaid earnouts following T&L's acquisition of the company in 2021.[3]  A total of $20.68 million in earnout payments were due, but allegedly not paid, in January 2023 and January 2024.  Defaults were entered on May 13 and May 16, 2024, after Neuron Fuel failed to appear, according to the case dockets.  Remarkably, in many of these cases, the Alleged Debtors are not even mounting a defense, suggesting that no defense may even exist and that T&L's interest in preserving these businesses is waning and perhaps non-existent.

8.      A chapter 11 trustee is ultimately very likely to be needed in these chapter 11 cases. But for now, the Petitioning Creditors are seeking relief in incremental stages.  In view of the Alleged Debtors' insolvent state and the misuse of the Petitioning Creditors' cash collateral and estate assets for purposes that should not, and cannot, be countenanced, restrictions on the Alleged Debtors' disposition of assets and allowing the Petitioning Creditors to monitor such compliance through regular disclosures by the Alleged Debtors are warranted, even during the Gap Period.

---

[2]     *Park Plaza Palo Alto LLC v. Tangible Play, Inc.*, Case No. 23CV426019 (Cal. Super. Ct., Santa Clara Cnty.).

[3]     *See Chong v. Neuron Fuel, Inc.*, Case No. 24CV432739 (Cal. Super. Ct., Santa Clara Cnty.); *Mandyam v. Neuron Fuel, Inc.*, Case No. 24CV432742 (Cal. Super. Ct., Santa Clara Cnty.); *Vedati v. Neuron Fuel, Inc.*, Case No. 24CV432743 (Cal. Super. Ct., Santa Clara Cnty.).

Indeed, to permit otherwise would cause not only irreparable harm to the Petitioning Creditors but to all other creditors of these estates.  The Motion should be granted.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

10.    Through this Motion, the Petitioning Creditors request, pursuant to Sections 105(a) and 303(f) of the Bankruptcy Code, entry of an order (a) prohibiting the Alleged Debtors from using estate assets for purposes other than those directly related to the operation of their businesses in the ordinary course and (b) requiring the Alleged Debtors to provide weekly disclosures sufficient to show all transfers of estate assets, whether cash or non-cash, made the preceding week.  As noted, the Proposed Order is attached hereto as **Exhibit A**.

## FACTUAL BACKGROUND

**A.    The Alleged Debtors' defaults on their guarantee obligations under the Term Loans.**

11.    On November 24, 2021, the Lenders issued $1.2 billion in five-year term loans (the "Term Loans") to borrower BYJU's Alpha, Inc. ("BYJU's Alpha") pursuant to, *inter alia*, a Credit and Guaranty Agreement (the "Credit Agreement").  Ex. B, Goldstein Decl. ¶¶ 4-5.  GLAS, also a Petitioning Creditor, serves as the Administrative Agent and Collateral Agent for the Lenders. *Id.* ¶ 5.  As security for the borrower's obligations, GLAS and the Lenders obtained guarantees from BYJU's Alpha's ultimate corporate parent in India, Think and Learn Private Ltd. ("T&L"), and five of T&L's direct and indirect subsidiaries, including the three Delaware-incorporated Alleged Debtors here. *Id.* ¶ 6.

12.     As set forth in the accompanying Goldstein Declaration, BYJU's Alpha repeatedly defaulted on the Credit Agreement, empowering the Lenders and GLAS to exercise remedies, which they did. *Id.* ¶¶ 9-11.  On March 3, 2023, GLAS, acting at the Lenders' direction, took three primary steps.   First, GLAS accelerated all amounts then outstanding under the Credit Agreement—at the time, approximately $1.255 billion in aggregate principal, interest, and premiums. *Id.* ¶ 9.  Then, GLAS took control of the pledged equity in BYJU's Alpha and replaced existing management with its own designee—Timothy R. Pohl, an experienced restructuring professional. *Id.* ¶ 11.  Finally, in a Notice of Default, GLAS demanded that the BYJU's Alpha and its six guarantors, including the Alleged Debtors, immediately pay the fully-accelerated Term Loans "in full in cash," and that no transfers of collateral be made by any of them. *Id.* ¶ 9.

13.     With respect to the final demand for payment, other than a limited $3 million amortization payment paid on or around March 31, 2023, no other payments have been made on the accelerated Term Loans.  *Id.* ¶ 10.  GLAS made subsequent demands for payment on June 7, 2023, November 21, 2023, December 6, 2023, and January 16, 2024, but to no avail.  *Id.* ¶ 9.  Today, approximately $1.5 billion in aggregate principal, interest, and premiums (not including outstanding fees) are due and owing.  *Id.* ¶ 19.

**B.     The troubling findings of the Petitioning Creditors' investigation.**

14.     So that the Petitioning Creditors could monitor their significant investment, the Credit Agreement imposes on T&L, on behalf of itself and the guarantors, various information-sharing covenants. *Id.* ¶¶ 15-16.  T&L, among other information, must furnish quarterly financial statements and host quarterly financial performance telephonic calls.  *Id.*  Moreover, GLAS is entitled to conduct an on-site inspection of the books and records of T&L and certain of its subsidiaries, including the Alleged Debtors, and discuss each entity's "affairs, finances and

conditions with its officers and independent accountants." *Id.* ¶ 15. However, shortly after the Lenders exercised remedies in March 2023, T&L ceased **all** information sharing and improperly refused GLAS's repeated information requests, *id.* ¶¶ 9-10, 15-17, in violation of the Credit Agreement, which requires ongoing performance notwithstanding default and acceleration. *See, e.g.*, Credit Agreement § 10.5 (attached as Ex. 1 to Goldstein Decl.) ("[a]ll covenants . . . shall continue in full force and effect as long as the principal of or any accrued interest on any Term Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid").

15.     With T&L and the Alleged Debtors on an information lockdown, the Petitioning Creditors have undertaken an extensive investigation into the Alleged Debtors. GLAS's investigator and his team have, among other steps, (a) interviewed over 20 of the Alleged Debtors' former employees, one of whom shared copies of Epic's bank statements, (b) pulled public records about the Alleged Debtors, including lawsuits filed against them, and (c) visited each Alleged Debtor's principal place of business (as listed in state filings). Ex. C, Gallo Decl. ¶ 4. The results are disturbing. The Petitioning Creditors have legitimate concerns that T&L is effectively winding down the Alleged Debtors' operations and/or transferring their assets away from guarantors.

16.     *First*, the Petitioning Creditors received certain Epic bank statements for periods of time in January and March 2024 from a former Epic manager, with the manager also providing information about additional transfers. *Id.* ¶¶ 14-15. These bank statements show that Epic, after receiving funds seemingly related to ordinary-course business operations, ultimately zeroes out its balance every night as part of an apparent "cash sweep redemption." *See* Compilation of Epic Bank Statements (attached as Ex. 5 to Gallo Decl.). And, these bank statements reflect repeated large transfers to other T&L subsidiaries for no apparent business purpose. *See id.* In the approximately one-month time period for which the Petitioning Creditors have detailed bank

statements, there were 24 separate transfers to other T&L subsidiaries in the aggregate amount of

$7,353,980.29. *See id.* Specifically:

| Date | Transfer Amount | Recipient |
| --- | --- | --- |
| Feb. 2, 2024 | $490,000.00 | BYJU's Beta, Inc. |
| Feb. 2, 2024 | $500,000.00 | BYJU's Beta, Inc. |
| Feb. 5, 2024 | $490,000.00 | BYJU's Beta, Inc. |
| Feb. 5, 2024 | $495,000.00 | BYJU's Beta, Inc. |
| Feb. 5, 2024 | $499,000.00 | BYJU's Beta, Inc. |
| Feb. 5, 2024 | $500,000.00 | BYJU's Beta, Inc. |
| Feb. 6, 2024 | $497,000.00 | BYJU's Beta, Inc. |
| Feb. 6, 2024 | $498,000.00 | BYJU's Beta, Inc. |
| Feb. 6, 2024 | $499,000.00 | BYJU's Beta, Inc. |
| Feb. 6, 2024 | $500,000.00 | BYJU's Beta, Inc. |
| Feb. 7, 2024 | $499,000.00 | BYJU's Beta, Inc. |
| Feb. 7, 2024 | $500,000.00 | BYJU's Beta, Inc. |
| Feb. 12, 2024 | $53,000.00 | Whitehat Education Technology LLC |
| Feb. 12, 2024 | $53,000.00 | Whitehat Education Technology LLC |
| Feb. 12, 2024 | $130,000.00 | Tangible Play, Inc. |
| Feb. 13, 2024 | $62,000.00 | Whitehat Education Technology LLC |
| Feb. 16, 2024 | $25,000.00 | Whitehat Education Technology LLC |
| Feb. 16, 2024 | $75,000.00 | Whitehat Education Technology LLC |
| Feb. 22, 2024 | $8,980.29 | Tangible Play, Inc. |
| Feb. 22, 2024 | $500,000.00 | Tangible Play, Inc. |
| Feb. 28, 2024 | $150,000.00 | Whitehat Education Technology LLC |
| Feb. 29, 2024 | $30,000.00 | Whitehat Education Technology LLC |
| Mar. 4, 2024 | $150,000.00 | Tangible Play, Inc. |
| Mar. 4, 2024 | $150,000.00 | Tangible Play, Inc. |

17.    Other than Tangible Play, the aforementioned recipients are not guarantors of the

Term Loans. *See* Ex. B, Goldstein Decl. ¶ 6. Upon information and belief, BYJU's Beta is a non-

operating subsidiary, making the millions of dollars of transfers to it that much more concerning.

18.    Additionally, the Petitioning Creditors learned of another 21 transfers totaling

$2,659,600.00 from the same former manager of Epic:

| Date | Transfer Amount | Recipient |
| --- | --- | --- |
| Jan. 3, 2024 | $10,000.00 | Whitehat Education Technology LLC |
| Jan. 4, 2024 | $400,000.00 | Tangible Play, Inc. |
| Jan. 4, 2024 | $500,000.00 | Tangible Play, Inc. |
| Jan. 5, 2024 | $500,000.00 | BYJU's Beta, Inc. |
| Jan. 12, 2024 | $25,000.00 | Whitehat Education Technology LLC |

| Date | Transfer Amount | Recipient |
|------|-----------------|-----------|
| Jan. 17, 2024 | $55,000.00 | Whitehat Education Technology LLC |
| Jan. 25, 2024 | $250,000.00 | BYJU's Beta, Inc. |
| Mar. 12, 2024 | $20,000.00 | Tangible Play, Inc. |
| Mar. 18, 2024 | $40,000.00 | Whitehat Education Technology LLC |
| Mar. 18, 2024 | $50,000.00 | Whitehat Education Technology LLC |
| Mar. 18, 2024 | $140,000.00 | Whitehat Education Technology LLC |
| Mar. 19, 2024 | $250,000.00 | Tangible Play, Inc. |
| Mar. 22, 2024 | $40,000.00 | Whitehat Education Technology LLC |
| Mar. 25, 2024 | $40,100.00 | Whitehat Education Technology LLC |
| Mar. 25, 2024 | $100,000.00 | BYJU's Beta, Inc. |
| Mar. 25, 2024 | $25,000.00 | Tangible Play, Inc. |
| Mar. 27, 2024 | $60,000.00 | Tangible Play, Inc. |
| Mar. 28, 2024 | $20,000.00 | Tangible Play, Inc. |
| Mar. 28, 2024 | $40,000.00 | Whitehat Education Technology LLC |
| Mar. 29, 2024 | $27,500.00 | Whitehat Education Technology LLC |
| Mar. 29, 2024 | $67,000.00 | Tangible Play, Inc. |

*See* Compilation of Epic Bank Statements at 2-3.

19.     *Second*, as detailed above, there has been mounting litigation against the Alleged Debtors for their failure to pay their debts as they come due, reflecting both their perilous financial condition and an abandonment of T&L's and Raveendran's support, especially since the Alleged Debtors are not even appearing to lodge defenses in many of these lawsuits.  *See* Ex. D.

20.    *Third*, the Alleged Debtors' principal places of business are apparently vacant. Epic's principal place of business at 702 Marshall Street, Suite 280 in Redwood City, California was closed, and the office directory did not list Epic as a tenant.



21.    On February 5, 2024, Neuron Fuel terminated its registration as an out-of-state entity doing business in the State of California.  Ex. C, Gallo Decl. ¶ 11.  Before then, its principal place of business was listed at 650B Fremont Avenue, 330 in Los Altos, California.  *See id.*  That is a strip mall, and unit 650B is a UPS Store, which has a mailbox #330, presumably belonging to (or once belonging to) Neuron Fuel.  *Id.* ¶ 10.



22.     As noted, Tangible Play was evicted from its Page Mill Road, Palo Alto address in March 2023.  Tangible Play now lists its principal place of business at 228 Hamilton Avenue, Floor 3 in Palo Alto, California.[4]  *Id.* ¶ 13.  228 Hamilton is a three-story corporate office building, but Tangible Play is not listed on the business directory and there were no readily-available markings or signage for Tangible Play (or Epic) anywhere in the building.  It appears that this address is just used as a "mail drop," not for actual work.  *Id.* ¶ 8.

   

23.     Even setting aside the investigation findings, as the Court has seen from BYJU's Alpha's chapter 11 case,[5] the Alleged Debtors' ultimate corporate parent, T&L, and governor Byju Raveendran have a history of unlawfully and fraudulently transferring assets away its subsidiaries' assets to frustrate the Petitioning Creditors' exercise of remedies.  *See generally In re BYJU's Alpha, Inc.*, 2024 WL 1455586 (Bankr. D. Del. Apr. 3, 2024).  If T&L was willing to conceal $533 million, and continue moving that money during the pendency of litigation in this Court, there is no reason to believe it will not also move the Alleged Debtors' assets in response to the Petitioning Creditors' involuntary petitions.

---

[4]     Epic's website also lists "228 Hamilton Avenue, floor 3" as an address.  *Id.* ¶ 8.
[5]     *In re BYJU's Alpha, Inc.*, Case No. 24-10140-JTD (Bankr. D. Del.).

## BASIS FOR RELIEF REQUESTED

24.    This is a textbook case in which relief under Sections 105(a) and 303(f) of the Bankruptcy Code is warranted.  The Petitioning Creditors request that the Court surgically restrict the Alleged Debtors' use of estate assets—the Petitioning Creditors' loan collateral, *see* Ex. B, Goldstein Decl. ¶ 5—to prevent the Alleged Debtors from unlawfully dissipating their assets, thereby preserving the value of the estate during the Gap Period and subsequent administration of a chapter 11 bankruptcy without disrupting ordinary-course business operations.

**I.    SECTION 303(f) EMPOWERS THE COURT TO LIMIT THE ALLEGED DEBTORS' UNLAWFUL DISPOSITION OF ASSETS DURING THE GAP PERIOD.**

25.    Under 11 U.S.C. § 303(f), the Alleged Debtors may continue to dispose of their assets, *except* "to the extent that the court orders otherwise":

> Notwithstanding section 363 of this title, **except to the extent that the court orders otherwise**, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

11 U.S.C. § 303(f) (emphasis added).

26.    Additionally, under 11 U.S.C. § 105(a), the Court may "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

27.    Together, Sections 105(a) and 303(f) provide a critical protection to creditors during the Gap Period.  Congress specifically empowered bankruptcy courts, *in their discretion*,[6]

---

[6]    There does not appear to be any reported decision interpreting "except to the extent that the court orders otherwise" from Section 303(f).  However, near-identical language used elsewhere under the Bankruptcy Code is instructive.  *See In re Hechinger Inv. Co. of Delaware, Inc.*, 335 F.3d 243, 253 (3d Cir. 2003) (cleaned-up) ("It is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.").  Such language has been interpreted as affording bankruptcy courts discretion in how they choose to administer the case. *See, e.g.*, *In re Acosta–*321 Rivera*, 557 F.3d 8, 11-12 (1st Cir. 2009) (finding that the "unless the court orders otherwise" language of 11 U.S.C. § 524(a)(1)(B) gives a bankruptcy court "discretion" to enter an order excusing nondisclosure of financial information after the time for filing the required

to restrict a debtor's disposition of assets when it "may attempt to abscond with assets, dispose of them at less than their fair market value, or dismantle [its] business, all to the detriment of . . . creditors," as here.  H.R. Rep. 95-595, 95th Cong., 1st. Sess. 303, 6279 (1977); Senate Rep. No. 95-989, 95th Cong., 2d Sess. 33 (1978); *see generally In re Wilson*, 62 B.R. 43, 46 (E.D. Tenn. 1985) ("Section 303(f) permits the Bankruptcy Court to stay any business transactions it fears will jeopardize the rights of creditors[.]"); 2 COLLIER ON BANKRUPTCY ¶ 303.23[1] (16th ed. 2024) ("[I]f the debtor is acting in a manner that suggests that the assets of the estate will be disposed of to the detriment of creditors, the court can limit the debtor's powers under section 303(f) as that subsection contemplates that the court can 'order otherwise.'").

28.     In applying that discretion, Section 303(f) requires "a balancing of the interests of the . . . debtor with those of creditors."  *Matter of Beaucrest Realty Assocs.*, 4 B.R. 164, 165 (Bankr. E.D.N.Y. 1980).  As such, courts routinely limit the debtor's ability to use its assets outside of the ordinary course of business, including making transfers to insiders.  *See, e.g.*, *In re Acis Cap. Mgmt., L.P.*, 584 B.R. 115, 118 n.2 (Bankr. N.D. Tex. 2018) (approving emergency Section 303(f) order imposing those restrictions permitted under Section 363 due to evidence of fraudulent transfers); **Ex. E** at 2, *In re Nassau Broadcasting I, LLC*, Case No. 11-12931 (KG) (Bankr. D. Del. Oct. 6, 2011) (ordering that "the Alleged Debtors are prohibited during the remainder of the Gap Period from making: (i) any transfers to or for the benefit of the Alleged Debtors' officers, directors and shareholders outside of the ordinary course of their business"); *In re C.W. Mining Co.*, 2008 WL 3539795, *4 (Bankr. D. Utah Aug. 7, 2008) (ordering that "pursuant to § 303(f) . . .

---

information has expired); *In re DeGroot*, 484 B.R. 311, 320 (B.A.P. 6th Cir. 2012) (in interpreting 11 U.S.C. § 554, finding that the phrase "unless the court orders otherwise" "appears throughout the Bankruptcy Code," and that courts have held that the language "grants a bankruptcy court discretion"); *In re Singer*, 368 B.R. 435, 444 (Bankr. E.D. Pa. 2007) (finding that the "unless the court orders otherwise" language in 11 U.S.C. § 1326(a)(1) grants bankruptcy courts discretion to excuse adequate protection payments "in appropriate circumstances").

any use, transfer, or disposition of any of the Debtor's assets outside the ordinary course of the Debtor's business is subject to the provisions of § 363 of the Bankruptcy Code"); *In re Rush*, 7 B.R. 579, 580 (Bankr. N.D. Ala. 1980) ("the debtor should be enjoined from committing waste of the estate or causing a loss to or of the property of the estate through negligence or indifference or bad faith on his part, all as a condition to the debtor's continuing to operate his business and to use, acquire, or dispose of property, pursuant to Section 303(f)").

## II.   BASED ON A BALANCING OF INTERESTS, THE ALLEGED DEBTORS SHOULD BE BARRED FROM TRANSFERRING ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS DURING THE GAP PERIOD.

### A.   The Alleged Debtors and their managers have a disturbing history of improper fraudulent transfers.

29.    The facts here clearly necessitate the relief requested in this Motion.  The evidence shows that the Alleged Debtors are grossly insolvent.  *See* Factual Background § B, *supra*.  And, the reasonable inference from their and their corporate parent's conduct, much of which has been improperly concealed from the Petitioning Creditors, is that T&L is siphoning funds from the Alleged Debtors and possibly also winding down their business operations in the United States.  Otherwise, the Alleged Debtors presumably would be paying their employees, landlords, vendors, and lenders, or, at a minimum, defending themselves against mounting litigation.  Instead, one Alleged Debtor lost its former headquarters to foreclosure due to unpaid rent without even appearing to defend itself, another defaulted on more than $20 million in earnout payments to its three founders, and all three Alleged Debtors are failing to pay their creditors.

30.    The Petitioning Creditors' concerns here are palpable.  This would not be the first time that T&L pillaged one of its U.S. subsidiaries in an attempt to hide assets, especially in the face of these Petitioning Creditors exercising remedies.  *See, e.g.*, *BYJU's Alpha*, 2024 WL 1455586, at *1-2, *9 (outlining the brazen concealment of $533 million of BYJU's Alpha's assets).

31.     Moreover, bank records establish that, in recent months, at least one of the Alleged Debtors, Epic, has been transferring a significant amount of money to affiliates for no reported consideration in return and for no readily apparent business purpose.  As detailed above, earlier this year there were over $10 million in transfers to three sister companies.  *See* Epic Bank Statements; Ex. C, Gallo Decl. ¶ 14.  The true motivation behind these transfers appears to be to facilitate the movement of funds away from the Lenders' guarantors to frustrate the Lenders' recoveries.

32.     Finally, if T&L had nothing to hide then it would have been transparent with the Alleged Debtors' financial affairs.  But, following the Petitioning Creditors' exercise of remedies in March 2023, T&L stopped complying with its required information-sharing obligations under the Credit Agreement, in breach thereof, including refusing to provide financial statements about it and its subsidiaries.  Ex. B, Goldstein Decl. ¶ 14.  Despite being obligated to furnish quarterly financial statements, the last set of financial statements provided is over a year stale—as of December 31, 2022.  *Id.* ¶ 13.  Worse still, despite GLAS's diligent efforts, T&L has improperly refused all of GLAS's requests for information and to conduct an on-site books and records inspection of each of the Alleged Debtors.  *Id.* ¶ 15.  The information the Petitioning Creditors have uncovered from their investigation explains why T&L and the Alleged Debtors are refusing to be transparent and explain their conduct:  they are hiding additional fraudulent transfers.  *See In re PRS Ins. Group, Inc.*, 274 B.R. 381, 387 (Bankr. D. Del. 2001) ("The Debtor's inability to explain the diversion of assets is evidence, at a minimum, of its incompetence or gross mismanagement and, at the most, evidence of actual fraud.").

**B.     The requested relief imposes no undue burden on the Alleged Debtors.**

33.     The Petitioning Creditors' requested relief is limited, narrowly tailored, and designed only to prevent obviously inappropriate use of assets of the Alleged Debtors' estates.

The requested restrictions will in no way adversely affect the Alleged Debtors' ordinary course business operations or prejudice any party in interest. Indeed, the Petitioning Creditors have not sought to appoint a Section 1104(a) trustee at this time, nor use GLAS's and the Lenders' cash collateral to run their businesses. The restrictions sought herein are reasonable, appropriate, and entirely consistent with the goals that Section 303(f) of the Bankruptcy Code is designed to promote.

34.      Simply, the Petitioning Creditors are merely seeking assurance that the Alleged Debtors are using their assets for ordinary course business operations and not for any other purpose. This narrowly-tailored requested relief is certainly warranted and should not be controversial.

**NOTICE**

35.      The Petitioning Creditors will provide notice of this Motion via overnight mail and email (if known) to the Office of the United States Trustee for the District of Delaware. Additionally, the Petitioning Creditors will serve a copy of this Motion via first class mail, postage prepaid, and certified mail, return receipt requested, to each of the Alleged Debtors together with service of the petitions in accordance with Bankruptcy Rules 1010 and 7004.[7] Moreover, the Petitioning Creditors will provide notice of this Motion by email to counsel of record for each of the Debtors in the BYJU's Alpha bankruptcy case. In light of the nature of the relief requested, the Petitioning Creditors submit that no other or further notice need be given.

---

[7] The Petitioning Creditors will serve a copy of this Motion along with a copy of the respective involuntary petition via (i) first class mail, postage prepaid, upon an authorized officer of each Alleged Debtor at the main address identified in such Alleged Debtor's involuntary petition and (ii) first class mail, postage prepaid, and certified mail, return receipt requested, upon each Alleged Debtor's respective registered agent.

WHEREFORE the Petitioning Creditors respectfully request that the Court grant the relief requested herein, enter the Proposed Order attached hereto as **Exhibit A**, and grant such other and further relief as it deems just and proper.

Dated: June 5, 2024
Wilmington, Delaware

/s/ Laura Davis Jones
**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:   (302) 652-4100
Email:        ljones@pszjlaw.com
                 pkeane@pszjlaw.com
- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash Jr., P.C. (*pro hac vice* pending)
Richard U.S. Howell, P.C. (*pro hac vice* pending)
Ravi Subramanian Shankar (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
                 rhowell@kirkland.com
                 ravi.shankar@kirkland.com

-and-

Brian Schartz, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:    (212) 446-4900
Email:        brian.schartz@kirkland.com

-and-

/s/ G. David Dean
**COLE SCHOTZ P.C.**
G. David Dean (DE Bar No. 6403)
Justin R. Alberto (DE Bar No. 5126)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone:   (302) 652-3131
Facsimile:    (302) 652-3117
Email: ddean@coleschotz.com
          jalberto@coleschotz.com

-and-

Seth Van Aalten (*pro hac vice* pending)
Sarah Carnes (*pro hac vice* pending)
Bryant P. Churbuck (*pro hac vice* pending)
1325 Avenue of the Americas
19th Floor
New York, NY 10019
Telephone:   (212) 752-8000
Facsimile:    (212) 752-8393
Email: svanaalten@coleschotz.com
          scarnes@coleschotz.com
          bchurbuck@coleschotz.com

-and-

**CAHILL GORDON & REINDEL LLP**
Joel Moss (*pro hac vice* pending)
Richard A. Stieglitz Jr. (*pro hac vice* pending)
Sesi Garimella (*pro hac vice* pending)
Jordan Wishnew (*pro hac vice* pending)
32 Old Slip
New York, NY 10005
Telephone:   (212) 701-3000
Facsimile:    (212) 269-5420

**REED SMITH LLP**
David A. Pisciotta (*pro hac vice* pending)
Nicholas B. Vislocky (*pro hac vice* pending)
599 Lexington Avenue, 22nd Floor
New York, New York 10022
Telephone:     (212) 521-5400
Facsimile:     (212) 521-5450
Email:         dpisciotta@reedsmith.com
               nvislocky@reedsmith.com

*Counsel to GLAS Trust Company LLC*

Email:  jmoss@cahill.com
        rstieglitz@cahill.com
        sgarimella@cahill.com
        jwishnew@cahill.com

*Counsel to the Petitioning Lender Creditors*