IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EPIC! CREATIONS, INC., *et al.*,[1] | Case No. 24-11161 (JTD) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF JACOB GRALL IN SUPPORT
OF TRUSTEE'S POSTPETITION FINANCING MOTION**

I, Jacob Grall, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am a Managing Director in the Chicago office of Novo Advisors, a restructuring-focused consulting firm. My areas of expertise include liquidity and working capital management, financial planning, financial process improvement, and project management. With a technical expertise grounded in accounting, financial modeling, and corporate finance, I have helped numerous businesses achieve their operational and financial goals.

2. Prior to joining Novo Advisors, I worked as a taxation consultant at RSM US LLP across their private equity and not-for-profit practices. I hold a B.S. of Accounting from the University of Illinois and am a certified public accountant in Illinois and an active member of the local chapter of the Turnaround Management Association and Secured Finance Network.

3. Since September 23, 2024, Novo Advisors has served as the proposed financial advisor to Claudia Z. Springer, in her capacity as the duly appointed Chapter 11 Trustee (the "Trustee") of the estates (the "Estates") of Epic! Creations, Inc. ("Epic"), Neuron Fuel, Inc.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Epic! Creations, Inc. (9113); Neuron Fuel, Inc. (8758); and Tangible Play, Inc. (9331).

("Neuron Fuel"), and Tangible Play, Inc. ("Tangible Play," together with Epic and Neuron Fuel, collectively the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I personally have been the primary person (under the direction of the Trustee) responsible for overseeing the finances and operations of the Estates. Since the Trustee's appointment, I have been focused on working to stabilize the businesses and construct books and records.

4.    I submit this declaration (the "Declaration") in support of the *Trustee's Motion For Entry Of Interim And Final Orders (I) Authorizing the Use of Cash Collateral, (II) Authorizing the Trustee to Obtain Postpetition Financing, (III) Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(C) and 364(D) of the Bankruptcy Code, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* (the "Financing Motion").[2] I am familiar with the contents of the Financing Motion (including its exhibits) and the facts and circumstances surrounding the transactions contemplated therein. All facts and circumstances described in the Motion are true to the best of my knowledge and belief.

5.    Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge or my opinion based on my experience and the information available to me. Subject to the foregoing, if called upon to testify, I would testify competently to the facts set forth in this Declaration.

**Estates' Need for Postpetition Financing**

6.    I have worked closely with the Trustee's advisors to evaluate the Estates' cash requirements for their business and continued operation in these Chapter 11 Cases. In our evaluation of the Estates' liquidity position, we developed their short-term cash flow forecasts

---

[2] Unless otherwise defined, all capitalized terms used herein shall have the meaning ascribed to such terms in the Financing Motion.

based on the available financial information. These forecasts took into account anticipated cash receipts and disbursements during the projected period and considered a number of factors, including the effect of the chapter 11 filing on the operations of the business, professional fees, and required operational payments. These forecasts indicated that the Estates' businesses face significant shortfalls, and the capital necessary to navigate these Chapter 11 Cases.

7. In particular, as of the filing of this Declaration, the Estates only had a combined total of approximately $2 million in cash on hand and we anticipate that over the next five weeks, the Estates' net cash flows (including both operating losses and restructuring-related expenses) will be approximately negative $7.0 million, leaving a deficit of around $4.0 million over the next five weeks in the absence of post-petition financing.

8. Based on these forecasts and discussions with her financial advisors at Novo Advisors and the Debtors' employees, prepetition lenders, and other stakeholders, the Trustee determined that she would require access to post-petition funding to provide sufficient liquidity to effectuate a successful outcome in these Chapter 11 Cases. Among other things, the Trustee needs such liquidity to pay employees, pay administrative costs and expenses in these Chapter 11 Cases, and make any other payments that are essential or appropriate for the continued management, operation, and preservation of the Estates' businesses and assets.

9. In addition, the Trustee requires access to post-petition financing to fund the Estates' ordinary course working capital needs and capital expenditures. I, along with the Trustee, believe that her ability to continue making such payments as she navigates these Chapter 11 Cases is essential to the continued operation and the preservation of the Estates' businesses and assets during the pendency of these Chapter 11 Cases.

10. Prior to entry of the Final DIP Order, based on Novo Advisors' current forecasts, I estimate that the Estates will need to borrow approximately $5.0 million under the DIP Facility to, among other things, enable the Trustee to fund payroll for November 2024 and restore access to critical operating systems. I believe that the Estates will suffer irreparable harm if the Trustee is unable to access such funding on an interim basis.

### **Trustee' Efforts to Obtain Postpetition Financing**

11. In light of this determination, I, along with the Trustee and her other advisors, evaluated potential debtor-in-possession financing opportunities. In parallel to negotiating with the Debtors' prepetition lenders, Novo Advisors solicited other potential lenders. Ultimately, however, we were unable to find any third-party lender willing to provide post-petition financing on terms more favorable than the Debtors' prepetition lenders, who refuse to consent to the priming of their existing liens and the Trustee has no means to provide them with the adequate protection necessary to grant non-consensual priming liens to a third-party lender.

12. After receiving an initial term sheet from the proposed DIP Lenders, the Trustee and I, along with her other advisors, continued to engage with the DIP Lenders for post-petition financing to obtain better terms than their initial proposal. The resulting DIP Facility will enable the Debtors' businesses to continue operating while the Trustee pursues a going-concern sale or other successful outcome in these cases.

13. I have reviewed the terms, conditions, and the potential impact of the proposed post-petition financing. Further, I have worked with the rest of Trustee's advisory team to evaluate the Estates' postpetition financing needs and to develop, negotiate and ultimately finalize the proposed DIP Facility described in the Financing Motion. I believe that the DIP Facility provides

the best terms available to the Estates, and importantly provides much needed liquidity to allow the Debtors' businesses to continue operating as a going concern.

14. Based upon the Estates' liquidity needs and the lack of other postpetition financing proposals the Trustee received despite its solicitation efforts, I do not believe alternative sources of financing are available to the Debtor on better terms than the DIP Facility. I believe the lack of interest from potential alternative lenders is due in large part to the fact that the Trustee and her advisors currently have minimal access to the Debtors' books and records and therefore cannot readily facilitate the level of due diligence that potential third-party lenders require before entering into a transaction of this size and risk profile, particularly on a junior basis. I therefore do not believe that continuing to solicit potential alternative lenders is likely to yield another potential financing option, let alone on more favorable terms.

15. In my opinion, the DIP Facility provides the best available material terms, including with respect to the interest rate, fees and expenses, and permitted uses. Thus, I believe, the proposed DIP Facility will deliver positive value to the Estates by enabling the Trustee to continue operating their businesses as a going concern as she navigates these Chapter 11 Cases, pay its administrative costs and fees, and pursue a going-concern sale or other successful restructuring outcome.

### The Proposed DIP Facility is Reasonable

16. I believe that the DIP Facility provides the Estates with much-needed immediate access to liquidity. The amounts borrowed under the DIP Facility will be used to provide working capital for, and other general corporate purposes of, the Estates and pay administrative costs and expenses related to these Chapter 11 Cases.

17. Without the DIP Facility, I believe that the Debtor would be unable to operate their businesses as a going concern and successfully navigate the Chapter 11 Case. Additionally, following the absence of other proposals received and discussions with the Trustee and her advisors, I believe that the total cost of the DIP Facility, taking into account both its interest rate and associated fees, is consistent with the cost of recent postpetition credit facilities incurred by trustees and debtors-in-possession in comparable cases.

18. Accordingly, I believe that the Trustee's entry into the DIP Facility is the only viable option to provide the Estates with critical liquidity and working capital to allow the Trustee to achieve a successful outcome in these cases. I believe the DIP Facility is in the best interests of the Estates and all stakeholders.

## The DIP Facility and Use Of Cash Collateral Have Been Negotiated at Arm's Length and in Good Faith

19. The DIP Lenders and the Trustee exchanged multiple drafts of term sheets and postpetition financing documents with respect to the proposed facility. Based on my experience and knowledge of the market, I believe that the fees and expenses in the proposed DIP Facility are necessary under the circumstances. Further, based upon my observations and involvement in the negotiation of the DIP financing in this matter, I believe that the negotiations with the DIP Lenders were conducted at arm's length and in good faith and that the DIP Lenders would be unwilling to lend on terms other than those set forth in the DIP Facility.

20. I believe approval of the relief requested in the Financing Motion is in the best interests of the Estates and all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 29, 2024               */s/Jacob Grall*_____
                                      Jacob Grall