## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EPIC! CREATIONS, INC., *et al.*,[1] | Case No. 24-11161 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline: Jan. 21, 2025 at 4 p.m. E.T.**<br>**Hearing Date: Jan. 30, 2025 at 11:00 a.m. E.T.** |

### CHAPTER 11 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) SCHEDULING BID DEADLINES AND AUCTIONS, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (V) GRANTING RELATED RELIEF

Claudia Z. Springer, not individually but solely as chapter 11 trustee (the "Trustee") for the estates (the "Estates") of Epic! Creations, Inc. ("Epic"); Tangible Play, Inc. ("Tangible Play"); and Neuron Fuel, Inc. ("Neuron," together with Epic and Tangible Play, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), files this motion (the "Motion") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"); Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"), (i) approving bid procedures in connection with the sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets") substantially in the form attached to the Bid

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Epic! Creations, Inc. (9113); Neuron Fuel, Inc. (8758); and Tangible Play, Inc. (9331).

Procedures Order as <u>Exhibit 1</u> (the "<u>Bid Procedures</u>"), (ii) scheduling bid deadlines, auctions, and sale hearings with respect to the Sale of the Assets, (iii) approving the form and manner of notice thereof, (iv) approving procedures for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases, and (v) granting related relief. In support of this Motion, the Trustee, by and through her undersigned counsel, respectfully represents:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (this "<u>Court</u>") has jurisdiction to consider this Motion under 28 U.S.C. § 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N), and (O). To the extent that the Court lacks the constitutional authority to enter a judgment granting the relief requested herein, the Trustee consents to the Court's entry of a judgment. Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 363, and 365; Bankruptcy Rules 2002, 6004, 6006, 9006, and 9007; and Local Rules 2002-1 and 6004-1.

## BACKGROUND

3.      The Debtors are three formerly unaffiliated U.S.-based education technology companies that develop and distribute three separate lines of educational products. Between 2019 and 2021, T&L, an Indian corporation founded by Byju Raveendran in 2011 with a stated purpose of providing accessible education technology, acquired each Debtor.

4.      On November 24, 2021, the Debtors' former affiliate, BYJU's Alpha, Inc., as borrower, and GLAS Trust Company LLC, as administrative and collateral agent, and certain lenders, closed on a $1.2 billion term loan facility under that certain Credit and Guaranty

Agreement dated as of November 24, 2021 (the "Credit Agreement"). Among others, T&L and each Debtor guaranteed BYJU's Alpha, Inc.'s obligations under the Credit Agreement.

5.      In January 2022, T&L was briefly lauded as India's most valuable start-up. It acquired the Debtors and at least fourteen other emerging education-related businesses for more than $3 billion. However, by October 2022, T&L had defaulted on its respective obligations as a guarantor under the Credit Agreement and has been embroiled in protracted disputes with the Prepetition Lenders (as defined below) and other creditors around the world ever since. In July 2024, T&L was placed into involuntary insolvency proceedings in India and an interim resolution professional was appointed to manage T&L's assets and businesses.

6.      On June 4 and 5, 2024 (the "Petition Date"), GLAS Trust Company LLC, in its capacity as administrative and collateral agent under the Credit Agreement, and certain lenders under the Credit Agreement (the "Prepetition Lenders") filed an involuntary chapter 11 petition against each Debtor. [D.I. 1]. Further factual background regarding the Debtors, including their business operations and the events leading to the commencement of these Chapter 11 Cases, is set forth in detail in the *Declaration of Claudia Z. Springer in Support of First Day Motions* [D.I. 193] (the "First Day Declaration"),[2] which is fully incorporated into this Motion by reference.

7.      On June 27, 2024, this Court entered an order directing joint administration of the Debtors' cases for procedural purposes. [D.I. 61].

8.      On September 16, 2024 (the "Order for Relief Date"), this Court entered an order for relief in the Debtors' involuntary chapter 11 cases and directed the appointment of a chapter 11 trustee. [D.I. 147].

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

9.  On September 23, 2024, the United States Trustee for Region 3 duly appointed Claudia Z. Springer as chapter 11 trustee of each Debtor, subject to approval by the Court. [D.I. 152].

10.  On October 7, 2024, this Court entered an order approving the appointment of the Trustee. [D.I. 180].

11.  On October 31, 2024, the Court entered its *Interim Order (I) Authorizing the Use of Cash Collateral, (II) Authorizing the Chapter 11 Trustee on Behalf of the Debtors' Estates to Obtain Postpetition Financing, (III) Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Section 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [D.I. 236] (the "DIP Financing Order"). The DIP Financing Order requires the Trustee to conduct an auction process and close sales of substantially all of the Debtors' assets by certain milestones, which milestones have been extended by agreement of the DIP Secured Parties to be consistent with the sale dates set forth herein.

12.  As described more fully herein, the Trustee has determined, in consultation with her advisors and the Prepetition Lenders, that the Sale of the Debtors' Assets is the best available method for maximizing the value of those Assets for the benefit of the Estates and all stakeholders. Accordingly, the Trustee intends to commence a marketing process to identify potential purchasers for the Assets.

13.  On November 19, 2024, the Trustee engaged Moelis & Company LLC ("Moelis") to act as the Trustee's investment banker in connection with the Sale of the Epic Assets, subject to approval by this Court.

14.     Also on November 19, 2024, the Trustee engaged SC&H Group ("SC&H") to act

as the Trustee's investment banker in connection with the Sale of the Tangible Play Assets and the

Neuron Assets, subject to approval by this Court.

## RELIEF REQUESTED

15.     To facilitate the marketing process and Sale of the Assets, the Trustee seeks entry

of the Bid Procedures Order in substantially the form attached hereto as **Exhibit A**:

(a)     authorizing and approving the Bid Procedures attached to the Bid
Procedures Order as Exhibit 1 in connection with the Sale of the Assets;

(b)     scheduling the auction ("Auction") and sale hearing ("Sale Hearing") with
respect to the Sale of the Assets;

(c)     approving the form and manner of notice of the Auction and Sale Hearing,
a copy of which is attached to the Bid Procedures Order as Exhibit 2 (the
"Sale Notice");

(d)     authorizing the Trustee in her discretion and in consultation with and with
the consent of the Consultation Parties (as defined below)[3], to (i) select one
or more bidders to act as stalking horse bidders (each, a "Stalking Horse
Bidder") and enter into a purchase agreement with such Stalking Horse
Bidder (each such agreement, a "Stalking Horse Agreement") and (ii) in
connection with any Stalking Horse Agreement, to provide a break-up fee
(the "Break-up Fee") and/or an expense reimbursement of the reasonable
and documented third-party fees and expenses incurred by the Stalking
Horse Bidder(s) in connection with the transactions contemplated by the
Stalking Horse Agreement (the "Expense Reimbursement" and, together
with the Break-up Fee, the "Bid Protections"), which Bid Protections shall
collectively not exceed a total of three percent (3%) of the cash purchase
price contemplated by the Stalking Horse Agreement, to the extent the
Trustee determines, in consultation with and with the consent of the
Consultation Parties, that provision of such Bid Protections would be an
actual and necessary cost of preserving the value of the Estates;

---

[3]     "Consultation Parties" means the DIP Secured Parties (as defined in the DIP Financing Order); *provided*,
*however*, that during any period in which any of the DIP Secured Parties is a Stalking Horse Bidder or
Qualified Bidder and solely for so long as such Bid remains a Qualified Bid and is not disqualified or
withdrawn, such DIP Secured Party shall not be considered a Consultation Party with respect to the evaluation
and qualification of competing Bids for the Assets included in such Bid, or with respect to seeking and/or
obtaining information about other Bids, but shall remain a Consultation Party for other purposes set forth in
the Bid Procedures and the Bid Procedures Order.

(e)     approving an overbid amount of $2,000,000 for the Epic assets, and 5% greater (initial bid) and 2% greater (subsequent bids) for the Tangible Play Assets, and 5% greater (initial bid) and 2% greater (subsequent bids) for Neuron Assets;

(f)     approving procedures for the assumption and assignment (as set forth in the Bid Procedures Order, the "<u>Assignment Procedures</u>") of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "<u>Assigned Contracts</u>") and approving the form and manner of notice thereof, a copy of which is attached to the Bid Procedures as <u>Exhibit 3</u> (the "<u>Assignment Notice</u>"); and

(g)     granting related relief.

16.     The Trustee also intends to seek entry of one or more Sale Order(s) at the Sale Hearing providing for the following relief:

(a)     if an Auction is conducted, authorizing and approving the sale of the Assets to the Qualified Bidder (as defined in the Bid Procedures) that the Trustee in consultation with the Consultation Parties determines has made the highest and best Qualified Bid (as defined in the Bid Procedures) for some or all of the Assets (the "<u>Successful Bidder</u>") (or, if the Successful Bidder fails to consummate the Sale, to the Qualified Bidder with the next-highest or second-best Qualified Bid at the Auction for the Assets (the "<u>Backup Bidder</u>")), free and clear of all liens, claims, encumbrances, and other interests other than the Permitted Liens and the Assumed Liabilities;

(b)     if an Auction is not conducted, authorizing and approving the Sale of the Assets to the relevant Qualified Bidder free and clear of liens, claims, encumbrances, and other interests, other than the Permitted Liens and the Assumed Liabilities;

(c)     authorizing the assumption and assignment of the Assumed Contracts; and

(d)     granting any related relief.

## SUMMARY OF KEY DATES AND DEADLINES

17.     The Trustee believes that a prompt sale of the Assets through a competitive sale process represents the best option available to maximize value for all stakeholders in these Chapter 11 Cases. As described in further detail in the First Day Declaration and subsequent filings, the Trustee has been undertaking steps to stabilize the Debtors' businesses and is focused on pursuing a value-maximizing path through one or more sale transactions that should allow the

Debtors' businesses to emerge from these Chapter 11 Cases and continue operating under new ownership.

18.     Specifically, through this Motion, the Trustee respectfully requests that this Court approve the following sale timeline for the assets of each of Epic (the "Epic Assets"), Tangible Play (the "Tangible Play Assets") and Neuron (the "Neuron Assets"):

(a)     ***Preliminary Bid Deadline***: On or before **February 14, 2025, at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Trustee in consultation with the Consultation Parties (the "Preliminary Bid Deadline"), each potential Bidder shall submit an indication of interest ("IOI") in writing to the Bid Recipients.

(b)     ***Stalking Horse Notification Deadline***: No later than **February 28, 2025**, the Trustee shall file a notice with the Court of (i) the selection of a Stalking Horse Bidder, if any, that includes a copy of an executed and binding Stalking Horse Agreement or (ii) that no Stalking Horse Bidder has been selected.

(c)     ***Assigned Contract Objection Deadline***: Objections to (i) the potential assumption and assignment of any executory contract or unexpired lease to the Successful Bidder and (ii) the proposed cure amount to be paid in connection with the assumption and assignment of any executory contract or unexpired lease shall be filed and served no later than fourteen (14) days after the service of the Assignment Notice (the "Assigned Contract Objection Deadline"); *provided* that, to the extent any Assigned Contract counterparty ("Assigned Contract Counterparty") is added to the Assignment Notice after the initial notice is served, such new Assigned Contract Counterparty shall have ten (10) days from the date of service of the supplemental notice to object to the proposed cure amount and assignment to the Successful Bidder.

(d)     ***Bid Deadline***: Binding, irrevocable bids, including the deposit and other requirements for a bid to be considered a Qualified Bid, must be received no later than **March 21, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"), or such later date as may be agreed to by the Trustee in the exercise of her reasonable business judgment after consultation with the Consultation Parties.

(e)     ***Auction***: The Auction, if necessary, shall be held on **March 25, 2025, at 10:00 a.m. (prevailing Eastern Time)**, at Jenner & Block, 353 North Clark Street, Chicago, Illinois, 60654, or such later time or other place as the Trustee determines, after consultation with the Consultation Parties, in which case the Trustee shall timely notify the Stalking Horse Bidder (if

any), the Qualified Credit Bidder (if any), and all other Qualified Bidders of such later time or other place, and file a notice of this change on the Court's docket for these Chapter 11 Cases.

(f) ***Post-Auction Notice Deadline***: As soon as reasonably practicable after closing the Auction, if any, and in any event not more than 24 hours after closing the Auction, the Trustee shall file and serve a notice identifying the Successful Bidder and the Back-Up Bidder (the "<u>Post-Auction Notice</u>").

(g) ***Post-Auction Objection Deadline***: The deadline to object to the Sale (such objection, a "<u>Post-Auction Objection</u>") shall be 2 business days following service of the Post-Auction Notice (the "<u>Post-Auction Objection Deadline</u>").

(h) ***Sale Hearing***: The Court shall hold a hearing to approve the Successful Bid on **April 1, 2025, at 10:00 a.m. (prevailing Eastern Time)**.

(i) ***Sale Closing***: The Sale shall be closed on or before **April 16, 2025**.

19.     The Trustee believes that this timeline allows her sufficient runway to close the Sales and comply with the timeline contemplated in the DIP Financing Order, as modified by agreement between the Trustee and the DIP Secured Parties. The proposed timeline will enable the Trustee to complete an open and robust sale process of all of the Assets and will afford the Trustee the best opportunity available under the circumstances to maximize the value received for the Assets.

20.     The marketing and bidding process contemplated herein are supported by the Prepetition Lenders and the DIP Lenders and provide for flexibility with respect to the structure of any transaction. In particular, the Bid Procedures preserve for the Trustee the ability to designate a Stalking Horse Bidder.

21.     If the Trustee selects a Stalking Horse Bidder in accordance with the Bid Procedures, the Trustee will, within two (2) business days, file with the Court and cause to be published on the case website a notice that contains information about the Stalking Horse Bidder, including the identity of the Stalking Horse Bidder, key terms of the Stalking Horse Bidder's bid

(the "Stalking Horse Bid"), and the proposed Stalking Horse Agreement. If the Stalking Horse Agreement satisfies the following conditions—(a) the Break-Up Fee and the Expense Reimbursement do not collectively exceed three (3%) of the cash purchase price and (b) the Stalking Horse Bidder is not an insider (as defined in section 101(31) of the Bankruptcy Code)— the Trustee may submit an order under certification of counsel approving the designation of the Stalking Horse Bidder and Stalking Horse Agreement as a stalking horse without the need for further hearing. If a Stalking Horse Bidder and Stalking Horse Agreement are designated but do not satisfy each of the conditions (a) through (b) in the prior sentence, and if an objection is filed to the Stalking Horse Bid with the Court and served on the Trustee and the Consultation Parties within seven (7) days of the filing of the Stalking Horse Bid notice, this Court shall hold a hearing to consider approval of the designation of the Stalking Horse Bidder and Stalking Horse Agreement as a stalking horse; *provided, however*, that if no objection is filed with the Court and served on the Trustee and the Consultation Parties within seven (7) days of the filing of the Stalking Horse Bid notice, the Trustee may submit an order under certification of counsel approving the designation of the Stalking Horse Bidder and Stalking Horse Agreement as a stalking horse without the need for further hearing.

22.    Having the flexibility to designate a Stalking Horse Bidder and provide Bid Protections will provide the Trustee with best opportunity available under the circumstances to encourage competition but, at the same time, secure a committed bid that sets a valuation floor. Given the Trustee's need to maximize value for creditors and other stakeholders through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bidder and offer Bid Protections to such bidder (although the Trustee ultimately may, in the exercise of her reasonable business judgment and in consultation with the Consultation Parties, not designate a

Stalking Horse Bidder at all) is a reasonable and sound exercise of the Trustee's business judgment and provides an actual benefit to the Estates.

23.     Accordingly, the Trustee believes the relief requested by this Motion is in the best interests of the Estates, the Debtors' creditors, other stakeholders, and all other parties in interest, and should be approved.

## PROPOSED BID PROCEDURES

I.     **The Bid Procedures and Auction Process.**

24.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Trustee has developed and proposed the Bid Procedures, attached as Exhibit 1 to the Bid Procedures Order. The Trustee designed the Bid Procedures to promote participation and active bidding, and to increase the likelihood that the Trustee receives the highest or otherwise best offer for the Assets. As such, the Trustee believes the timeline for consummating the Sale processes established pursuant to the Bid Procedures is in the best interest of the Estates and all parties in interest.

25.     The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, the criteria for selecting a successful bidder and the non-exhaustive procedures for conducting an auction if timely Qualified Bids are received.

26.     The following summary describes the salient points of the Bid Procedures and discloses certain information required pursuant to Local Rule 6004-1:[4]

---

[4]     This summary of the Bid Procedures is qualified in its entirety by the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order. All capitalized terms that are used in this summary, but not otherwise defined herein, shall have the meanings set forth in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

| Provision | Summary |
|---|---|
| **Provisions Governing Qualifications of Bidders (Local Bankr. R. 6004-1(c)(i)(A))** | On or before the Preliminary Bid Deadline, each potential Bidder shall submit an IOI in writing to the Bid Recipients (as defined herein). Each IOI submitted must specify (a) the Assets proposed to be acquired, (b) the amount and type of consideration to be offered for any Debtor Assets to be purchased**,** (c) any material conditions or assumptions upon which a bid by such party will be based, and (d) any other material terms to be included in a bid by such party. The Trustee reserves the right to exclude such party (prior to its submission of a Qualified Bid) from continuing in the Auction process if the Trustee determines, after consultation with the Consultation Parties, that the consideration proposed in such party's IOI is insufficient. |
| | The Trustee shall provide copies of all IOIs received as soon as reasonably practicable, but no later than one (1) business day after receipt thereof, to the advisors to the Consultation Parties. |
| | To receive due diligence information, including full access to the Trustee's electronic data room and additional non-public information regarding the Debtors, any party interested in submitting a bid (each a "<u>Potential Bidder</u>"), other than any Stalking Horse Bidder (if any), must deliver an executed confidentiality agreement ("<u>Acceptable Confidentiality Agreement</u>") by email to the Trustee's respective investment banker—for sale of the Epic Assets, Moelis & Company LLC, Attn: Nate Laverriere, Cullen Murphy, and Mayank Pagaria (nate.laverriere@moelis.com, cullen.murphy@moelis.com, and mayank.pagaria@moelis.com) for sale of the Tangible Play Assets and the Neuron Assets, SC&H Group, Attn: Ken Mann and Michael Gorman (kmann@schgroup.com and mgorman@schgroup.com)--with a copy to the Debtors' counsel, (a) Jenner & Block LLP, Attn: Catherine Steege (csteege@jenner.com), Melissa Root (mroot@jenner.com), and William Williams (wwilliams@jenner.com), and (b) Pashman Stein Walder Hayden, P.C., Attn: Henry J. Jaffe (hjaffe@pashmanstein.com), Joseph C. Barsalona II (jbarsalona@pashmanstein.com), and Alexis R. Gambale (agambale@pashmanstein.com) (collectively, the "<u>Bid Recipients</u>"). Notwithstanding the foregoing, the Trustee shall also grant access to the Data Room and the Diligence Materials to the advisors to the Consultation Parties. |
| | As soon as reasonably practicable after a Potential Bidder delivers an Acceptable Confidentiality Agreement to the Bid Recipients, the Potential Bidder may proceed to conduct due diligence and ultimately submit a Bid. All due diligence requests must be directed to Moelis for the sale of the Epic Assets and SC&H for the sale of the Tangible Play Assets and the Neuron Assets. The Trustee shall consult with the Consultation Parties prior to deeming any Potential Bidder a Qualified Bidder or not Qualified Bidder. |

| Provision | Summary |
|---|---|
| | The Trustee, with the assistance of her advisors, will coordinate all reasonable requests from Bidders for additional information and due diligence access. The Trustee may decline to provide such information to Bidders who, in the Trustee's reasonable business judgment, after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Bidder intends in good faith or has the capacity to consummate a sale transaction of all or substantially all of the Debtors' Epic, Tangible Play, and/or Neuron Assets (a "<u>Transaction</u>"). <br><br> The Trustee reserves the right to withhold any diligence materials that the Trustee determines are business-sensitive or otherwise inappropriate for disclosure to a Potential Bidder. <br><br> The Trustee will afford any Potential Bidder the time and opportunity to conduct reasonable due diligence before the Bid Deadline. No due diligence will continue after the Bid Deadline. <br><br> Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access by the Trustee or her advisors regarding such Potential Bidder and its contemplated Transaction. <br><br> *See* Bid Procedures § II.A. |
| **Good Faith Deposit (Local Rule 6004-1(b)(iv)(F))** | Each Bid must be accompanied by a cash deposit in the amount of 10% of the total cash component of the Purchase Price to be held in an escrow account to be identified and established by the Trustee (the "<u>Deposit</u>"). To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Qualified Bid, the Trustee reserves the right to require, after consultation with the Consultation Parties, that such Qualified Bidder increase its Deposit so that it equals 10% of the increased cash component of the Purchase Price. <br><br> No Deposit shall be required in connection with any Qualified Credit Bid. <br><br> *See* Bid Procedures § II.D(ix). |
| **Other Highlighted Terms Under Del. Bankr. L.R. 6004-1(b)(iv)** | <u>Private Sale/No Competitive Bidding</u>:  The Sale is being conducted pursuant to the competitive bidding process detailed in the Motion. <br><br> <u>Credit Bid</u>:  Any Qualified Bidder that has a valid and perfected lien on any assets of the Estates (a "<u>Secured Creditor</u>") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured. <br><br> *See* Bid Procedures § II.F. |

| Provision | Summary |
|---|---|
| | Relief from Bankruptcy Rule 6004(h) and 6006(d):  As noted in this Motion, the Trustee is requesting relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d). |
| **Provisions Governing Qualified Bids (Local Bankr. R. 6004-1(c)(i)(A), (B))** | To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "<u>Bid</u>") other than a Qualified Credit Bid or Stalking Horse Bid (each as defined below), if any, and each party submitting such a Bid (each, a "<u>Bidder</u>") other than a Qualified Credit Bidder or Stalking Horse Bidder (each as defined below), if any, must be determined by the Trustee, after consultation with the Consultation Parties, to satisfy each of the following conditions:<br><br>(i)   <u>Bid Deadline</u>. Binding, irrevocable bids, including the deposit and other requirements for a bid to be considered a Qualified Bid, must be received no later than **March 21, 2025, at 4:00 p.m. (prevailing Eastern Time)**, or such later date as may be agreed to by the Trustee in the exercise of her reasonable business judgment after consultation with the Consultation Parties.<br><br>(ii)   Bids must be sent to the Bid Recipients by the Bid Deadline to be considered.<br><br>(iii)   <u>Form and Contents</u>. All Bids shall be in the form of an irrevocable offer letter from a person or persons that the Trustee, in the exercise of her reasonable business judgment and in consultation with the Consultation Parties, deem financially able to consummate the purchase of the Assets, which letter states and includes:<br><br>(A)   <u>Marked Agreement</u>. Each Bid must state that the Bidder irrevocably offers to purchase some or all of the Assets upon the terms and conditions set forth in a duly executed non-contingent and attached complete asset purchase agreement, the form of which will be provided to any Potential Bidder prior to the Bid Deadline, prepared and executed by the Bidder (an electronic version in Word format and blacklined against the form agreement and, in the case of an Auction with a Stalking Horse Bidder, against the Stalking Horse Agreement), together with its exhibits and schedules, including terms relating to price and the time of closing (the "<u>Proposed Agreement</u>");<br><br>(B)   <u>Assets</u>. Each Bid must clearly specify the Assets that are included in the Bid;<br><br>(C)   <u>Bids for Portions of the Assets</u>. Each Bid must state whether the Bidder is offering to purchase all or substantially all of the Assets, any portion of the |

| Provision | Summary |
|---|---|
| | Assets, and any combination of the Assets. The Trustee may, in consultation with the Consultation Parties, waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Assets; |
| | (D)     <u>Purchase Price</u>. Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, such as certain liabilities to be assumed by the Bidder as part of the Transaction (the "<u>Purchase Price</u>"); |
| | (E)     <u>Committed Financing</u>. To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Qualified Bid must include evidence of committed financing that demonstrates that the Bidder has received sufficient non-contingent and binding debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing acceptable to the Trustee (as determined after consultation with the Consultation Parties) must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Trustee, after consultation with the Consultation Parties; |
| | (F)     <u>Contingencies; No Financing or Diligence Outs</u>. A Bid shall not be conditioned on a Bidder obtaining, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence, which must be completed before the Bid Deadline, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions; |
| | (G)     <u>Identity</u>. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also |

14

| Provision | Summary |
|---|---|
|  | include contact information for the specific person(s) and counsel the Trustee's advisors should contact regarding such Bid. Each Bid should contain sufficient evidence that the Bidder is legally empowered, by power of attorney or otherwise, to complete the Transaction on the terms contemplated by the parties. Each Bid should also fully disclose any connections or agreements with any of the Debtors, any known, potential or prospective bidder, any Bidder or any officer, director, manager, significant creditor, or equity holder of any Debtor; |
|  | (H) <u>Authorization</u>. Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Trustee, after consultation with the Consultation Parties) acceptable to the Trustee, after consultation with the Consultation Parties, with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid; |
|  | (I) <u>Consummation</u>. Each Bid must include a statement or evidence reflecting that the Bidder is prepared to consummate the transaction upon entry of an order of the Court approving the Sale to the Successful Bidder (the "<u>Sale Order</u>); |
|  | (J) <u>Irrevocability</u>. Each Bid must include a statement that, in the event the Bidder becomes (i) the Successful Bidder, such Qualified Bidder's offer is irrevocable until two (2) business days after the closing of the sale of the Assets or (ii) the Back-Up Bidder (as defined below) such Qualified Bidder's offer is irrevocable until the earlier of (a) the closing of the sale of the Assets and (b) ninety (90) days after the closing of the Auction; |
|  | (K) <u>Actual Value</u>. Each Bid must state the proposed actual value of such Bidder's bid to the Estate; |
|  | (L) <u>Assigned Contracts and Leases</u>. Each Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Qualified Bidder wishes to be assumed pursuant to a Sale. A Bid must specify that such Bidder will be responsible for any cure costs associated with such assumption, and include a good-faith estimate of such cure costs (which estimate shall be provided by the Trustee); |

| Provision | Summary |
|---|---|
| | (M)    <u>Damages</u>. Each Bid must provide that the Trustee has the right to pursue all available damages in the event of the Bidder's breach of, or failure to perform under, the Proposed Agreement; |
| | (N)    <u>Bid Representatives</u>. Each Bid shall identify the representatives of the Bidder that are authorized to appear and act on behalf of the Bidder in connection with the proposed Sale; |
| | (O)    <u>No Break-Up Fee</u>. Each Bid shall indicate that such Bidder will not seek any transaction break-up fee, expense reimbursement, or similar type of payment (other than to the extent such Bid is selected to be a Stalking Horse Bid, and subject to the provisions applicable to "<u>Stalking Horse Bids</u>" below); |
| | (P)    <u>Consent to Jurisdiction</u>. Each Bidder must submit to the exclusive jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Trustee's qualification of Bids, the Auction, the construction and enforcement of the Bid Procedures, the Sale documents, and the closing of the Sale, as applicable; |
| | (Q)    <u>Compliance with the Bankruptcy Code and Non-Bankruptcy Law; Acknowledgment</u>. Each Bid must comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law. Each Bid must also include a written acknowledgment that the Qualified Bidder agrees to all of the terms of the Sale set forth in the Bid Procedures; |
| | (R)    <u>Other Information</u>. Each Bid must contain such other information as may be reasonably requested by the Trustee; and |
| | (iv)    <u>Adequate Assurance</u>. Each Bid must provide for adequate working capital financing to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Bidder. |
| | (v)    <u>Back-Up Bidder</u>. Each Bid must acknowledge that by submitting a Bid, the Bidder agrees to be a Back-Up Bidder, should the Bid be so selected. |
| | (vi)    <u>Wind-Down Amounts</u>. Each Bid must ensure that the Trustee will retain sufficient cash to fund the orderly wind-down of the |

| Provision | Summary |
|---|---|
| | Estates, which amount the Trustee shall determine in her reasonable business judgment in consultation with, and with the consent of, the Consultation Parties. |
| | (vii) <u>Proof of Financial Ability to Perform</u>. Each Bid must provide written evidence the Trustee reasonably concludes, in consultation with the Consultation Parties, demonstrates the Bidder has the necessary financial ability to close the Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Transaction. Such information should include, *inter alia*, the following: (a) contact names and numbers for verification of any third-party financing sources; (b) written evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the transaction; (c) the Bidder's current financial statements (audited if they exist); (d) a description of the Bidder's pro forma capital structure; and (e) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Trustee, after consultation with the Consultation Parties, demonstrating such Bidder has the ability to close the transaction. |
| | (viii) <u>As Is, Where Is</u>. Each Bid must include a written acknowledgement that the Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets or the Sale; (ii) has relied solely upon its own independent review and investigation and/or inspection of any documents and any other information in making the Bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Trustee or any of their advisors (including Moelis and SC&H) or other representatives regarding the Bid, the Assets, the physical condition of the Assets, the Sale or the completeness or accuracy of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures; and (iv) the Bidder did not engage in any collusive conduct and acted in good faith in submitting its Bid. |
| | (ix) <u>Free and Clear</u>. Except as otherwise provided in the Proposed Agreement, all of the Trustee's and Estates' right, title, and interest in and to the Assets to be acquired shall be sold free and clear of all liens, claims, charges, security interests, restrictions, and other encumbrances of any kind or nature thereon and there against (collectively, the "<u>Transferred Liens</u>"), with such Transferred Liens to attach to the proceeds of the Sale. |

| Provision | Summary |
|---|---|
|  | (x)    <u>Good Faith Deposit</u>. Each Bid must be accompanied by the Deposit. To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Qualified Bid, the Trustee reserves the right to require, after consultation with the Consultation Parties, that such Qualified Bidder increase its Deposit so that it equals 10% of the increased cash component of the Purchase Price. |
|  | (xi)    <u>Binding Effect</u>. By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bid Procedures and to refrain from submitting a Qualified Bid or seeking to reopen the Auction after conclusion of the Auction; and |
|  | (xii)    <u>Time Frame for Closing</u>. A Bid by a Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations in the Trustee's reasonable business judgment) to be consummated, if selected as the Successful Bid, within a time frame reasonably acceptable to the Trustee in consultation with the Consultation Parties. The Bidder must commit to closing the proposed Sale(s) contemplated by the Bid as soon as practicable and provide perspective on any potential regulatory issues that may arise in connection with such Bidder's acquisition of the Assets including timing for resolution thereof. |
|  | The Trustee shall provide copies of all Bids received as soon as reasonably practicable, but no later than one (1) business day after receipt thereof, to the Consultation Parties. |
|  | Unless otherwise determined by the Trustee in consultation with the Consultation Parties, a Bid received before the Bid Deadline will be considered a "<u>Qualified Bid</u>" and each Bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>" if the Trustee determines, in consultation with the Consultation Parties, that such Bid meets the requirements above for a Bid as set forth in these Bid Procedures, subject to the Trustee's rights in the exercise of her reasonable business judgment to waive any such requirements or any part thereof in consultation with the Consultation Parties. For the avoidance of doubt, any Stalking Horse Bid for the Assets that is selected and approved in accordance with the Bid Procedures shall be deemed a Qualified Bid and the Bidder submitting such Stalking Horse Bid shall be deemed a Qualified Bidder. |
|  | *See* Bid Procedures § II.D. |

| Provision | Summary |
|---|---|
| | Once selected and approved in accordance with the terms of the Bid Procedures, a Stalking Horse Bidder (if any) shall be deemed to be a Qualified Bidder, a Stalking Horse Bid (if any) shall be deemed a Qualified Bid, and a Stalking Horse Bidder (if any) may participate in the Auction with respect to the Debtors' Assets.<br><br>*See* Bid Procedures § II.E.<br><br>Notwithstanding anything to the contrary herein, each of the DIP Secured Parties and the Prepetition Secured Parties (as defined in the DIP Financing Order) that submits a Bid shall be deemed to be a Qualified Bidder and, subject to section 363(k) of the Bankruptcy Code and to such party's compliance with the Bid Procedures, may submit a credit bid of all or any portion of the aggregate amount of their respective secured claims pursuant to section 363(k) at any time before or during the Auction, and any such credit bid will be considered a Qualified Bid (such a Qualified Bid, a "Qualified Credit Bid"), unless otherwise ordered by the Court for cause.<br><br>*See* Bid Procedures § II.F. |
| **Stalking Horse Bid Protections (Local Rule 6004-1(c)(i)(C))** | In consultation with the Consultation Parties and subject to the provisions set forth in the Bid Procedures and the Bid Procedures Order, the Trustee shall be authorized, but not obligated to, in an exercise of her reasonable business judgment and in consultation with the Consultation Parties:  (i) select one or more Qualified Bidders to act as Stalking Horse Bidder(s) in connection with the Sale and enter into Stalking Horse Agreement(s), subject to higher or otherwise better offers at the Auction; and (ii) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder, provide Bid Protections, which Bid Protections shall collectively not exceed a total of three percent (3%) of the cash purchase price contemplated by the Stalking Horse Agreement.<br><br>*See* Bid Procedures § II.E |
| **Bidding Increments (Local Rule 6004-1(c)(i)(C)(3))** | Any Overbid (as defined in the Bid Procedures), including any Bids by any Stalking Horse Bidder (if any), after the Baseline Bid (as defined below) shall be made in increments of at least $2,000,000 for the Epic Assets and 5% greater (initial bid) and 2% greater (subsequent bids) for the Tangible Play Assets, and 5% greater (initial bid) and 2% greater (subsequent bids) for the Neuron Assets (the "Minimum Overbid Increment"). Additional consideration in excess of the amount set forth in the Baseline Bid may include cash and/or non-cash consideration; *provided*, *however* that the value for such non-cash consideration shall be determined by the Trustee in her reasonable business judgment, after consultation with the Consultation Parties.<br><br>*See* Bid Procedures § III.B. |

| Provision | Summary |
|---|---|
| **Modifications of Bidding and Auction Procedures (Local Rule 6004-1(c)(i)(D))** | The Trustee reserves her rights to modify these Bid Procedures (other than the consultation and consent rights of the Consultation Parties), at or prior to the Auction, in her reasonable business judgment and after consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process. *See* Bid Procedures § VII. |
| **Closing with Alternative Backup Bidders (Local Rule 6004-1(c)(i)(E))** | The Auction shall continue until there is only one Qualified Bid or combination of Qualified Bids that the Trustee determines in her reasonable business judgment, after consultation with the Consultation Parties, is the highest or otherwise best Qualified Bid(s) at the Auction (the "<u>Successful Bid</u>" and, the Bidder(s) submitting such Successful Bid, the "<u>Successful Bidder</u>"). In making this decision, the Trustee, in consultation with the Consultation Parties, shall consider the Bid Assessment Criteria. |
|  | Promptly following the Trustee's selection of the Successful Bid and the conclusion of the Auction, the Trustee shall announce the Successful Bid and Successful Bidder. The Trustee will file a notice identifying the Successful Bidder and the party(ies) with the second highest or otherwise second-best Qualified Bid (or combination of Qualified Bids) at the Auction, as determined by the Trustee, in the exercise of her reasonable business judgment, in consultation with the Consultation Parties (the "<u>Back-Up Bidder</u>") as soon as reasonably practicable after closing the Auction, if any, and in any event not more than 24 hours following closing the Auction. The Back-Up Bidder shall be required to keep its initial Qualified Bid(s) (or if the Back-Up Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "<u>Back-Up Bid</u>") open and irrevocable until the earlier of (a) the closing of the sale of the Assets and (b) ninety (90) days from the closing of the Auction (the "<u>Outside Back-Up Date</u>"). |
|  | If the Successful Bidder fails to consummate an approved transaction, the Trustee may designate, after consultation with the Consultation Parties, the Back-Up Bidder to be the new Successful Bidder, and the Trustee will be authorized, but not required, to consummate the transaction with the Back-Up Bidder without further order of the Court. In such case, the defaulting Successful Bidder's Deposit, if any, shall be forfeited to the Estates, and the Trustee specifically reserves the right to seek all available damages from the defaulting Successful Bidder. The closing date to consummate the transaction with the Back-Up Bidder shall be no later than the later of (i) twenty-five (25) days after the date the Trustee provide notice to the Back-Up Bidder that the Successful Bidder has failed to consummate a sale and the Trustee desire to consummate the transaction with the Back-Up Bidder and (ii) five (5) days after necessary regulatory approvals are completed by the Back-Up Bidder and/or the Trustee. |
|  | *See* Bid Procedures §§ III.B, D. |

| Provision | Summary |
|---|---|
| **Provisions Governing the Auction (Local Rule 6004-1(c)(ii))** | <u>Auction</u>. If the Trustee receives at least two Qualified Bids (including any Stalking Horse Bid and/or any Qualified Credit Bid (if any)) by the Bid Deadline, the Trustee will conduct the Auction to determine, in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids. |
| | <u>Time and Place</u>. The Auction, if necessary—for the Epic Assets, the Tangible Play Assets, and the Neuron Assets will take place on **March 25, 2025, at 10:00 a.m. (prevailing Eastern Time)**, at Jenner & Block, 353 North Clark Street, Chicago, Illinois, 60654—or such later time or other place as the Trustee determines, after consultation with the Consultation Parties, in which case the Trustee shall timely notify the Stalking Horse Bidder (if any), the Qualified Credit Bidder (if any), and all other Qualified Bidders of such later time or other place, and file a notice of this change on the Court's docket for these Chapter 11 Cases. |
| | <u>Baseline Bid</u>. Prior to the Auction, the Trustee (in consultation with the Consultation Parties) will evaluate Qualified Bids and identify the Qualified Bid that is, in the Trustee's reasonable business judgment, in consultation with the Consultation Parties, the highest or otherwise best bid (the "<u>Baseline Bid</u>" and, the Bidder making such Baseline Bid, the "<u>Baseline Bidder</u>"), and shall notify all Qualified Bidders with Qualified Bids of the Baseline Bid no later than the opening of the Auction. The Baseline Bid may be comprised of any combination of the Assets, and the Trustee may determine, in consultation with the Consultation Parties, that different Baseline Bids exist for different groupings of the Assets. The Trustee shall have the discretion to determine, in consultation with the Consultation Parties, how to proceed when auctioning the Assets in groupings that do not include all of Debtors' Assets so as to maximize the value of the Assets. |
| | <u>Auction Procedures</u>. The Auction shall be conducted in a timely fashion according to the following procedures: |
| | (i)    The Trustee, with the assistance of her professionals, shall direct and preside over the Auction and the Auction shall be transcribed or videotaped. |
| | (ii)    Prior to the commencement of the Auction, the Trustee shall determine, in consultation with the Consultation Parties, which of the Qualified Bids, at such time, is the highest or otherwise best bid for purposes of constituting the opening bid of the Auction, and shall promptly notify all Qualified Bidders with Qualified Bids of such Baseline Bid. |
| | (iii)    Any Overbid after the Baseline Bid shall be made in increments of at least the Minimum Overbid Increment. Upon the solicitation of each round of Overbids, the Trustee may, after consultation with the Consultation Parties, announce a deadline (the "<u>Overbid Round Deadline</u>"), by which time any Overbids |

| Provision | Summary |
|---|---|
| | must be submitted to the Trustee. After each Overbid Round Deadline, the Trustee shall determine, in consultation with the Consultation Parties, whether an Overbid is higher or otherwise better than the Baseline Bid (as defined in the Bid Procedures) in the initial Overbid round or, in subsequent rounds, the Overbid previously designated by the Trustee as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Trustee shall announce and describe to all Qualified Bidders present at the Auction the material terms of any new Overbid designated by the Trustee as the Prevailing Highest Bid, as well as the value attributable by the Trustee to such Prevailing Highest Bid. Any Overbid to a Prevailing Highest Bid by any Qualified Bidder must provide more value for the Estates than any prior bid. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Estates than any prior Qualified Bid or Overbid and shall otherwise comply with the terms of these Bid Procedures. |
| | (iv)    Only Qualified Bidders, including any Stalking Horse Bidders and/or Qualified Credit Bidders (if any), shall be entitled to make Bids at the Auction, subject to the terms of the Bid Procedures and other limitations as may reasonably be imposed by the Trustee. |
| | (v)    Only the Trustee and her respective advisors, any participating Qualified Bidders and their respective advisors, the Consultation Parties and their respective advisors, and any creditor of the Debtors may attend the Auction; *provided* that any of the Debtors' creditors who are not Qualified Bidders must provide three (3) business days' written notice to counsel to the Trustee of their intent to attend the Auction; *provided, further*, that the Trustee reserves the right to retract her permission at any point during the Auction if such creditor party who is not a Qualified Bidder does not act in good faith or in an orderly fashion during the Auction. |
| | (vi)    The Trustee, in consultation with the Consultation Parties, shall determine the Qualified Bid that is the highest or otherwise best Qualified Bid or combination of Qualified Bids. This determination shall take into account any factors the Trustee, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the Estates, including, *inter alia,* the following non-exhaustive factors: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any, and the excluded assets and/or executory contracts or unexpired leases, if any; (iii) the ability of the Qualified Bidder to close the proposed Transaction and |

| Provision | Summary |
|---|---|
|  | the conditions related thereto, including, without limitation, any regulatory approvals required, and the timing thereof; (iv) whether the Bid is a bulk bid or a partial bid for only some of the Debtors' assets; (v) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (vi) any purchase price adjustments; (vii) the impact of the transaction on any actual or potential litigation; (viii) the net after-tax consideration to be received by the Estates; (ix) the tax consequences of such Qualified Bid; and (x) the consent of the parties in interest and/or the cost and expense to the Trustee of resolving sale issues before Closing (collectively, the "Bid Assessment Criteria"). |
|  | (vii)    The Auction will be governed by such other procedures as may be announced by the Trustee and her advisors, after consultation with the Consultation Parties, from time to time on the record at the Auction. |
|  | Closing the Auction. The Auction shall continue until there is only one Qualified Bid or combination of Qualified Bids that the Trustee determines in her reasonable business judgment, after consultation with the Consultation Parties, is the Successful Bid and the Successful Bidder. In making this decision, the Trustee, in consultation with the Consultation Parties, shall consider the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, in the Trustee's discretion, in consultation with the Consultation Parties, to submit an Overbid at the Auction to the then-existing Overbid and the Successful Bidder has submitted fully executed Transaction Documents memorializing the terms of the Successful Bid. The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of the Successful Bid. |
|  | Promptly following the Trustee's selection of the Successful Bid and the conclusion of the Auction, the Trustee shall announce the Successful Bid and Successful Bidder. The Trustee will file a notice identifying the Successful Bidder and Back-Up Bidder as soon as reasonably practicable after closing the Auction, if any, and in any event not more than 24 hours following the closing the Auction. The Trustee shall not consider any Bids submitted after the conclusion of the Auction. |
|  | The Trustee reserves the right, in her reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Trustee and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Trustee with additional evidence as the Trustee, in her reasonable business judgment and in consultation with the Consultation Parties, may require to establish that the Qualified Bidder has sufficient internal resources or has |

| Provision | Summary |
|---|---|
| | received sufficient non-contingent debt and/or equity financing commitments to consummate the proposed transaction at the Prevailing Highest Bid.<br><br>No Collusion; Good-Faith Bona Fide Offer. Each Qualified Bidder participating at the Auction shall be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, (ii) its Qualified Bid is a good-faith bona fide offer, and (iii) it intends to consummate the proposed Transaction if selected as the Successful Bidder.<br><br>*See* Bid Procedures § III. |

27.     Importantly, the Bid Procedures recognize the Trustee's fiduciary obligations to maximize the value of the Debtors' Assets and, as such, do not impair the Trustee's ability to consider all Qualified Bids. Additionally, as noted above, the Bid Procedures preserve the Trustee's rights to modify the Bid Procedures as necessary or appropriate to maximize the value of the Assets for the benefit of the Estates.

**II.        Form and Manner of Sale Notice.**

28.     On or within two (2) business days after entry of the Bid Procedures Order, the Trustee shall cause the Sale Notice to be served on:  (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Linda J. Casey, Esq. (email: Linda.Casey@usdoj.gov); (ii) the holders of the twenty (20) largest, known non-insider unsecured claims against the Debtors, if no official committee of unsecured creditors has been appointed; (iii) counsel to the official committee of unsecured creditors, if one has been appointed; (iv) the Prepetition Agent and counsel thereto; (v) the Prepetition Secured Lenders and counsel thereto; (vi) the Debtors' counsel of record and registered agents; (vii) all parties known by the Trustee to assert a lien on any of the Assets; (viii) all entities reasonably known to have expressed an interest in a transaction with respect to any of the Assets; (ix) the United States Attorney's Office for the District of Delaware;

(x) the Internal Revenue Service; (xi) all state and local taxing authorities with an interest in the Assets; (xii) the offices of the attorneys general for the states in which the Debtors operate; (xiii) the Assigned Contract Counterparties; and (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002.

29.     In addition, the Trustee proposes to publish the Sale Notice once in the *Wall Street Journal* as soon as practicable after entry of the Bid Procedures Order. Finally, the Trustee will post a copy of the Sale Notice at the website of her claims and noticing agent, Verita Global, located at https://veritaglobal.net/epiccreations.

**III.     Summary of the Assignment Procedures.**

30.     The Trustee is also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assigned Contracts in connection with the Sale(s). Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, shall be provided in the Assignment Notice to be sent to the applicable Assigned Contract Counterparties. Because the Bid Procedures Order sets forth the Assignment Procedures in detail, they are not restated herein. Generally, however, the Assignment Procedures:  (i) outline the process by which the Trustee shall serve notice to all Assigned Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assigned Contracts to the extent necessary.

## BASIS FOR RELIEF

**I.    The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.**

31.    The Trustee believes that the Bid Procedures, and in particular the timeline contemplated therein, will ensure a value-maximizing sale or sales while, at the same time, providing an achievable path towards an orderly resolution of these Chapter 11 Cases. Moreover, the sale timeline is designed to comply with the milestones in the DIP Financing Order, as amended by agreement between the Trustee and the DIP Secured Parties.

**A.    The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate.**

32.    The Trustee seeks authority to sell the Assets through the Auctions, if necessary, and related sale process, subject to the Trustee's right to seek an alternative course of action to maximize the value of the Estates. The Trustee will conduct an extensive marketing process. The Trustee, with the assistance of Moelis and SC&H, will contact those parties whom the Trustee believes may be interested in pursuing a Sale, and whom the Trustee reasonably believes may have the financial resources to consummate such a transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Estates for the benefit of their creditors and other stakeholders.

33.    Under Bankruptcy Rule 2002(a) and (c), the Trustee shall notify creditors of the proposed Sale of the Assets, including a disclosure of the time and place of any Auction, the terms and conditions of a Sale, and the deadline for filing any objections.

34.    The Trustee respectfully submits that the Sale Notice is reasonably calculated to provide parties with timely and proper notice of the proposed Sale, including:  (i) the date, time, and place of the Auction (if one will be held); (ii) the Bid Procedures; (iii) the deadline for filing objections to the Sale; (iv) a reasonably specific identification of the Assets; (v) a description of

the Sale as being free and clear of all liens, claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds; and (vi) notice of the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder.

35.     The Trustee further submits that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Assignment Notice, and publication of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Trustee further submits the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Trustee's marketing process, while minimizing costs to the Estates. Accordingly, the Trustee respectfully requests that the Court find the proposed notice procedures set forth in this Motion are sufficient, and no other or further notice of the Bid Procedures, Auction, or Sale is required.

**B.      The Bid Procedures Are Appropriate and Will Maximize Value.**

36.     Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate"). Courts have made clear that a debtor's or Trustee's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.'  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should

approve the sale") (*quoting In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*, 933 F.2d at 515); *Montgomery Ward*, 242 B.R. at 153 (same); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992).

37.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir. 1997) (stating that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (internal citations omitted); *Edwards*, 228 B.R. at 561.

38.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Res.*, 147 B.R. at 659 (stating bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y.1991) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

39.     Here, the Bid Procedures will promote active bidding from interested parties and are intended to elicit the highest or otherwise best offers available for the Assets. The Bid Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by these Estates from the Sale. In particular, the Bid Procedures contemplate an open Auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

40.     Moreover, it is well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001) (noting that while a "sale transaction does not require an auction procedure, . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is especially true here, where a Sale of the Assets will have been subjected to an extensive marketing process by the Trustee with the assistance of her retained advisors. Moreover, having the option to enter into a Stalking Horse Agreement with a Stalking Horse Bidder ensures that the Trustee retain flexibility to set a minimum purchase price for the Assets that will be tested by the marketplace. As such, the Trustee and the Debtors' creditors can be assured that, taking into account the financial condition of the market and the economy, the consideration obtained will be fair and reasonable and at or above market.

41.     The Trustee submit the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously

approved in this District. *See, e.g.*, *In re Vyaire Medical, Inc.*, No, 24-11217 (BLS) (Bankr. D. Del. July 11, 2024); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 5, 2024); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 17, 2023); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023); *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Aug. 04, 2023); *In re SiO2 Med. Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. April 25, 2023).[5]

42.     Thus, the Bid Procedures are reasonable, appropriate, and within the Trustee's sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Estates.

**C.     The Minimum Overbid Increment Is Appropriate.**

43.     One important component of the proposed Bid Procedures is the "Overbid" provision. Once the Trustee determines the Baseline Bid, as determined by the Trustee in consultation with the Consultation Parties, and hold the Auction, bidding on the Assets must be in Minimum Overbid Increments of at least $2,000,000 for the Epic Assets and 5% greater (initial bid) and 2% greater (subsequent bids) for each of the Tangible Play Assets and Neuron Assets.

44.     The Trustee believes that such Minimum Overbid Increment is reasonable under the circumstances and will enable the Trustee to maximize the value received for the Assets while limiting any potential chilling effect in the marketing process.

**D.     The Bid Protections Have a Sound Business Purpose and Should Be Approved.**

45.     The Trustee is also seeking authority to designate one or more Stalking Horse Bidders and offer Bid Protections to each such Stalking Horse Bidder. The use of a stalking horse

---

[5] Because the number of orders cited is voluminous, individual orders have not been attached to this Motion. Copies of these orders are available upon request to the Trustee's counsel.

in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254, at *1 n.1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (citation omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

46.     Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *Integrated Res.*, 147 B.R. at 659-60 (emphasis in original). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

47.     As a result, courts in this jurisdiction routinely approve such bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a

benefit to the estate. *See O'Brien Envtl. Energy,* 181 F.3d at 535 ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010). The allowance of Bid Protections, in the event that the Trustee executes a Stalking Horse Agreement, is in the best interests of the Estates and their creditors, as any Stalking Horse Agreement will establish a floor for further bidding that may increase the consideration given in exchange for the Assets, which will inure to the benefit of the Estates.

48.     The Trustee believes that the Bid Protections are necessary to attract and retain a Stalking Horse Bidder. Any Bid Protections will be negotiated through back-and-forth, arm's-length negotiations. By inducing the Stalking Horse Bidder to hold its offer open as a baseline from which other potential bidders can submit higher or better offers, the Bid Protections will serve to encourage more competitive bidding, which will hopefully increase the purchase price of the assets. As such, the Bid Protections will, among other things, enable the Trustee to maximize the value of the Estates for the benefit of all economic stakeholders in these Chapter 11 Cases. *See, e.g.*, *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. Del. Nov. 14, 2019) (pre-approving bid protections in an amount of up to 3% of the proposed purchase price).

49.     If the Court does not approve the Bid Protections, the Stalking Horse Bidder, to the extent one may otherwise exist, may elect not to serve as the stalking horse, to the detriment of the Estates. Further, if the Bid Protections were to be paid, it would be because the Trustee has received higher or otherwise superior offers for the Assets. In short, the proposed Bid Protections are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the

prospective purchaser." *Integrated Res.*, 147 B.R. at 662 (quoting *995 Fifth Ave.*, 96 B.R. at 28). Accordingly, the Bid Protections should be approved.

50.     The Bid Protections are a sound exercise of the Trustee's business judgment and are in the best interests of the Debtors, the Estates, and all stakeholders. Accordingly, the Court should approve Bid Protections.

> **E.     The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate.**

51.     As set forth above, the Sale contemplates the potential assumption and assignment of the Assigned Contracts to the Successful Bidder arising from the Auction, if any. In connection with this process, the Trustee believes it is necessary to establish a process by which:  (i) the Trustee and the Assigned Contract Counterparties can reconcile cure obligations, if any, in accordance with sections 105(a) and 365 of the Bankruptcy Code; and (ii) such counterparties can object to the potential assumption and assignment of the Assigned Contracts and/or related cure amounts.

52.     The Bid Procedures specify the process by which the Trustee will serve Assignment Notices and the procedures and deadline for Assigned Contract Counterparties to Assigned Contracts to file and serve Assigned Contract Objections and Post-Auction Objections.

53.     Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (i) payment of the undisputed cure amount (the "Cure Amount") and/or (ii) reserving amounts with respect to any disputed cure amounts.

54.     As set forth in the Bid Procedures Order, the Trustee also requests, to the fullest extent permitted by law, that any party that fails to object to the proposed assumption and

assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code, along with the Cure Amounts identified in the Assignment Notice. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that by not objecting to the motion, a creditor is deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

55.     The Trustee believes the Assignment Procedures are fair and reasonable, provide sufficient notice to the Assigned Contract Counterparties of the potential assumption and assignment of its Assigned Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof. Accordingly, the Trustee requests this Court approve the Assignment Procedures set forth in the Bid Procedures Order.

**II.      The Assumption and Assignment of the Assigned Contracts Should Be Approved.**

**A.      The Assumption and Assignment of the Assigned Contracts Reflects the Trustee's Reasonable Business Judgment.**

56.     To facilitate and effectuate a Sale of the Assets, the Trustee is seeking authority to assign the Assigned Contracts to the Successful Bidder to the extent required by such Successful Bidder.

57.     Section 365 of the Bankruptcy Code authorizes a trustee to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(b)(1).

58.     The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See*

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

59.     Courts generally will not second-guess a debtor's or a Trustee's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *appeal denied, judgment aff'd*, No. ADV. 06-33-(KJC), 2008 WL 522516 (D. Del. Feb. 27, 2008), *vacated and remanded*, 607 F.3d 957 (3d Cir. 2010), *as amended* (June 24, 2010) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard."); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted). A debtor's or Trustee's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *Network Access Solutions*, 330 B.R. at 75; *Exide Techs.*, 340 B.R. at 239.

60.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale(s) as a sound exercise of the Trustee's business judgment. First, the Assigned Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. Second, it is unlikely any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations of the Debtors' business were included in the transaction. Third, the Assigned Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases. Accordingly, the Trustee submits the assumption and assignment of the Assigned Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Trustee's business judgment.

61.     A Trustee may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139

B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle*

*Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

62.    Counterparties to Assigned Contracts will have the opportunity to object to

adequate assurance of future performance by the Successful Bidder by the Assigned Contract

Objection Deadline or the Post-Auction Objection Deadline, as applicable. Accordingly, the

Trustee submits the assumption and assignment of the Assigned Contracts as set forth herein

should be approved.

63.    Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired

leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired
> lease of the debtor, or in applicable law, that prohibits, restricts, or
> conditions the assignment of such contract or lease, the trustee may
> assign such contract or lease under paragraph (2) of this subsection
> . . . .

11 U.S.C. § 365(f)(1).

64.    Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates

provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired

lease. *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F.3d

904, 910-11 (9th Cir. 1997) ("[N]o principle of bankruptcy or contract law precludes us from

permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when

to do so will effectuate the purposes of section 365."), *cert. denied*, 522 U.S. 1148 (1998).

Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the

Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate

the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway*

*Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (holding that section 365(f)(3) of the Bankruptcy Code

prohibits enforcement of any lease clause creating right to terminate lease because it is being

assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

66. Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [*sic*], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer,, Inc.*, the court noted that:

> [The] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Trustee requests that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

66. Orders granting motions to sell property and for the assumption and assignment of executory contracts or unexpired leases frequently contain language explicitly stating the counterparty to the assigned contracts are barred from asserting against the debtor any default by reason of the closing, including any breach or right of termination relating to a change in control of the debtor. *See, e.g., In re Irish Bank Resolution Corp. Ltd.*, No. 13-12159 (CSS), 2014 WL 1759609, at *8 (Bankr. D. Del. Feb. 14, 2014) ("No sections or provisions of the Contracts that

purport to . . . declare a breach or default as a result of a change in control in respect of the Debtor . . . shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under 11 U.S.C. § 365(f) and/or are otherwise unenforceable under 11 U.S.C. § 365(e).”); *see also In re McPhillips Motors, Inc.*, No. 6:09-BK-37488-RN, 2010 WL 3157062, at *7 (Bankr. C.D. Cal. Feb. 9, 2010) (holding that “any breach related to or arising out of change-in-control or other assignment in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts” was unenforceable); *In re Bethel Healthcare, Inc.*, No. 1:13-BK-12220-GM, 2014 WL 12758523, at *4 (Bankr. C.D. Cal. May 1, 2014) (“Any provision in the Lease that purports to declare a breach or default as a result of a change in control of the Debtor’s business or requires the consent of a non-seller party is hereby determined unenforceable under section 365(f) of the Bankruptcy Code . . . .”).

## WAIVER OF BANKRUPTCY RULES 6004 AND 6006

67.     To the extent applicable, and to implement the foregoing successfully, the Trustee seeks a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property pursuant to Bankruptcy Rule 6004(h) and the assumption and assignment of the Assigned Contracts pursuant to Bankruptcy Rule 6006(d). As described above, the relief requested herein is necessary to maximize the value of the Estates. Accordingly, ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## CONSENT TO JURISDICTION

68.     Pursuant to Local Rule 9013-1(f), the Trustee consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## **NOTICE**

69.    Notice of this Motion has been or will be provided to: (a) the U.S. Trustee; (b) the Debtors' counsel of record and registered agents; (c) the holders of the 20 largest known unsecured claims against the Debtors (on a consolidated basis, as and if identified); (d) the office of the attorney general for each of the states in which the Debtors operate; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the United States Department of Justice; (i) the Prepetition Agent and counsel thereto; (j) the Prepetition Secured Lenders and counsel thereto; (k) the DIP Secured Parties; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.

70.    In addition, copies of the Sale Notice, the Bid Procedures, and the Bid Procedures Order will be served on the applicable parties no later than two (2) business days after entry of the Bid Procedures Order by this Court. In addition, a copy of this Motion, Sale Notice, the Bid Procedures, and the Bid Procedures Order will be available on (i) this Court's website, at www.deb.uscourts.gov, and (ii) the website maintained by the Trustee's Claims and Noticing Agent, Verita Global, located at https://veritaglobal.net/epiccreations. In light of the nature of the relief requested herein, the Trustee submits no other or further notice is required.

**WHEREFORE**, the Trustee respectfully requests this Court enter the Bid Procedures Order, the form of which is attached as **Exhibit A** hereto and grant such other and further relief as is just and proper.

Dated: January 7, 2025
     Wilmington, Delaware

**PASHMAN STEIN WALDER HAYDEN, P.C.**

*/s/ Alexis R. Gambale*
Henry J. Jaffe (No. 2987)
Joseph C. Barsalona II (No. 6102)
Alexis R. Gambale (No. 7150)
824 N. Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 592-6496
Email: hjaffe@pashmanstein.com
       jbarsalona@pashmanstein.com
       agambale@pashmanstein.com

-and-

**JENNER & BLOCK LLP**
Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
Telephone: (312) 923-2952
Email: csteege@jenner.com
       mroot@jenner.com
       wwilliams@jenner.com

*Co-counsel to the Trustee*