**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SAGA FORMATIONS, INC., *et al.*,[1] | Case No. 24-11161 (BLS) |
| Debtors. | (Jointly Administered) |

### **<u>FIRST AMENDED </u>COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN FOR THE ESTATES OF SAGA FORMATIONS, INC., PAJEAU, INC., AND TANGIBLE PLAY, INC.</u>**

**JENNER & BLOCK LLP**
Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
William Williams (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
Telephone: (312) 923-2952
csteege@jenner.com
mroot@jenner.com
wwilliams@jenner.com

**PASHMAN STEIN WALDER HAYDEN, P. C.**
Henry J. Jaffe (No. 2987)
Joseph C. Barsalona II (No. 6102)
Alexis R. Gambale (No. 7150)
Pashman Stein Walder Hayden, P. C.
824 North Market Street, Suite 800
Wilmington, DE 07601
Telephone: (302) 592-6497
hjaffe@pashmanstein.com
jbarsalona@pashmanstein.com
agambale@pashmanstein.com

*Counsel for the Chapter 11 Trustee*

Dated: ~~July 15~~<u>August 1</u>, 2025
Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Saga Formations, Inc. (f/k/a Epic! Creations, Inc.) (9113); Pajeau, Inc. (f/k/a Neuron Fuel, Inc.) (8758); and Tangible Play, Inc. (9331).

# TABLE OF CONTENTS

**Page**

~~DISCLAIMERS~~DISCLAIMERS RELATED TO DISCLOSURE STATEMENT ........................... 1

ARTICLE I : INTRODUCTION AND IMPORTANT DATES ........................... 2

    A.  Introduction ........................... 2

    B.  Important Dates ........................... 2

ARTICLE II : DEFINED TERMS AND RULES OF INTERPRETATION ........................... 3

    A.  Defined Terms. ........................... 3

    B.  Rules of Interpretation. ........................... 20

ARTICLE III : DISCLOSURE STATEMENT ........................... 22

    A.  General Background ........................... 22

        1.  Overview of Business Operations ........................... 22

        2.  The Debtors' Capital Structure ........................... 23

            a.  Secured Obligations to the Prepetition Term Loan Lenders ........................... 23

            b.  Unsecured Obligations ........................... 23

            c.  The Debtors' Organizational Structure ........................... 24

        3.  Events Leading to the Commencement of the Chapter 11 Cases ........................... 24

    B.  These Chapter 11 Cases ........................... 26

        1.  The Involuntary Petitions ........................... 26

        2.  The Order for Relief and Appointment of the Chapter 11 Trustee ........................... 26

        3.  First Day Motions and Orders ........................... 26

        4.  Post-Petition Financing ........................... 27

        5.  Retention of Professionals ........................... 27

        6.  The Stay Violations and the Chapter 11 Trustee's Litigation to Preserve and Recover Estate Property ........................... 28

a.   The Stripe Stay Violations ................................................................. 28

b.   The Apple Stay Violations and the Hailer Testimony .......................... 29

c.   The GitHub Stay Violation ................................................................ 30

d.   The Cloudflare Stay Violations ......................................................... 30

e.   Google Stay Violations ..................................................................... 30

f.   The India Lawsuit ............................................................................ 31

7.   The Chapter 11 Trustee's Investigation ................................................... 32

a.   The Unauthorized Postpetition Transfers ......................................... 33

b.   The Intercompany Loans and Transfers ............................................ 36

c.   The Merchant Cash Advance Loans .................................................. 38

d.   T&L's and Byju Raveendran's Ongoing Attempts to Control the Debtors .... 40

8.   Post-Petition Operations. .......................................................................... 41

9.   Pre-Petition Financial Statements. ............................................................ 41

10.  The Sale Process. ...................................................................................... 41

a.   Sale of Epic Assets ........................................................................... 41

b.   Sale of Neuron Fuel Assets ............................................................... 42

c.   Marketing of Tangible Play Assets .................................................... 43

11.  Claims Review and Reconciliation Process ............................................. 43

C.  Summary of Treatment of Claims and Interests Under the Plan ...................... 44

1.   Claims and Interests ................................................................................. 44

D.  Retained Causes of Action .............................................................................. 44

E.  Certain Federal Income Tax Consequences ................................................... 4645

1.   Tax Consequences to U.S. Holders of Claims .......................................... 47

2.   Tax Consequences to the Debtors ............................................................ 4847

a.   Cancellation of Indebtedness Income and Guaranty Claims ............. 4847

b. Importance of Obtaining Professional Tax Assistance ........................... 48

F. Certain Risk Factors to be Considered ........................................................ 4948

G. Cramdown ...................................................................................................... 50

H. Feasibility ...................................................................................................... 50

I. Best Interests Test and Alternatives to the Plan ...................................... 50

J. Releases .......................................................................................................... 5251

K. Administrative Claims .................................................................................. 52

L. DIP Facility Claims ....................................................................................... 53

M. Professional Fee Claims ................................................................................ 53

N. Priority Tax Claims ....................................................................................... 54

O. Statutory Fees ................................................................................................ 54

ARTICLE IV : CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ... 5455

A. Classification of Claims and Interests ........................................................ 5455

   1. Class Identification .................................................................................. 55

      a. Claims and Interests ........................................................................ 55

B. Treatment of Claims and Interests .............................................................. 55

   1. Treatment of Claims and Interests ........................................................ 55

      a. Class 1 – Other Secured Claims ..................................................... 55

      b. Class 2 – Other Priority Claims ...................................................... 56

      c. Class 3 – Prepetition Term Loan Claims ....................................... 5657

      d. Class 4 – General Unsecured Claims .............................................. 58

      e. Class 5 – Intercompany Claims ...................................................... 58

      f. Class 6 – Section 510(b) Claims ..................................................... 5859

      g. Class 7 – Interests ............................................................................ 59

C. Impaired Claims and Equity Interests ......................................................... 59

D.  Confirmation Pursuant to Sections 1129(a)(10) of the Bankruptcy Code ........... ~~59~~60

E.  No Unfair Discrimination ........................................................................ ~~59~~60

F.  Elimination of Vacant Classes ................................................................. 60

ARTICLE V : THE WIND-DOWN DEBTORS ............................................................ 60

A.  Establishment of the Wind-Down Debtors ................................................. 60

B.  Vesting of the Wind-Down Debtor Assets in the Wind-Down Debtors ........... 60

C.  Wind-Down Debtors' Rights With Respect to Disputes and Litigation ........... ~~60~~61

D.  Governance of the Wind-Down Debtors ..................................................... 61

E.  The Wind-Down Debtors' Transfer of Privileges ......................................... 61

F.  Bankruptcy Rule 2004 ............................................................................ 61

G.  Cooperation with the Plan Administrator; Books and Records ...................... 62

H.  Vesting of Wind-Down Debtors' Assets .................................................... 62

I.  Expenses of Wind-Down Debtors ............................................................. 63

J.  Wind-Down Financing Facility .................................................................. 63

K.  Wind-Down Debtors Oversight Committee ................................................. 63

1.  Selection of Wind-Down Debtors Oversight Committee ......................... 63

2.  Rights, Powers, Duties, and Responsibilities of the Wind-Down Debtors Oversight Committee ....................................................................... 63

L.  Manner of Wind-Down Distributions ......................................................... 64

M.  Termination of the Wind-Down Debtors .................................................... 64

N.  Distribution of Excess Reserves by the Wind-Down Debtors ....................... 65

ARTICLE VI : PLAN ADMINISTRATOR ................................................................. 65

A.  Plan Administrator Agreement .................................................................. 65

B.  Appointment of the Plan Administrator ...................................................... 65

C.  The Term of the Plan Administrator .......................................................... 65

D.  Plan Administrator Rights and Powers ............................................... 6566

E.  Plan Administrator Responsibilities ................................................... 66

F.  Plan Administrator Exculpation, Indemnification, Insurance, and Liability
    Limitation ......................................................................................... 69

ARTICLE VII : CONFIRMATION PROCEDURES ........................................ 69

A.  Confirmation Procedures .................................................................. 69

    1.  Combined Hearing ..................................................................... 69

    2.  Procedure for Objections ........................................................... 69

    3.  Requirements for Confirmation .................................................. 6970

B.  Solicitation and Voting Procedures .................................................. 70

    1.  Eligibility to Vote on the Plan ................................................... 70

    2.  Solicitation Package .................................................................. 70

    3.  Voting Procedures and Voting Deadline ..................................... 70

    4.  Presumed Acceptance and Deemed Rejection .............................. 71

    5.  Acceptance by Impaired Classes ................................................ 71

ARTICLE VIII : IMPLEMENTATION AND EXECUTION OF THE PLAN ..... 72

A.  Effective Date ................................................................................. 72

B.  Establishment and Funding of Plan Reserves .................................... 72

C.  Wind-Down Transactions ................................................................. 72

D.  Corporate Action ............................................................................ 7372

E.  Exemption from Certain Taxes and Fees .......................................... 73

F.  Termination of the Consumer Privacy Ombudsman .......................... 73

G.  Provisions Governing Distributions Under the Plan .......................... 7473

    1.  Dates of Distributions ............................................................... 7473

    2.  Delivery of Distribution on Prepetition Term Loan Claims .......... 74

3.  Distributable Proceeds .................................................................................. 74

4.  De Minimis Distributions; Rounding of Payments ..................................... 74

5.  Compliance with Tax Requirements/Allocations ........................................ 75

H.  Resolution of Disputed Claims ............................................................................ 75

1.  Allowance of Claims .................................................................................... 75

2.  Prosecution of Objections to Claims ........................................................... ~~76~~75

3.  Deadline to File Objections to Claims ......................................................... 76

4.  Amendments to Claims ................................................................................. 76

I.  Disallowance of Certain Claims Subject to Avoidance or Recovery .................... 76

ARTICLE IX : TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ~~77~~76

A.  Rejection of Executory Contracts and Unexpired Leases ..................................... ~~77~~76

B.  Assumption of D&O Insurance Policies ............................................................... 77

C.  Rejection Damages Bar Date ................................................................................. 77

D.  Indemnification Obligations .................................................................................. 77

ARTICLE X : EXCULPATION, RELEASES, AND INJUNCTIONS ...................................... 78

A.  Exculpation ............................................................................................................ 78

B.  Plan Injunction ...................................................................................................... 78

C.  Injunction Related to Releases and Exculpation ................................................... 79

D.  Debtors' and Estates' Releases .............................................................................. 79

E.  Compromises and Settlements ............................................................................... ~~81~~80

F.  Preservation of Causes of Action .......................................................................... 81

G.  No Discharge of Debtors or Wind-Down Debtors ................................................ ~~82~~81

ARTICLE XI : CONDITIONS PRECEDENT TO CONSUMMATION OF THE COMBINED
PLAN AND DISCLOSURE STATEMENT .......................................................................... 82

A.  Conditions Precedent to the Effective Date .......................................................... 82

B.  Waiver of Conditions ................................................................................ ~~83~~82

C.  Effect of Failure of All Conditions ............................................................. ~~83~~82

ARTICLE XII : RETENTION OF JURISDICTION ...................................................... 83

ARTICLE XIII : MISCELLANEOUS PROVISIONS ..................................................... ~~85~~84

A.  Immediate Binding Effect ........................................................................... ~~85~~84

B.  Reservation of Rights .................................................................................. 85

C.  Modification, Withdrawal, or Revocation of the Combined Plan and Disclosure
Statement ...................................................................................................... 85

D.  Exhibits/Schedules ...................................................................................... 86

E.  Plan Supplement .......................................................................................... 86

F.  Filing of Additional Documents ................................................................. 86

G.  Successors and Assigns ............................................................................... 86

H.  Governing Law ............................................................................................ 86

I.  Time ............................................................................................................. 86

J.  Term of Injunctions or Stays ...................................................................... ~~87~~86

K.  Severability ................................................................................................. 87

L.  Votes Solicited in Good Faith .................................................................... 87

M. Revocation ................................................................................................... 87

N.  Conflicts ...................................................................................................... 87

O.  No Admissions ............................................................................................ 87

P.  Reservation of Rights .................................................................................. ~~88~~87

Q.  Compromise of Controversies .................................................................... 88

## DISCLAIMERS RELATED TO DISCLOSURE STATEMENT

THE DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE CHAPTER 11 TRUSTEE'S KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED IN THE DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE CHAPTER 11 TRUSTEE, THE ESTATES, THE DEBTORS, OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE CHAPTER 11 TRUSTEE, THE ESTATES, THE DEBTORS, OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS HEREIN ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED PLAN AND DISCLOSURE STATEMENT OTHER THAN THAT WHICH IS CONTAINED HEREIN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THE ESTATES HAVE BEEN AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B), AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. SEE ARTICLE III.F "CERTAIN RISK FACTORS TO BE CONSIDERED," FOR A DISCUSSION OF CONSIDERATIONS IN CONNECTION WITH A DECISION TO VOTE TO ACCEPT THE PLAN.

## ARTICLE I: INTRODUCTION AND IMPORTANT DATES

### A.    Introduction[2]

Claudia Springer, not individually but solely as Chapter 11 Trustee (the "**Chapter 11 Trustee**") of the Estates of Saga Formations, Inc. (f/k/a Epic! Creations, Inc.), Pajeau, Inc. (f/k/a Neuron Fuel, Inc.), and Tangible Play, Inc., proposes this *First Amended Combined Disclosure Statement and Chapter 11 Plan for the Estates of Saga Formations, Inc., Pajeau, Inc., and Tangible Play, Inc.* (the "**Combined Plan and Disclosure Statement**" or "**Plan**" or "**Disclosure Statement**" as the context indicates) pursuant to sections 105, 1125, and 1129 of the Bankruptcy Code for the disposition of the Estates' remaining assets and Distribution of the proceeds of the assets to the Holders of Allowed Claims against the Debtors as set forth herein. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. The Chapter 11 Trustee is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**Copies of this Combined Plan and Disclosure Statement and all other documents related to the Chapter 11 Cases are available for review without charge through the Debtors' Voting Agent, Verita, at www. veritaglobal.net/epiccreations.**

Each Holder of a Claim against any Debtor entitled to vote to accept or reject the Plan is encouraged to read the Combined Plan and Disclosure Statement in its entirety before voting.

Subject to the restrictions and modifications as set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and in this Plan, the Chapter 11 Trustee expressly reserves the right to alter, amend, or modify the Plan one or more times before its substantial consummation.

### B.    Important Dates

| Description | Deadline |
|---|---|
| Voting Procedures Hearing Objection Deadline | July 29, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Voting Procedures and Interim Plan and Disclosure Statement Hearing | August 5, 2025 at 10:00 a.m. (prevailing Eastern Time) |
| Voting Record Date | August 5, 2025 |
| Solicitation Deadline | August 12, 2025 |
| Publication Deadline | August 14, 2025 |

---

[2]    Capitalized terms used in this Article I shall have the meaning ascribed to them in Article II hereof.

| Description | Deadline |
|---|---|
| Deadline to File Plan Supplement | September 2, 2025 |
| Voting Deadline for the Plan | September 9, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Plan Objection Deadline | September 9, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to file: (1) Confirmation Brief; and (2) Reply to any Objections to the Confirmation and/or final approval of the adequacy of the Combined Plan and Disclosure Statement | September 19, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Voting Tabulation Affidavit | September 19, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Combined Hearing | September 24, 2025, at 11:00 a.m. (prevailing Eastern Time), *subject to the Bankruptcy Court's availability* |

## ARTICLE II: DEFINED TERMS AND RULES OF INTERPRETATION

**A.    Defined Terms.**

As used in this Combined Plan and Disclosure Statement, the following terms have the following meanings. All capitalized terms not defined herein shall have the meaning ascribed to them in the Bankruptcy Code or Bankruptcy Rules as applicable.

1.    "**Acquired Assets**" means those assets acquired by the applicable Purchaser under one or more Purchase Agreement(s).

2.    "**Administrative Claim**" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; *provided, however*, that any Administrative Claim that is an Assumed Liability under a Purchase Agreement shall be satisfied under the Purchase Agreement and shall not be an obligation of the Debtors, the Estates, or the Wind-Down Debtors to the extent so assumed.

3.    "**Administrative Claims Amount**" means an amount equal to the Chapter 11 Trustee's good-faith estimate of the aggregate Allowed Administrative Claims, which estimate the Chapter 11 Trustee shall deliver to counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

4.    "**Administrative Claims Bar Date**" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be the later of (i) thirty (30) days after the Effective Date or (ii) in the event an Executory Contract is rejected following the Effective Date, solely as to Administrative Claims related to such rejected Executory Contract, thirty (30) days after notice to the counterparty to such rejected Executory Contract; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

5.    "**Administrative Claims Reserve**" means the reserve for the Allowed Administrative Claims established by the Chapter 11 Trustee in an amount equal to the Administrative Claims Amount.

6.    "**Adversary Proceedings**" means the currently pending adversary proceedings, Adv. Pro. Case Nos. 24-50142, 24-50233, and 24-50280, and any other adversary proceedings commenced by the Chapter 11 Trustee before the Effective Date.

7.    "**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by, or is under common Control with, such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such Person were a debtor in a case under the Bankruptcy Code.   "**Affiliated**" has a correlative meaning.

8.    "**Allowed**" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed by the Claims Bar Date or the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed) in accordance with the terms of the Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in the foregoing clauses (a) and (b), such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.   Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.   For purposes of determining the amount of an Allowed Claim, there may be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable Law.   Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be Filed), is not considered Allowed and shall be expunged from the claims register maintained by the Voting Agent without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.   For

the avoidance of doubt:  (x) a Proof of Claim ~~or~~Filed after the Claims Bar Date is deemed Disputed; (y) the request for payment of an Administrative Claim~~, as applicable,~~ Filed after ~~the Claims Bar Date or~~ the Administrative Claims Bar Date~~, as applicable,~~ shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Administrative Claim or agreement in writing by the Chapter 11 Trustee or Wind-Down Debtors, as applicable, and the Holder of such late-Filed Administrative Claim; and (~~y~~z) the Chapter 11 Trustee or Wind-Down Debtors, as applicable, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "**Allow**" and "**Allowing**" shall have correlative meanings.

9.   "**Alpha DIP Credit Agreement**" means that certain senior secured superpriority debtor-in-possession credit and guaranty agreement, dated as of April 3, 2024, among BYJU's Alpha, as borrower, GLAS, as agent, and certain lenders and guarantors thereto (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

10.  "**Alpha Funds**" means the approximately $533,000,000 in aggregate funds transferred by BYJU's Alpha to Camshaft Capital Fund, LP in April 2022 and July 2022, and the proceeds thereof.

11.  "**Apple**" has the meaning provided in Article III, Section B.6.

12.  "**Assumed Liability**" or "**Assumed Liabilities**" means any liability assumed by one or more Purchasers pursuant to a Sale Transaction.

13.  "**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other Causes of Action, Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non bankruptcy law, including Causes of Action, Claims, actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common Law, including fraudulent transfer Laws.

14.  "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

15.  "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 156, the United States District Court for the District of Delaware.

16.  "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, as now in effect or hereafter amended.

17. "**Bar Date**" means, with respect to any particular Claim, the specific date established by the Bankruptcy Court as the last day for filing Proofs of Claim against the Debtors.

18. "**Bar Date Order**" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Claims Under 11 U.S.C. §§ 507(a)(3) through (a)(10) and 503 (b)(9), (II) Approving the Form for Filing Proofs of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [D.I. 530].

19. "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

20. "**BYJU's Alpha**" means BYJU's Alpha, Inc.

21. "**Cash**" means cash, cash equivalents, bank deposits, and negotiable instruments payable on demand.

22. "**Cause of Action**" or "**Causes of Action**" means any Claim, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty, interest, damage, remedy, cause of action, proceeding, agreement, cross claim, counterclaim, contribution, suit, class action, third-party claim, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, direct or indirect, choate or inchoate, Disputed or undisputed, liquidated or unliquidated, Secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, in tort, at Law, in equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and Claims under contracts or for breaches of duties imposed by Law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign Law, or breach of any duty imposed by Law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) Claims pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (e) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (f) the Adversary Proceedings; and (g) any Avoidance Actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer Laws.

23. "**Chapter 11 Cases**" means the chapter 11 cases for each of the Debtors: *In re Saga Formations, Inc.* (f/k/a Epic Creations, Inc.) (Case No. 24-11161 (BLS)), *In re Pajeau, Inc.* (f/k/a Neuron Fuel, Inc.) (Case No. 24-11162 (BLS)), and *In re Tangible Play, Inc.* (Case No. 24-11163 (BLS)), all of which are jointly administered under Case No. 24-11161 (BLS).

24. "**Chapter 11 Trustee**" means Claudia Z. Springer, Esq., not individually but in her capacity as chapter 11 trustee on behalf of the Estates of each of the Debtors.

25. **"Claim"** means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

26. **"Claims and Noticing Agent"** means Kurtzman Carson Consultants LLC d/b/a Verita Global.

27. **"Claims Objection Deadline"** means the date that is sixty (60) days after the Effective Date, unless otherwise extended by the Bankruptcy Court.

28. **"Class"** means a class of Claims or Interests as set forth in Article IV hereof pursuant to section 1122(a) of the Bankruptcy Code.

29. "**Cloudflare**" has the meaning provided in Article III, Section B.6.

30. **"Combined Hearing"** means the hearing held by the Bankruptcy Court to consider (a) approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (b) Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

31. **"Confirmation Date"** means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

32. "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

33. "**Consent of the Agent**" means the prior written consent of the Prepetition Administrative Agent or Prepetition Collateral Agent, as applicable, at the direction of the Prepetition Required Lenders, solely to the extent that (i) the Prepetition Term Loan Claims have not already been paid in full in Cash and (ii) the action that requires consent may adversely affect the Holders of Prepetition Term Loan Claims.

34. "**Consummation**" means the occurrence of the Effective Date.

35. "**Consumer Privacy Ombudsman**" means Elise S. Frejka, the appointed consumer privacy ombudsman.

36. **"Creditor"** means any Person that is the Holder of a Claim against the Debtors.

37. "**D&O Liability Insurance Policies**" means all directors and officers liability insurance contracts (including any "tail policy") issued or providing coverage at any time to any of the Debtors, any of their predecessors, and/or any of their current or former subsidiaries for current or former directors', managers', and officers' liability, and all agreements, documents, or instruments relating thereto.

38. **"Debtor Release"** means the release set forth in Article X.D hereof.

39.  **"Debtors"** means Saga Formations, Inc. (f/k/a Epic! Creations, Inc.), Pajeau, Inc. (f/k/a Neuron Fuel, Inc.), and Tangible Play, Inc. collectively, and each is a "Debtor."

40.  **"DIP Agent"** means GLAS in its capacity as administrative and collateral agent under the DIP Facility.

41.  **"DIP Credit Agreement"** means that certain senior secured superpriority debtor-in-possession credit and guaranty agreement, dated as of October 31, 2024, among the Chapter 11 Trustee, on behalf of the Debtors and their Estates, as borrower, the DIP Agent, and certain lenders thereto (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

42.  **"DIP Facility"** means that certain senior-secured multiple-draw term loan facility in the maximum principal amount of up to $152 million (including the Roll-Up Loans), entered into pursuant to the DIP Credit Agreement and the Final DIP Order.

43.  "**DIP Lenders**" means, collectively, the lenders from time to time under the DIP Facility.

44.  "**DIP Motion**" means the *Trustee's Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Authorizing the Trustee to Obtain Postpetition Financing, (III) Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [D.I. 221].

45.  **"Disallowed"** means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Plan, the Bankruptcy Code, applicable law, or by Final Order.

46.  **"Disputed"** means, with respect to any Claim or an Interest (or portion thereof): (a) that is not yet Allowed; (b) that is not Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment without any further notice to or action, order, or approval of the Bankruptcy Court.

47.  "**Distributable Cash**" means all the Cash of the Debtors or the Wind-Down Debtors, on the Effective Date, after giving effect to the funding of the Plan Reserves.

48.  "**Distributable Proceeds**" means all Cash on hand of the Plan Administrator and the Wind-Down Debtors, including all Cash proceeds generated from the use, sale, lease, liquidation, or other disposition of the Wind-Down Debtors' Assets and the prosecution, enforcement, settlement, or other monetization or disposition of the Retained Causes of Action, in each case regardless of whether such proceeds are collateral of any Holder of a Secured Claim; *provided* that all distributions of the Distributable Proceeds shall be subject to the terms of the Plan, the Confirmation Order, and the Plan Administrator Agreement, including, for the avoidance of doubt, the requirement to pay or reserve for the expenses of the Plan Administrator or the Wind-Down Debtors, including amounts outstanding under the

Wind-Down Financing Facility, in advance of making any distribution.  For the avoidance of doubt, any proceeds distributed from the Distributable Cash on or prior to the Effective Date shall not be considered Distributable Proceeds.

49.  **"Distribution"** means any transfer of Cash or other property or instruments to a Holder of an Allowed Claim pursuant to the Combined Plan and Disclosure Statement.

50.  **"Distribution Record Date"** means the record date for the purpose of determining Holders of Allowed Claims entitled to receive Distributions under the Plan on account of Allowed Claims, which date shall be (a) as to the Distributable Cash, the Confirmation Date or such other date designated in the Confirmation Order or any subsequent Bankruptcy Court order and (b) as to the Distributable Proceeds, such date determined by the Plan Administrator and the Wind-Down Debtors Oversight Committee.

51.  **"Effective Date"** means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the occurrence of the Effective Date have been satisfied or waived, and (c) the Plan is declared effective by the Chapter 11 Trustee (with the Consent of the Agent).

52.  **"Effective Date Distributions"** means all the Distributions required to be made on the Effective Date of the Plan to the Holders of Claims that are Allowed as of the Effective Date.

53.  **"Epic**" means Saga Formations, Inc. (f/k/a Epic! Creations, Inc.).

54.  **"Epic Joinder"** means Epic's joinder to the Prepetition Term Loan Facility via execution of the Counterpart Agreement (as defined in the Prepetition Credit Agreement) and execution of the Joinder Agreement (as defined in the Prepetition Security Agreement), on or around July 19, 2022.

55.  **"Epic Purchase Agreement"** means the Purchase Agreement by and between Claudia Z. Springer, not in her individual capacity but solely in her capacity as Chapter 11 Trustee of Epic! Creations, Inc., on behalf of the Estate of Debtor Epic! Creations, Inc. (as Seller), and Hy Ruby Limited (as Buyer) dated as of May 15, 2025.

56.  **"Entity"** shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

57.  **"Estate Professionals**" means Jenner & Block LLP, Pashman Stein Walder Hayden, P.C., Quinn Emanuel Urquhart & Sullivan LLP, The Law Offices of Panag & Babu, Novo Advisors LLC, FTI Consulting, Inc., Moelis & Company LLC, SC&H Group, Inc., and Kurtzman Carson Consultants LLC d/b/a Verita Global.

58.  **"Estates"** means the estates created in these Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

59. "**Excess Reserves**" means any excess amounts remaining in any of the Plan Reserves after the final Distribution has been made to the Holders of Allowed Claims entitled to receive a Distribution from such Plan Reserve, which amounts shall immediately vest in the Wind-Down Debtors and be considered Retained Assets and Distributable Proceeds.

60. "**Excluded Parties**" means all parties that are not "Released Parties," as defined herein, including, without limitation: (1) Think and Learn Private Limited; (2) Think & Learn, Inc.; (3) BYJU's Pte. Ltd.; (4) BYJU's Inc.; (5) BYJU's K3 Education Pvt Ltd.; (6) BYJU's ~~Technologia~~Tecnologia Educacional LTDA; (7) Byju's S.A. de C.V.; (8) BYJU's Alpha, Inc.; (9) BYJU's Beta, Inc.; (10) BYJU'S Learning Company FZCO Dubai; (11) ~~BYJU'S Tecnologia Educational Ltda; (12)~~ Codr, Inc.; (12) Whitehat Education Technology Pvt. Ltd.; (13) Whitehat Education Technology ~~Pvt. Ltd., LLC~~; (14) ~~Whitehat Education Technology, LLC; (15)~~ Great Learning Education Pte Ltd.; (~~16~~15) Inspilearn LLC; (~~17~~16) Aakash Educational Services Ltd.; (~~18~~17) Specadel Technologies Pvt Ltd; (~~19~~18) Span Thoughtworks Pvt. Ltd; (~~20~~19) Topper Technologies Pvt Ltd; (~~21~~20) Grade Stack Learning Private Ltd; (~~22~~21) Aakash Edutech Pvt Ltd; (~~23~~22) Haygot Services Private Limited; (~~24~~23) Digital Aristotle Pvt Ltd.; (~~25~~24) Geogebra GMBH; (~~26~~25) all other non-Debtor current and former direct and indirect subsidiaries and Related Parties of Think and Learn Private Limited; (~~27~~26) Byju Raveendran and Byju Ravindran; (~~28~~27) Riju Raveendran and Riju Ravindran; (~~29~~28) Divya Gokulnath; (~~30~~29) Anita Kishore; (~~31~~30) Aaron Kornblum; (~~32~~31) Roshan Thomas; (~~33~~32) S. Hari; (~~34~~33) Elvis Mookken; (~~35~~34) all other current and former directors, officers, and managers of Think and Learn Private Limited and each of its non-Debtor current and former direct and indirect subsidiaries except for those parties that are expressly identified as Released Parties; (~~36~~35) all current and former directors and officers of the Debtors except for those parties that are expressly identified as Released Parties (*i.e.*, the Chapter 11 Trustee), including but not limited to Vinay Ravindra, Jonathan Naseath, Cherian Thomas, Mark Solomon, Pramod Sharma, Katherine Xu, Srikanth Chinnam, Ranjit Pawar, Jerome Scholler, Suren Markosian, Kevin Donahue, and Guillaume Poncin; (~~37~~36) Camshaft Capital Fund, LP; (~~38~~37) Camshaft Capital Management, LLC; (~~39~~38) Camshaft Capital Advisors, LLC; (~~40~~39) William Cameron Morton; (~~41~~40) OCI Limited; (~~42~~41) Apex Fund Services, Inc.; (~~43~~42) the Voizzit Entities; (~~44~~43) all current and former directors and officers of the Voizzit Entities included but not limited to Rajendaran Vellapalath; (~~45~~44) Sandeep Vellapalath; (~~46~~45) Arkishnan Nair Vellapalath; (~~47~~46) Rahul Rajendran Vellapalath; (~~48~~47) Bisy Philip Vellapalath; (~~49~~48) the MCA Lenders; (~~50~~49) Praveen Prakash; (~~51~~50) Sharath Kumar; (~~52~~51) Shaji Puthalath; (~~53~~52) Ranjan Pai; (~~54~~53) Manipal Education and Medical Group; (~~55~~54) Oliver Chapman; (~~56~~55) Rupin Banker; (~~57~~56) Aswanit Nambarambath; (~~58~~57) John Coyne; (~~59~~58) Margot Herman; (~~60~~59) Arjun Mohan; (~~61~~60) Taejoon Park; (~~62~~61) Maneesh Arora; (~~63~~62) Heidi Walas; (~~64~~63) Nirav Shah; (~~65~~64) Joe Mixon; (~~66~~65) Saiprasad Palekar; (~~67~~66) Aranjith Pawar; (~~68~~67) Nathin Golani; (~~69~~68) Will Hailer; (~~70~~69) Joe Isaacof; (~~71~~70) Rao Nagam; (~~72~~71) Utsav Wgoswami; (~~73~~72) Jennifer Kajisa; (~~74~~73) Thuy Do; (~~75~~74) Karan Bajaj; (~~76~~75) Sajid Shariff; (~~77~~76) Marc Jacobson; (~~78~~77) Trupti Mukker; (~~79~~78) Hiruth Haile; (~~80~~79) Raghav Jain; (~~81~~80) Abhishek Dugar; (~~82~~81) Pradeepta Pradham; (~~83~~82) Prashant Marwaha; (~~84~~83) Yifat Schnur; (~~85~~84) Nawab Nasrat; (~~86~~85) Hardik Bhatia; (~~87~~86) Santosh Kumar; (~~88~~87) Mandar Patil; (~~89~~88) Adler Martins; (~~90~~89) Markus Hohenwarter; (~~91~~90) Rose Acre; (~~92~~91) BDO; (~~93~~92) Suri & Co.; (~~94~~93) Ernst & Young; (~~95~~94) YLVS ESQ LLC; (~~96~~95) DLA Piper LLP; (~~97~~96) Kasowitz Benson Torres LLP; (~~98~~97) Pankaj Srivastava; (~~99~~98) Google LLC; (~~100~~99) Stripe, Inc.; (~~101~~100) Wells Fargo Bank, National

Association; (~~102~~101) Hogan Lovells US LLP and Hogan Lovells International LLP; (~~103~~102) every additional Person or Entity that is included on the Schedule of Excluded Parties to be Filed with the Plan Supplement, if any; and (~~104~~103) each current and former Affiliate and Related Party of each Person or Entity in clauses (1) through (~~103~~102). Notwithstanding anything herein to the contrary, no Excluded Party shall be considered a Released Party or an Exculpated Party in any capacity hereunder and all Claims and Causes of Action against each Excluded Party shall be preserved and shall not be released. The term "Excluded Parties" shall be deemed to control over the term "Released Parties," such that if an Entity would be considered both an Excluded Party and a Released Party, such Entity shall be deemed an Excluded Party and not a Released Party for all purposes hereunder.

61.    **"Exculpated Claim"** means any Claim related to any act taken or omitted to be taken in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Combined Plan and Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Combined Plan and Disclosure Statement, the preparation, filing or administration of the Chapter 11 Cases or the operation of the Debtors' businesses, the pursuit of Confirmation, the pursuit of the approval of the Sale Transactions, and the administration and implementation of the Combined Plan and Disclosure Statement, including the Distribution of property under the Combined Plan and Disclosure Statement or any other agreement.

62.    **"Exculpated Parties"** means (i) the Chapter 11 Trustee and her Related Parties, including the Estates' Professionals; and (ii) the CPO.

63.    "**Executory Contract**" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

64.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

65.    **"Final DIP Order"** means the *Final Order (I) Authorizing the Use of Cash Collateral, (II) Authorizing the Chapter 11 Trustee on Behalf of the Debtors' Estates to Obtain Postpetition Financing, (III) Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 313].

66.    **"Final Order"** means, as applicable, an order or judgment of the Bankruptcy Court or other United States court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay, and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or Filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could

be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be Filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

67. **"General Bar Date"** means March 26, 2025.

68. **"General Unsecured Claim"** means any Claim, other than a Secured Claim, that is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) a Priority Tax Claim, (c) an Other Secured Claim, (d) an Other Priority Claim, (e) a DIP Claim, (f) an Intercompany Claim, or (g) a Section 510(b) Claim; *provided* that any General Unsecured Claim that is an Assumed Liability under a Purchase Agreement shall be satisfied under such Purchase Agreement and shall not be an obligation of the Debtors, the Estates or the Wind-Down Debtors to the extent so assumed.

69. **"GLAS"** means GLAS Trust Company LLC, in its capacity as Prepetition Administrative Agent, Prepetition Collateral Agent, or DIP Agent, as applicable.

70. "**Google**" has the meaning provided in Article III, Section B.6.

71. **"Governmental Bar Date Order"** means March 26, 2025.

72. **"Holder"** means any Entity that is the legal or beneficial holder of a Claim or Interest.

73. **"Impaired"** means, with respect to any Class, a Class that is impaired within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

74. "**Intercompany Claim**" means any Claim held by a Debtor or an Affiliate of a Debtor against a Debtor.

75. "**Intercompany Interest**" means any Interest held by a Debtor in another Debtor or non-Debtor subsidiary or Affiliate.

76. "**Intercreditor Agreement**" means that certain Amended and Restated Subordination and Intercreditor Agreement, dated as of October 31, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and between GLAS, as administrative agent and collateral agent for the lenders under the Alpha DIP Credit Agreement, GLAS, as administrative agent and collateral agent for the lenders under the DIP Credit Agreement, and GLAS, as administrative agent and collateral agent under the Prepetition Credit Agreement, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

77. **"Interests"** means any equity interest in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other

agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

78. **"Interim Approval and Procedures Order"** means the *Order (I) Approving the Combined Plan and Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots and Solicitation Materials; (IV) Establishing the Voting Record Date; (V) Fixing the Date, Time, and Place for the Combined Hearing and the Deadline for Filing Objections Thereto; and (VI) Granting Related Relief.* [D.I. [● ].]

81. **"Law"** means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

82. **"Lien"** shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

83. **"Liquidating Trust"** means a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations, which may be established by the Wind-Down Debtors for the purpose of facilitating the Wind-Down.

84. **"Liquidation Analysis"** is the analysis set forth herein at <u>Exhibit A</u>.

85. **"Local Rules"** means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

86. "**MCA Lenders**" means Cobalt Funding Solutions, City Capital NY, Alva Advance, Riverside Capital NY, 24 Capital, Infusion Capital Group, Fidi Capital, Progressive Capital, Redstone Advance Inc., Cheetah Capital, American Funding, Symplifi, Coldwater Capital, Secure Capital, Shift Capital, and any other Person who made an MCA Loan to any of the Debtors or who obtained a guarantee of a MCA Loan from any of the Debtors.

87. "**MCA Loan**" means a merchant cash advance loan or similar lending instrument with comparable terms to an MCA Loan.

88. "**Moelis**" has the meaning provided in Article III, Section B.6.

89. **"Neuron Fuel"** means Pajeau, Inc. (f/k/a Neuron Fuel, Inc.).

90. **"Neuron Fuel Joinder"** means Neuron Fuel's joinder to the Prepetition Term Loan Facility via execution of the Counterpart Agreement (as defined in the Prepetition Credit Agreement) and execution of the Joinder Agreement (as defined in the Prepetition Security Agreement), on or around July 19, 2022.

91. **"Neuron Fuel Purchase Agreement"** means the Purchase Agreement by and between Claudia Z. Springer, not in her individual capacity but solely in her capacity as

Chapter 11 Trustee of Neuron Fuel, Inc., on behalf of the Estate of Debtor Neuron Fuel, Inc. (as Seller), and Tynker Holdings, LLC, (as Buyer) dated as of May 6, 2025.

92.    **"Order for Relief Date"** means September 16, 2024, the date on which the Bankruptcy Court entered the *Order or Relief in Involuntary Cases and Appointing Chapter 11 Trustee* [D.I. 147].

93.    **"Other Priority Claim"** means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases; *provided* that any Other Priority Claim that is an Assumed Liability under a Purchase Agreement shall be satisfied solely under such Purchase Agreement and shall not be an obligation of the Debtors, the Estates or the Wind-Down Debtors.

94.    "**Other Priority Claims Amount**" means an amount equal to the Chapter 11 Trustee's good-faith estimate of the aggregate Allowed Other Priority Claims, which estimate the Chapter 11 Trustee shall deliver to counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

95.    "**Other Priority Claims Reserve**" means the reserve for the Allowed Other Priority Claims established by the Chapter 11 Trustee in an amount equal to the Other Priority Claims Amount.

96.    "**Other Secured Claim**" means any Secured Claim, other than the Prepetition Term Loan Claims; *provided* that any Other Secured Claim that is an Assumed Liability under a Purchase Agreement shall be satisfied solely under such Purchase Agreement and shall not be an obligation of the Debtors, the Estates or the Wind-Down Debtors.

97.    "**Other Secured Claims Amount**" means an amount equal to the Chapter 11 Trustee's good-faith estimate of the aggregate Allowed Other Secured Claims, which estimate the Chapter 11 Trustee shall deliver to counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

98.    "**Other Secured Claims Reserve**" means the reserve for the Allowed Other Secured Claims established by the Chapter 11 Trustee in an amount equal to the Other Secured Claims Amount.

99.    **"Person"** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

100.   **"Petition Date"** means June 4, 2024, with respect to Epic and June 5, 2024, with respect to Neuron Fuel and Tangible Play, the dates on which the Petitioning Lender Creditors filed involuntary petitions against the Debtors under Chapter 11 of the Bankruptcy Code.

101.   **"Petitioning Lender Creditors"** means those Entities identified in the column, "Petitioning Creditor Group" on the *Table of Contents for Epic! Creations, Inc. Involuntary Petition* attached to the *Involuntary Petition Against a Non-Individual* [D.I. 1].

14

102. **"Plan Supplement"** means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Chapter 11 Trustee no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest.

103. **"Prepetition Administrative Agent"** means GLAS, in its capacity as the administrative agent under the Prepetition Credit Agreement.

104. **"Prepetition Agent"** means GLAS, in its capacities as administrative agent and collateral agent under the Prepetition Term Loan Facility.

105. **"Prepetition Collateral Agent"** means GLAS, in its capacity as the collateral agent under the Prepetition Credit Agreement.

106. **"Prepetition Credit Agreement"** means that certain credit and guaranty agreement dated November 24, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

107. **"Prepetition Required Lenders"** has the meaning ascribed to the term "Required Lenders" in the Prepetition Credit Agreement.

108. **"Prepetition Security Agreement"** means that certain Pledge and Security Agreement dated as of November 24, 2021.

109. **"Prepetition Term Loans"** means loans, including fees and expenses, outstanding under the Prepetition Credit Agreement.

110. **"Prepetition Term Loan Claims"** means any Claims arising under, derived from, or based upon the Prepetition Credit Agreement, including but not limited to Claims Secured by the Prepetition Term Loan Lenders' liens granted by the Prepetition Security Agreement on substantially all of the Debtors' assets, including all causes of action, and the Prepetition Term Loan Lenders' liens on Avoidance Actions to the extent of diminution of value granted by the Final DIP Order.

111. **"Prepetition Term Loan Effective Date Distribution"** means the payment in Cash on the Effective Date from Distributable Cash, up to the aggregate amount of Prepetition Term Loan Claims outstanding as of the Effective Date.

112. **"Prepetition Term Loan Facility"** means that certain secured term loan facility arising under the Prepetition Credit Agreement.

113. **"Prepetition Term Loan Guarantees"** means the guarantees of Tangible Play, Epic, and Neuron Fuel provided pursuant to the Epic Joinder, Neuron Fuel Joinder, the Prepetition Credit Agreement, the Prepetition Security Agreement, and related Loan Documents (as defined in the Prepetition Credit Agreement).

114. "**Prepetition Term Loan Lenders**" means, collectively, the lenders from time to time under the Prepetition Credit Agreement.

115. "**Priority Tax Claim**" means any Claim which, if Allowed, would be entitled to priority under Section 507(a)(8) of the Bankruptcy Code; *provided* that any Priority Tax Claim that is an Assumed Liability under a Purchase Agreement shall be satisfied solely under such Purchase Agreement and shall not be an obligation of the Debtors, the Estates or the Wind-Down Debtors.

116. "**Priority Tax Claim Amount**" means an amount equal to the Chapter 11 Trustee's good-faith estimate of the aggregate Allowed Priority Tax Claims, which estimate the Chapter 11 Trustee shall deliver to counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

117. "**Priority Tax Claim Reserve**" means the reserve for the Allowed Priority Tax Claims established by the Chapter 11 Trustee in an amount equal to the Priority Tax Claims Amount.

118. "*pro rata*" means, for purposes of distributions under the Plan, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

119. "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

120. "**Professional Fee Claim**" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after each Petition Date and through and including the Effective Date that the Bankruptcy Court has not denied by Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

121. "**Professional Fee Escrow Account**" means an interest-bearing escrow account to be funded by the Chapter 11 Trustee, with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

122. "**Professional Fee Escrow Amount**" means the aggregate amount of the Professional Fee Claims and other unpaid fees and expenses the Chapter 11 Trustee's Professionals estimate they have incurred or will incur in rendering services to the Chapter 11 Trustee prior to and as of the Effective Date, which estimates such Professionals shall deliver to the Chapter 11 Trustee and counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

123. **"Proof of Claim"** means the proof of Claim filed by a Holder on account of such Claim.

124. **"Purchase Agreements"** mean the Epic Purchase Agreement and the Neuron Fuel Purchase Agreement.

125. **"Purchaser"** means Hy Ruby Limited (for purposes of the Epic Purchase Agreement) and Tynker Holdings, LLC (for purposes of the Neuron Fuel Purchase Agreement).

126. **"Reinstate,"** **"Reinstated,"** or **"Reinstatement"** means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

127. **"Related Party"** means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees, each in their capacities solely as such.

128. **"Released Parties"** means (a) the current Prepetition Term Loan Lenders; (b) the Prepetition Agent; (c) the DIP Lenders; (d) the DIP Agent; (e) the Petitioning Lender Creditors, and each of their Related Parties and any other related Persons, but solely in their capacity as such.

129. **"Rejection Bar Date"** means the deadline by which a counterparty to a rejected Executory Contract or Unexpired Lease of the Debtors must file a Proof of Claim for damages resulting from the rejection of such Executory Contract or Unexpired Lease by the Chapter 11 Trustee, which deadline shall be the later of: (a) the General Bar Date; (b) thirty (30) days after the entry of an order by the Bankruptcy Court authorizing such rejection; or (c) such other date, if any, as the Bankruptcy Court may fix in the order authorizing such rejection.

130. **"Rejection Claims"** means any Claim arising from, or relating to, the rejection of an Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code by the Chapter 11 Trustee, as limited, in the case of a rejected Unexpired Lease, by section 502(b)(6) of the Bankruptcy Code.

131. **"Retained Assets"** means those assets vesting in the Wind-Down Debtors upon or after the Effective Date; *provided* that the Plan Reserves shall not be designated as Retained Assets except to the extent of any excess funds in any such reserve. For the avoidance of doubt, the Retained Assets shall exclude (a) the Acquired Assets, and (b) any

17

assets abandoned or otherwise disposed of pursuant to the Plan or any Final Order of the Bankruptcy Court.

132. "**Retained Causes of Action**" means all Claims and Causes of Action (including, for the avoidance of doubt, the Adversary Proceedings and the Avoidance Actions) belonging to the Chapter 11 Trustee, any of the Debtors, or their respective Estates, including, but not limited to, all Causes of Action enumerated on the Schedule of Retained Causes of Action which shall be filed with the Plan Supplement, all of which shall vest in the Wind-Down Debtors pursuant to the terms of the Plan and be deemed an integral part thereof. For the avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action against the Excluded Parties, whether or not listed on the Schedule of Retained Causes of Action. For the further avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action arising out of or in connection with: (a) the efforts of Byju Raveendran, Riju Ravindran, the Voizzit Entities, Rajendran Vellapalath, or the Debtors insiders, including Vinay Ravindra, or any of their respective Affiliates or associates, to transfer or take the Debtors' assets either before the Petition Date or during the Chapter 11 Cases, (b) the efforts of Byju Raveendran, Riju Ravindran, the Voizzit Entities, Rajendran Vellapalath, or the Debtors' insiders, including Vinay Ravindra, or any of their respective Affiliates or associates, to disrupt or impair the Chapter 11 Cases, (c) the Alpha Funds, and (d) any breach of fiduciary duties by the Debtors' current or former directors or officers, with the exception of the Chapter 11 Trustee or any individual appointed as a director or officer by the Chapter 11 Trustee. Retained Causes of Action shall not include any Causes of Action that are (x) settled, released, or exculpated under the Plan or (y) expressly sold or assigned to any Purchaser, as set forth in the applicable Purchase Agreement, pursuant to the applicable Sale Order.

133. "**Sale Order(s)**" means the *Order (I) Approving the Sale of Epic! Creations, Inc.'s Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief* [D.I. 724] (the "**Epic Sale Order**") and the *Order (I) Approving the Sale of Neuron Fuel, Inc.'s Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief* [D.I. 723] (the "**Neuron Fuel Sale Order**").

134. "**Sale Transaction**" means the sale of all, substantially all, or a portion of a respective Debtor's assets and/or equity interests, and all other transactions pursuant to any Purchase Agreement entered into by the Chapter 11 Trustee, on behalf of the Debtors and their respective Estates.

135. "**SC&H**" has the meaning provided in Article III, Section B.6.

136. "**Schedule of Assumed Executory Contracts and Unexpired Leases**" means that certain schedule, if any, Filed with the Plan Supplement of certain Executory Contracts and Unexpired Leases to be assumed by the Chapter 11 Trustee pursuant to the Plan and in accordance with the respective Purchase Agreement (if applicable), as such schedule may be

amended, modified, or supplemented from time to time by the Chapter 11 Trustee which, including any modifications thereto, shall be acceptable to the Purchasers.

137. "**Schedule of Excluded Parties**" means that certain schedule Filed with the Plan Supplement of a non-exhaustive list of Excluded Parties.

138. "**Schedule of Retained Causes of Action**" means that certain schedule Filed with the Plan Supplement of a non-exhaustive list of Claims and Causes of Action of the Debtors and their Estates that are not released, waived, or transferred, other than to the Wind-Down Debtors, pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.  For the avoidance of doubt, the failure to list a Claim or Cause of Action on the Schedule of Retained Causes of Action shall not affect such Claim or Cause of Action being a Retained Cause of Action.

139. "**Scheduled**" means that a Claim is specifically acknowledged in the Schedules.

140. "**Schedules**" means the schedules of assets and liabilities, the list of Holders of Interests, and the statements of financial affairs Filed by the Debtors under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto, if any.

141. "**Secured**" means when referring to a Claim:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable Law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.

142. "**Security**" means any security, as defined in section 2(a)(1) of the Securities Act.

143. "**Solicitation Package**" means the packages to be distributed to Creditors for solicitation of votes on this Plan.

144. "**Statutory Fees**" means all fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable.

145. "**Stripe**" has the meaning provided in Article III, Section B.6.

146. "**T&L**" means Think & Learn Pvt. Ltd. d/b/a BYJU's.

147. "**Tangible Play**" means Tangible Play, Inc.

148. "**Tangible Play Guaranty**" means the guaranty of the Prepetition Term Loan Facility dated as of November 24, 2021.

149. "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

150. "**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

151. "**U.S. Trustee**" means the United States Trustee for the District of Delaware.

152. "**U.S. Trustee Fees**" means fees arising under 28 U. S. C. § 1930(a)(6).

153. "**Voizzit Entities**" means Voizzit India and Voizzit UAE.

154. "**Voizzit India**" means Voizzit Technology Private Ltd.

155. "**Voizzit UAE**" means Voizzit Information Technology LLC.

156. "**Voting Agent**" means Kurtzman Carson Consultants LLC d/b/a Verita Global.

157. "**Voting Deadline**" means September 9, 2025, at 4:00 p.m. (prevailing Eastern Time).

158. "**Voting Record Date**" means the date established by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

159. "**Wind-Down**" means, the wind-down, dissolution, and liquidation of the Debtors' Estates after the Effective Date.

160. "**Wind-Down Debtor Assets**" means, on the Effective Date, all assets of each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, which shall exclude the Acquired Assets and Assumed Liabilities, and which shall in any event include, without limitation: (a) the Wind Down Reserve, (b) all Retained Causes of Action, (c) all Retained Assets; (d) the Excess Reserves (if any); and (e) the proceeds of any of the foregoing.

161. "**Wind-Down Debtors**" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise on or after the Effective Date.

162. "**Wind-Down Debtors Oversight Committee**" means the oversight committee tasked with overseeing the Wind-Down Debtors in accordance with the Plan and Plan Administrator Agreement.

163. "**Wind-Down Transactions**" means any mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, formations, dissolutions or other corporate transactions described in, approved by, contemplated by, or undertaken to implement the Wind-Down pursuant to the Plan.

**B.      Rules of Interpretation.**

1.      **Bankruptcy Code Section 102.** The rules of construction in section 102 of the Bankruptcy Code apply to this Combined Plan and Disclosure Statement to the extent not inconsistent with any other provision of this Article II.B.

2.      **Undefined Terms.** Any term that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

3.      **Combined Plan and Disclosure Statement Definitions Control.** The definition given to any term or provision in the Combined Plan and Disclosure Statement supersedes and controls any different meaning that may be given to that term or provision in the Bankruptcy Code, the Bankruptcy Rules, or the Disclosure Statement.

4.      **Include and Including.** The terms "including" or "include(s)" are intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" or "include(s), but is not limited to."

5.      **Plural and Singular Terms.** Whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine and the feminine gender shall include the masculine.

7.      **References to Court Filings.** Unless the context should otherwise require, all references to documents to be filed shall refer to filing with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules.

9.      **Inclusion of Amended Agreements.** Any reference in the Combined Plan and Disclosure Statement to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified, or supplemented.

11.      **Exhibits.** Unless otherwise specified, all references in the Combined Plan and Disclosure Statement to "Articles," "Sections," "Exhibits" and "Schedules" are references to Articles, Sections, Exhibits and Schedules of or to the Combined Plan and Disclosure Statement. Unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions.

13.      **Herein/Hereof/Hereto.** The words "herein," "hereof," and "hereto" refer to the Combined Plan and Disclosure Statement in its entirety rather than to a particular portion of the Combined Plan and Disclosure Statement.

15.      **Headings.** Captions and headings to Articles and Sections are inserted for ease of reference only and shall not be considered a part of the Combined Plan and Disclosure Statement or otherwise affect the interpretation of the Combined Plan and Disclosure Statement.

17. **Interpretation.** Any effectuating provisions may be interpreted by the Chapter 11 Trustee in such a manner that is consistent with the overall purpose and intent of the Combined Plan and Disclosure Statement all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control.

19. **Merger.** The Combined Plan and Disclosure Statement supersedes all prior plans, drafts of plans, and all prior negotiations, agreements, and understandings with respect to the plan, evidence of which shall not affect the interpretation of any provision of the Combined Plan and Disclosure Statement.

21. **Reference to Monetary Figures**. All references in the Combined Plan and Disclosure Statement to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

23. **Computation of Time.** Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Combined Plan and Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

25. **Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Combined Plan and Disclosure Statement, any agreements, documents, instruments, or contracts executed or entered into in connection with the Combined Plan and Disclosure Statement (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

## ARTICLE III: DISCLOSURE STATEMENT[3]

### A.   General Background

#### 1.   Overview of Business Operations

The Debtors are three U.S.-based companies that previously operated educational technology companies. Between 2019 and 2021, T&L, an Indian corporation co-founded by Byju Raveendran[4] in 2011, acquired each of the Debtors. T&L aimed to provide accessible education technology, and was run by a close-knit group of Byju Raveendran loyalists, including his brother Riju Ravindran.

---

[3]  The disclosures contained herein reflect the Chapter 11 Trustee's compliance with 11 U.S.C. § 1106(a)(3) and (4) and constitute her report for purposes of §1106(a)(4).

[4]  Byju Raveendran's name is sometimes also spelled "Ravindran." All references herein and in the Plan Supplement to Byju Raveendran are also references to Byju Ravindran.

As set forth in greater detail below, the Chapter 11 Trustee retained investment bankers to conduct a marketing process for substantially all of the Debtors' assets. Following that process, the Chapter 11 Trustee sold substantially all of the Epic and Neuron Fuel assets on May 27, 2025, and May 30, 2025, respectively. The Tangible Play marketing process did not result in a buyer. The Chapter 11 Trustee determined, in her business judgment, that there was not a path forward for Tangible Play's business to continue as a going concern. Tangible Play's business ceased operations in April 2025.

Prior to the Sale Transaction, Epic owned and operated the leading reading application in the United States for children at home, at school, and on the go. Through its application, which Epic reported in 2023 was used in over 80% of U.S. public elementary schools, Epic provided electronic books and other educational materials to students in kindergarten through eighth grade via a subscription-based service. Epic was founded in 2012 and acquired by T&L in November 2021 for a purported purchase price of approximately $500 million.

Prior to the Sale Transaction, Neuron Fuel operated a subscription-based educational platform known as Tynker that provided gamified coding lessons to children with over 100 million registered users across the globe. Neuron Fuel was founded in 2012 and acquired by T&L in September 2021 for a purported purchase price of approximately $200 million.

Tangible Play developed and sold a variety of educational gaming products, including its well-known Osmo line of products, which used a combination of physical and digital components to engage children in augmented reality-based educational games and experiences. Tangible Play was founded in 2013 and acquired by T&L in January 2019 for a purported purchase price of approximately $120 million.

### 2.    The Debtors' Capital Structure

### a.    Secured Obligations to the Prepetition Term Loan Lenders

The Debtors' secured prepetition indebtedness arises out of each Debtor's obligation as a guarantor of BYJU's Alpha's obligations under the Prepetition Credit Agreement.

In 2021, BYJU's Alpha, a Delaware corporation, was formed as a special purpose vehicle. As set forth below, through BYJU's Alpha, the T&L enterprise obtained financing from Western markets, including for its working capital and general corporate purposes.

On November 24, 2021, BYJU's Alpha, as borrower, and GLAS and the Prepetition Term Loan Lenders closed on the Prepetition Credit Agreement. The "Guarantors" to the Prepetition Credit Agreement included T&L, BYJU's Pte. Ltd., and certain of T&L's other affiliates, including Tangible Play. As security for their obligations under the Prepetition Credit Agreement, BYJU's Alpha and certain of guarantors, including Tangible Play, granted the Prepetition Term Loan Lenders a lien on the property defined as "Collateral" in the Prepetition Security Agreement.

On July 19, 2022, after T&L acquired Epic and Neuron Fuel, Riju Ravindran (also the signatory for the Tangible Play Guaranty) executed the Epic Joinder and the Neuron Fuel Joinder, obligating Neuron Fuel and Epic as additional guarantors of the Prepetition Credit

Agreement and the Prepetition Security Agreement. Riju Ravindran identified himself as a director of each Debtor when he signed the Tangible Play Guaranty, Epic Joinder, and Neuron Fuel Joinder (as applicable) on their behalf.

Following a series of defaults under the Prepetition Credit Agreement by BYJU's Alpha, GLAS, as collateral agent for the Prepetition Term Loan Lenders, exercised its right to transfer the pledged equity of BYJU's Alpha to itself and thereby became BYJU's Alpha's sole shareholder. Thereafter, on February 1, 2024, BYJU's Alpha commenced a voluntary chapter 11 case, *In re BYJU's Alpha*, Case No. 24-10140 in the Bankruptcy Court. As set forth below, on the Petition Date, the Petitioning Lender Creditors filed involuntary petitions against each of the Debtors, commencing the Chapter 11 Cases.

As of the Petition Date, each Debtor was obligated as a Guarantor for the outstanding amount due under the Prepetition Credit Agreement: $1,493,997,189.00.

### b.    Unsecured Obligations

As of the Order for Relief Date, the Trustee did not have access to the books and records of the Debtors. As of the General Bar Date, unsecured Claims totaling approximately $81,417,937 were asserted against the Estates, including trade payables, tax obligations, amounts owed to former and current employees, and other debts, but excluding the Prepetition Term Loan Lenders' unsecured deficiency Claims. The Trustee has not performed a detailed review of these Claims, however, based on a preliminary review, believes these Claims are overstated and include Claims which would be subordinated to unsecured Claims or that were satisfied in full or part by the payment of cure amounts set forth below.

In connection with the sales of the assets of Epic and Neuron Fuel (described below) the Estates paid a total of approximately $1,740,000.00 in cure payments, including $865,000 to scheduled Creditors or Creditors who filed Proofs of Claim.

As of the Petition Date, Epic had approximately $155,274.98 in Cash, Neuron Fuel had approximately $477,736.75 of Cash, and Tangible Play had approximately $34,013.79 of Cash.

In connection with the First-Day Motions, the Bankruptcy Court authorized the Chapter 11 Trustee to pay $229,791.66 in employee wages and commissions that accrued between the Petition Date and the Order for Relief Date.

### c.    The Debtors' Organizational Structure

A simplified chart depicting the Debtors' organizational structure is below:

24



### 3.    Events Leading to the Commencement of the Chapter 11 Cases

Although each of the Debtors operated as distinct businesses, the key events leading to the Chapter 11 Cases are common to all Debtors.

Between 2019 and 2021, T&L acquired each of the Debtors as part of its portfolio of educational technology companies. In November 2021, BYJU's Alpha borrowed $1.2 billion in term loans from the Prepetition Term Loan Lenders. Tangible Play executed the Tangible Play Guaranty contemporaneously with the closing of Prepetition Term Loan Facility. E Epic and Neuron Fuel each signed their respective Joinder Agreements—Epic signed the Epic Joinder and Neuron Fuel signed the Neuron Fuel Joinder—to the Prepetition Credit and Security Agreement on July 19, 2022. The terms of the Prepetition Term Loan Facility granted GLAS, as the agent for the Prepetition Term Loan Lenders, the right to on-site inspections of T&L and any loan party, including the Debtors. GLAS also had the right to receive information regarding the business operations and finances of any loan party, including the Debtors.

In January 2022, after securing the funding from the Prepetition Term Loan Facility, T&L was briefly lauded as India's most valuable startup, with a valuation of $22 billion. Circumstances changed quickly. Within four months after entering into the Prepetition Credit Agreement and borrowing $1.2 billion, on March 16, 2022, BYJU's Alpha defaulted on its covenants under the Credit Agreement. The Prepetition Term Loan Lenders agreed to multiple amendments of the Prepetition Credit Agreement, affording BYJU's Alpha and its guarantors, including the Debtors, multiple opportunities to cure their defaults while simultaneously

preserving the Prepetition Term Loan Lenders' rights to exercise contractual remedies. There ultimately was no cure. On March 3, 2023, following months of efforts by the Prepetition Term Loan Lenders to achieve a negotiated resolution, the Prepetition Term Loan Lenders directed GLAS to, *inter alia*, exercise remedies by accelerating the loan obligations and taking ownership of the pledged common stock in BYJU's Alpha. Nearly a year later, on February 1, 2024, BYJU's Alpha filed a chapter 11 petition in the Bankruptcy Court.

After GLAS, in its capacity as Prepetition Collateral Agent, took ownership of BYJU's Alpha, T&L and the Debtors failed to respond to the Prepetition Term Loan Lenders' information requests regarding the Debtors' finances and business operations. This failure was yet another default under the Prepetition Credit Agreement, which required ongoing performance notwithstanding default and acceleration. BYJU's Alpha, GLAS, and the Prepetition Term Loan Lenders elected to undertake their own investigation, which, in the words of GLAS and the Petitioning Lender Creditors, "revealed a frightening reality: the Ravindran brothers have orchestrated an international fraud, the full extent of which remains hidden." [D.I. 79.]

This investigation revealed a $533 million transfer in mid-2022 from BYJU's Alpha to Camshaft Fund (a sham hedge fund) in exchange for a limited partnership interest therein. Then, on March 31, 2023, *after* the Prepetition Term Loan Lenders had taken control of BYJU's Alpha, a transfer of the BYJU's Alpha limited partnership interest in Camshaft Fund was made to Inspilearn LLC, a non-operating, non-guarantor T&L subsidiary governed exclusively by Riju Ravindran. The investigation also revealed tens of millions of transfers out of the Debtors' bank accounts to other T&L affiliates, mounting debt and strained vendor relationships, depleted employee morale, vacant office spaces, and balance sheet insolvency. As set forth in detail below, the Chapter 11 Trustee's investigation supplemented this preliminary investigation and confirmed T&L's fraud and mismanagement in its ownership of the Debtors.

## B.    These Chapter 11 Cases

### 1.    The Involuntary Petitions

On the Petition Date, the Petitioning Lender Creditors filed an involuntary chapter 11 petition against each Debtor. [D.I. 1.]  On June 27, 2024, this Court entered an order directing joint administration of the Debtors' cases for procedural purposes. [D.I. 61.]

On June 5, 2024, the Petitioning Lender Creditors filed the *Motion of the Petitioning Creditors Under 11 U.S.C. 105(a) and 303(f) for Entry of an Order (A) Prohibiting the Alleged Debtors From Using Estate Assets for Non-Ordinary Course Purposes and (B) Requiring the Alleged Debtors to Provide Weekly Disclosures* [D.I. 9]. The Court entered an order granting the motion on June 28, 2024 [D.I. 69] (the "**303(f) Order**"), in which it prohibited the Debtors from transferring any assets outside the ordinary course of business and required the Debtors to produce weekly financial reports to the Petitioning Lender Creditors. As set forth below, the Chapter 11 Trustee's investigation revealed that, in violation of the 303(f) Order, from June 28, 2024 to October 9, 2024, the Debtors transferred at least $6.7 million of funds to non-Debtor T&L affiliates. The Debtors also failed to comply with the weekly financial reporting requirements by, among other things, failing to disclose all operative bank accounts.

On July 30, 2024, the Petition Lenders filed the *Petitioning Creditors' Motion to Appoint a Chapter 11 Trustee* [D.I. 80] citing to, among other things, the Debtors' repeated violation of the 303(f) Order, T&L's history of fraud, dishonesty, and gross mismanagement, the Debtors' failure to respond to the Petitioning Lender Creditors' information requests in violation of the Prepetition Credit Agreement, and the precipitous decline in the value of the Debtors.

### 2.     The Order for Relief and Appointment of the Chapter 11 Trustee

On the Order for Relief Date, September 16, 2024, this Court entered an order for relief in the Chapter 11 Cases and directed the appointment of a chapter 11 trustee [D.I. 147.]. On September 23, 2024, the U.S. Trustee appointed Claudia Z. Springer as the Chapter 11 Trustee. No examiner or statutory committee of unsecured creditors was appointed in the Chapter 11 Cases. On March 5, 2025, the U.S. Trustee appointed the Consumer Privacy Ombudsman.

### 3.     First Day Motions and Orders

On October 10, 2024, the Chapter 11 Trustee filed three motions (the "**First Day Motions**") to facilitate the efficient administration of the Chapter 11 Cases, stabilize operations, and preserve relationships with vendors, customers, and employees. The First Day Motions sought authority to, among other things, honor employee-related wage and benefits obligations, pay certain critical prepetition accounts payable, and ensure the continuation of the Debtors' cash management systems and other business operations. In support of the First Day Motions, the Chapter 11 Trustee submitted her declaration [D.I. 193.]. The Bankruptcy Court held a hearing on the First Day Motions on October 29, 2024, and granted the relief sought in the First Day Motions [D.I. 227, 228, and 229.].

### 4.     Post-Petition Financing

Upon her appointment, the Chapter 11 Trustee identified an immediate need for post-petition financing. As of the Chapter 11 Trustee's appointment, the Estates had a combined total of approximately $2 million in Cash on hand, which would have been insufficient to continue operations, maintain key employees, pay administrative costs, and preserve the businesses pending a marketing and sale process.

Accordingly, the Chapter 11 Trustee solicited multiple parties for financing opportunities. Ultimately the DIP Lenders, comprised of certain of the Prepetition Term Loan Lenders, were the only parties to present a term sheet. The Chapter 11 Trustee and her advisors engaged in arms' length negotiations with the DIP Lenders over the terms of the financing and agreed, subject to Bankruptcy Court approval, to the terms of the DIP Facility, which provided for $9.5 million in new money, with an uncommitted $9.5 million accordion feature, and a dollar for dollar roll up not to exceed $133 million, for a total of $152 million in potential DIP financing.

On October 29, 2024, the Chapter 11 Trustee filed the DIP Motion. In support of the DIP Motion, the Chapter 11 Trustee submitted the declaration of Jacob Grall. [D.I. 222.] The Bankruptcy Court approved the DIP Motion on an interim basis on October 31, 2024, and entered the Final DIP Order on November 20, 2024.

The Chapter 11 Trustee borrowed $10,445,335.24 under the DIP Facility. On May 27, 2025, the Chapter 11 Trustee paid off the Estates' obligations under the DIP Facility in full, including by paying the $10,445,335.24 in principal, $233,641.07 in interest, $66,500,000.07 of a roll-up amount attributable to the loans, $380,000.00 in a repayment premium, and directing that the $6,250,000.00 set in an escrow account by the DIP Lenders in connection with the DIP Facility be returned to them. The DIP Facility is now terminated.

Following the repayment of the DIP Facility, the Chapter 11 Trustee and the Prepetition Term Loan Lenders entered into a letter agreement extending the Estates' use of cash collateral through the Effective Date subject to certain terms and conditions.

### 5. Retention of Professionals

The Chapter 11 Trustee, through various applications which were subsequently approved by the Bankruptcy Court, retained Kurtzman Carson Consultants LLC d/b/a Verita Global as the Claims and Noticing Agent and Voting Agent [D.I. 181], Pashman Stein Walder Hayden, P.C. as Delaware bankruptcy counsel [D.I. 211], Quinn Emanuel Urquhart & Sullivan LLP as special counsel [D.I. 212], Novo Advisors LLC as accountants and financial advisors [D.I. 217], Jenner & Block LLP as bankruptcy co-counsel [D.I. 219], Panag & Babu as Indian local counsel [D.I. 367], FTI Consulting, Inc. to provide investigative and financial advisory services [D.I. 407], SC&H Group, Inc. ("**SC&H**") as investment banker and financial advisor for the Neuron Fuel and Tangible Play sales, and Moelis & Company LLC ("**Moelis**") as investment banker and financial advisor for the Epic sale [D.I. 437].

### 6. The Stay Violations and the Chapter 11 Trustee's Litigation to Preserve and Recover Estate Property

Immediately upon her appointment, the Chapter 11 Trustee, with the support of her legal and financial advisors, worked to familiarize herself with and stabilize the Debtors' businesses and operations, secure the Debtors' assets wherever located, identify reliable books and records, and assemble the information necessary to provide to this Court and other stakeholders.

As part of those efforts, the Chapter 11 Trustee's professionals reached out to the technology companies that provide the services necessary for the Debtors' operations and through which the Debtors' various software applications and services are distributed, including Google, LLC ("**Google**"), Apple, Inc. ("**Apple**"), Stripe, Inc. ("**Stripe**"), Cloudflare, Inc. ("**Cloudflare**"), GitHub, and others, to ensure that these entities would transfer all control over these accounts to the Chapter 11 Trustee.

As a result of these contacts, the Chapter 11 Trustee learned that the Voizzit Entities, Rajendran Vellapalath, Vinay Ravindra (the former CEO of Epic and Tangible Play and chief content officer of T&L), along with others, were violating the automatic stay and the 303(f) Order by asserting control over bank accounts, online platforms, e-mail accounts, and programs that were crucial to the Debtors' operations. Based on the facts before her, the Chapter 11 Trustee reasonably believed that these bad actors were taking these actions in concert with Byju Raveendran (the founder of T&L) and other T&L related parties. As set forth in more detail below, the Chapter 11 Trustee's investigation and evidence presented at several hearings

confirmed the Chapter 11 Trustee's belief that the Voizzit Entities, Mr. Vellapalath, and Mr. Ravindra were in fact working with Byju Raveendran and other T&L parties to divert Estate assets.

The Chapter 11 Trustee sought emergency enforcement of the automatic stay and commenced three adversary proceedings, each resulting in the entry of a temporary restraining order and later a preliminary injunction to prevent irreparable harm to the Estates as a result of the actions of bad actors attempting to divert the Debtors' assets to T&L controlled or related parties. The evidence and testimony admitted in the various adversary proceedings is set forth below.

### a.        The Stripe Stay Violations

On October 8, 2024, the Chapter 11 Trustee discovered that, on both September 26, 2024 and October 1, 2024, Mr. Ravindra transferred $201,565.07 and $9,999.00 from the Debtors' Stripe account to a Wells Fargo, National Association ("**Wells Fargo**") bank account maintained by the Debtors' non-Debtor affiliate, Whitehat Education Technology LLC. In addition, on September 27, 2024, Mr. Ravindra attempted to transfer control of Epic's Stripe account to Voizzit UAE.

The Chapter 11 Trustee immediately commenced an adversary proceeding styled *Claudia Z. Springer v. Stripe, Inc., Wells Fargo Bank National Association, Whitehat Education Technology LLC, and John Does 1-100* (Adv. Pro. Case No. 24-50142), and sought and subsequently obtained a temporary restraining order and preliminary injunction barring further unauthorized transfers out of the Debtors' Stripe account and freezing Whitehat's Wells Fargo account. [Adv. D.I. 9, 20].

### b.        The Apple Stay Violations and the Hailer Testimony

On November 1, 2024, the Chapter 11 Trustee discovered that on September 26, 2024, Mr. Ravindra transferred the registered ownership of Epic's application from Epic's Apple account to Voizzit India's Apple account. On October 14, 2024, all of Tangible Play's Osmo applications were similarly transferred from Tangible Play's Apple account to the same Voizzit India account with Apple.  In addition, Mr. Ravindra transferred more than $1 million of the Debtors' revenues from their Apple accounts to bank accounts controlled by the Voizzit Entities.

On November 4, 2024, the Chapter 11 Trustee filed an emergency motion to enforce the automatic stay (the "**Apple Stay Motion**") [D.I. 244]. The Bankruptcy Court held an initial hearing on the Apple Stay Motion on November 12, 2024. Neither Mr. Ravindra nor T&L appeared at the November 12, 2024, hearing. Counsel for the Voizzit Entities and Mr. Vellapalath, however, did appear and asked the Court to adjourn the hearing. They argued that an adjournment was appropriate because (i) they allegedly did not know about the Chapter 11 Cases when they took control of Epic and Tangible Play's applications, and (ii) they had changed the registered owners of Epic and Tangible Play's applications because the Voizzit Entities allegedly owned Epic and Tangible Play and their intellectual property.

The Bankruptcy Court denied the request for a continuance and found the automatic stay had been violated. The Bankruptcy Court found that the transfers of the registered ownership of

Epic and Tangible Play's Apple applications were *void ab initio* and further ordered: "[t]he Voizzit Entities and their affiliates, successors, assigns, agents, and related parties are expressly prohibited from taking or causing others to take any actions in violation of 11 U.S.C. § 362(a), including any actions to assert ownership over the Debtors' Apps or the funds collected from the sale of the Debtors' Apps." [D.I. 276].

The Bankruptcy Court held a hearing on November 21, 2024, to consider damages for the stay violation. The evidence presented at the November 21, 2024, sanctions hearing established that all of the stay violations, including the Voizzit Entities' attempted misappropriation of the Epic and Tangible Play's Stripe, Google, GitHub (described below), and Apple accounts, were done with knowledge of these Chapter 11 Cases as part of a scheme to take control of the Debtors' businesses.

Also at the November 21 hearing, GLAS presented the testimony of William Hailer, who provided even more evidence of the Voizzit Entities' bad acts and collusion with Byju Raveendran and the India T&L entities. Mr. Hailer testified that beginning in the Spring of 2023, and continuing through the fall of 2024, he was in contact with Byju Raveendran regarding Mr. Raveendran's efforts to regain control of the Debtors. Mr. Hailer's testimony directly connected Mr. Vellapalath to Byju Raveendran and T&L, explaining that in October 2024, Mr. Hailer attended an in person meeting with Raveendran and Mr. Vellapalath during which they discussed that the Debtors were in bankruptcy. According to Mr. Hailer, at no point during that meeting did Mr. Vellapalath assert any ownership over the Debtors' assets. Mr. Hailer further testified that following the meeting Raveendran discussed with Mr. Hailer ways in which they could create documents that would purport to show that Mr. Hailer's company owned the Debtors' assets. Mr. Hailer refused to have his company participate in this scheme. Thereafter, Mr. Vellapalath presented the court with document purporting to show the Voizzit Entities owned Epic and Tangible Play.

On June 4, 2025, the Bankruptcy Court entered a Judgment Order in favor of the Chapter 11 Trustee and against each of T&L, Mr. Ravindra, the Voizzit Entities, and those acting in concert with them, including Mr. Vellapalath, in the amount of $3,139,565.04, with post-judgment interest running from the date of the Judgment Order.

### c.    The GitHub Stay Violation

On November 7, 2024, GitHub informed the Chapter 11 Trustee that all 72 of Epic's source code repositories were transferred to an "edunest-ep" account on September 24, 2024, and that all 321 of Tangible Play's repositories were transferred to an "edunest-tp" account on October 14, 2024. The Chapter 11 Trustee subsequently learned that both "EduNest" accounts are controlled by the Voizzit Entities. In January 2025, after the Voizzit Entities failed to comply with the court orders discussed below, GitHub finally returned the Debtors' GitHub repositories to the Chapter 11 Trustee.

### d.    The Cloudflare Stay Violations

On November 17, 2024, the Chapter 11 Trustee discovered that the Voizzit Entities had taken control of the Cloudflare account, which hosts Tangible Play's playosmo.com website. As

a result, the playosmo.com website crashed, resulting in a considerable number of schools that use Tangible Play's apps submitting complaints about a lack of access to the Tangible Play programs. The Chapter 11 Trustee immediately reached out to Cloudflare and learned that the Voizzit Entities had asserted control over the Debtors' accounts.

The Chapter 11 Trustee negotiated a draft agreed order with Cloudflare authorizing and directing Cloudflare to grant the Chapter 11 Trustee administrative control over the Debtors' Cloudflare accounts and to turn over their domains. The Bankruptcy Court entered that order on November 20, 2024 [D.I. 312], and the Chapter 11 Trustee was able to regain control over the Tangible Play accounts and the playosmo.com domain.

### e.    Google Stay Violations

On November 18, 2024, after discovering that certain of Epic's and Tangible Play's Google accounts and related data had been transferred to the Voizzit Entities, the Chapter 11 Trustee commenced the adversary proceeding, *Claudia Z. Springer v. Google LLC, Voizzit Technology Private Ltd., Voizzit Information Technology LLC, Vinay Ravindra, Rajendran Vellapalath* (Adv. Pro. Case. No. 24-50233).

The Chapter 11 Trustee sought and obtained a temporary restraining order, which (i) required the Voizzit Entities and Mr. Vellapalath to provide the Chapter 11 Trustee with a list of accounts they had transferred to themselves and return all transferred property to the Chapter 11 Trustee, (ii) enjoined Google from accepting instructions from any entity or person other than the Chapter 11 Trustee, and (iii) directed Google to provide the Chapter 11 Trustee with complete access to the Debtors' Google accounts [Adv. D.I. 14]. The Voizzit Entities and Mr. Vellapalath violated the temporary restraining order by failing to transfer to provide the Chapter 11 Trustee with a list of the accounts they had transferred and by failing to return property they had transferred from the Debtors.

On November 26, 2024, the Chapter 11 Trustee filed an emergency motion to hold the Voizzit Entities and Mr. Vellapalath in contempt. Following a hearing on the contempt motion and the preliminary injunction, the Bankruptcy Court entered the preliminary injunction [Adv. D.I. 36] and issued an Order to Show Cause for the Voizzit Entities and Mr. Vellapalath's failure to comply with the Bankruptcy Court's orders. In connection with these proceedings, Mr. Vellapalath once again defended himself and the Voizzit Entities by arguing the Voizzit Entities owned Epic and Tangible Play and their intellectual property. The Bankruptcy Court, without considering whether the Voizzit Entities truly acquired the equity interests of Epic and Tangible Play prior to the filing of the Chapter 11 Cases, emphasized to Mr. Vellapalath that only the Chapter 11 Trustee controlled the Debtors' businesses and property. Thereafter, on January 30, 2025, the Bankruptcy Court entered an order granting the Chapter 11 Trustee's contempt motion, ordering the Voizzit Entities and Mr. Vellapalath to comply with its orders, fining them $25,000 per day until they had complied with the order, and awarding the Chapter 11 Trustee's fees and costs. This sanction remains in place and is currently in excess of $4 million.

### f.    The India Lawsuit

On December 9, 2024, the Chapter 11 Trustee discovered that on November 20, 2024, contrary to the stay and the Bankruptcy Court's temporary restraining orders, the Voizzit Entities filed suit in India before a commercial court in Ernakulam, Kerela (the "**Kerala Court**") against the Chapter 11 Trustee and the India-based subsidiaries of Apple, Google, Microsoft, and certain other internet companies asking an Indian court to bar the Chapter 11 Trustee from interfering with the Voizzit Entities' access to the Debtors' accounts and property (the "**India Lawsuit**").

On December 10, 2024, the Chapter 11 Trustee commenced the adversary proceeding, *Claudia Z. Springer v. Voizzit Technology Private Ltd., Voizzit Information Technology, LLC, Think and Learn Pvt. Ltd, and Rajendran Vellapalath* (Adv. Pro. Case No. 24-50280) and sought and obtained a temporary restraining order against the defendants enjoining them from continuing to pursue the India Lawsuit. [Adv. D.I. 12.] On December 18, 2024, the Bankruptcy Court entered a preliminary injunction ordering the Voizzit Entities and Mr. Vellapalath to dismiss the India Lawsuit. [Adv. D.I. 20.] Notwithstanding these injunctions, the Voizzit Entities did not dismiss the India Lawsuit and continued to actively prosecute the India Lawsuit.

On May 21, 2025, one day after the Bankruptcy Court entered the Sale Order approving the Epic Purchase Agreement, the Voizzit Entities filed a new proceeding, this time in the High Court in Kerala (the "**Kerala High Court**") (which oversees the commercial court). The new proceeding was filed on an *ex parte* emergency basis with no notice given to the Chapter 11 Trustee. In this new proceeding, the Voizzit Entities asked the Kerala High Court to stay the Chapter 11 Trustee's sale of the Epic assets (the sale process is described below). The Kerala High Court granted the application.

Immediately upon learning that the Kerala High Court had entered an order purporting to stay a sale the Bankruptcy Court had already approved, the Chapter 11 Trustee filed an emergency motion in the Bankruptcy Court on notice to the Voizzit Entities to enforce the Bankruptcy Court's prior preliminary injunctions and to hold the Voizzit Entities in contempt for their willful violation of the Bankruptcy Court's injunctions. [Adv. D.I. 31]. The Voizzit Entities were on notice of this emergency motion but did not appear at the hearing.

On May 22, 2025, the Bankruptcy Court entered an order granting the Chapter 11 Trustee's emergency motion. The Bankruptcy Court held the Voizzit Entities in contempt for their willful violation of the Bankruptcy Court's injunction and declared that the order of the Kerala High Court entered after the Epic Sale Order did not modify, vacate, stay, or reverse the Bankruptcy Court's Epic Sale Order and that because the Kerala High Court Order was entered in violation of the automatic stay it was *void ab initio*. [Adv. D.I. 36].

At the same time as the Chapter 11 Trustee was seeking the emergency assistance of the Bankruptcy Court, the Chapter 11 Trustee's counsel in India also sought emergency relief from the India Supreme Court. On May 27, 2025, the India Supreme Court set aside the Kerala High Court's May 21, 2025 order. The sale of the Epic assets (described in detail below) closed later that day after the India Supreme Court had ruled.

On June 3, 2025, undeterred by the Bankruptcy Court's May 22, 2025 contempt order or the India Supreme Court's May 27, 2025 order, the Voizzit Entities and Mr. Vellapalath filed a motion in the Kerala High Court seeking to hold the Chapter 11 Trustee in contempt for

violating the Kerala High Court Order. On June 4, 2025, the Chapter 11 Trustee's India counsel appeared before the Kerala High Court on both the May 21, 2025 stay application and the June 3, 2025 contempt motion. The Kerala High Court dismissed Voizzit Entities' May 21, 2025 stay application and set a continued hearing on the June 3, 2025 contempt motion.

The Estates are continuing to incur costs to defend against the Voizzit Entities' willful stay violations. Most recently, on July 1, 2025, the Chapter 11 Trustee's India counsel appeared before the Kerala High Court on the Chapter 11 Trustee's motion to dismiss the India Lawsuit and the contempt motion. ~~The~~On July 23, 2025, the Kerala High Court ~~has taken those matters under advisement~~denied the motion to dismiss. The Trustee's India counsel plan to appeal this decision to the India Supreme Court. The Chapter 11 Trustee and the Plan Administrator reserve all rights to seek further damages as a result of the Voizzit Entities' conduct.

Pursuant to the Epic Purchase Agreement, the Epic Estate is required to defend the India Lawsuit and obtain its dismissal. The Estates or the Wind-Down Debtors, as applicable, will continue to cover the costs of defending against the India Lawsuit in accordance with the terms of the Epic Purchase Agreement.

### 7.    The Chapter 11 Trustee's Investigation

Immediately upon her appointment, the Chapter 11 Trustee commenced an investigation into the facts and circumstances leading to the Chapter 11 Cases and potential causes of action to bring value back to the Estates.

On November 6, 2024, the Chapter 11 Trustee filed a motion for authority to conduct examinations under Bankruptcy Rule 2004 [D.I. 253]. The Bankruptcy Court entered an order granting the motion on November 18, 2024 [D.I. 294].

The Chapter 11 Trustee served document and deposition subpoenas on more than ten of the Debtors' and/or T&L affiliates' employees or former employees and conducted ten depositions and multiple witness interviews. In addition, the Chapter 11 Trustee served document subpoenas and document requests on the Debtors' financial institutions and prior advisors, including their auditors and legal counsel. The deposition transcripts, witness interview notes, and documents produced, collected, and reviewed during the Chapter 11 Trustee's investigation are maintained in a database that will be provided to the Plan Administrator to aid in its prosecution of the Retained Causes of Action.

In overview, the Chapter 11 Trustee's investigation confirmed the Petitioning Lender Creditors' allegations of T&L's gross mismanagement and misconduct, particularly with respect to (but not limited to) Epic and Tangible Play. For instance, each of the witnesses that had been an employee of Epic and Tangible Play before and after the T&L acquisition testified that, post-acquisition, control over the Debtors' finances was reserved for a select group of T&L executives in India, and that the Debtors and most of their pre-acquisition U.S. executives and management team had little control over, or visibility into, the Debtors' finances. Based on the Chapter 11 Trustee's investigation, it appears that T&L paid little regard to the corporate separateness of its U.S. subsidiaries, and instead transferred money in and out of the Debtors as it suited the needs of T&L.  According to former employees, the Debtors' spending far outpaced its

revenues, requiring regular cash infusions from T&L. And when T&L itself began to experience financial difficulty, T&L's support for the Debtors suddenly ceased. Tangible Play and Epic began taking on high-interest rate merchant cash advance loans to maintain operations. Each of the Debtors likewise transferred funds to one another and other T&L subsidiaries and affiliates, despite having insufficient funds to pay their own debts. This financial mismanagement threatened their financial stability and operations.

### a.    The Unauthorized Postpetition Transfers

The Chapter 11 Trustee identified the below list of more than $6.7 million in postpetition transfers in violation of the Court's 303(f) Order:

| Date | Transferor (Debtor) | Debtor Account | Amount | Transferee |
|------|---------------------|----------------|--------|------------|
| 6/4/2024 | Epic | SVB | $25,000.00 | Whitehat Education Technology LLC |
| 6/6/2024 | Epic | SVB | $350,000.00 | Byju's Beta, Inc. |
| 6/6/2024 | Epic | SVB | $500,000.00 | Byju's Beta, Inc. |
| 6/6/2024 | Epic | SVB | $25,000.00 | Whitehat Education Technology LLC |
| 6/7/2024 | Epic | SVB | $25,000.00 | Whitehat Education Technology LLC |
| 6/10/2024 | Epic | SVB | $25,000.00 | Whitehat Education Technology LLC |
| 6/11/2024 | Epic | SVB | $25,000.00 | Whitehat Education Technology LLC |
| 6/12/2024 | Epic | SVB | $25,000.00 | Whitehat Education Technology LLC |
| 6/13/2024 | Epic | SVB | $50,000.00 | Whitehat Education Technology LLC |
| 6/17/2024 | Epic | SVB | $53,000.00 | Whitehat Education Technology LLC |
| 6/24/2024 | Epic | SVB | $30,000.00 | Whitehat Education Technology LLC |
| 7/1/2024 | Epic | Wells Fargo | $10,000.00 | Byju's Beta Inc. |

| Date | Transferor (Debtor) | Debtor Account | Amount | Transferee |
|---|---|---|---|---|
| | | Bank | | |
| 7/1/2024 | Epic | Wells Fargo Bank | $90,000.00 | Byju's Beta, Inc. |
| 7/2/2024 | Epic | Wells Fargo Bank | $310,205.00 | Byju's Beta, Inc. |
| 7/5/2024 | Epic | SVB | $45,000.00 | Whitehat Education Technology LLC |
| 7/8/2024 | Epic | SVB | $75,000.00 | Whitehat Education Technology LLC |
| 7/9/2024 | Epic | SVB | $15,000.00 | Whitehat Education Technology LLC |
| 7/11/2024 | Epic | Wells Fargo Bank | $196,000.00 | Whitehat Education Technology LLC |
| 7/12/2024 | Epic | Wells Fargo Bank | $100,000.00 | Whitehat Education Technology LLC |
| 7/17/2024 | Epic | Wells Fargo Bank | $35,000.00 | Whitehat Education Technology LLC |
| 7/18/2024 | Epic | Wells Fargo Bank | $50,000.00 | Whitehat Education Technology LLC |
| 7/23/2024 | Epic | Wells Fargo Bank | $100,000.00 | Whitehat Education Technology LLC |
| 7/25/2024 | Epic | Wells Fargo Bank | $10,000.00 | Whitehat Education Technology LLC |
| 7/25/2024 | Epic | Wells Fargo Bank | $190,000.00 | Whitehat Education Technology LLC |
| 8/6/2024 | Epic | Wells Fargo Bank | $6,000.00 | Whitehat Education Technology LLC |
| 8/7/2024 | Epic | Wells Fargo Bank | $5,000.00 | Whitehat Education Technology LLC |

| Date | Transferor (Debtor) | Debtor Account | Amount | Transferee |
|------|---------------------|----------------|--------|------------|
| 8/8/2024 | Epic | Wells Fargo Bank | $5,000.00 | Whitehat Education Technology LLC |
| 8/9/2024 | Epic | Wells Fargo Bank | $25,000.00 | Whitehat Education Technology LLC |
| 8/13/2024 | Epic | Wells Fargo Bank | $100,000.00 | Whitehat Education Technology LLC |
| 8/16/2024 | Epic | Wells Fargo Bank | $250,000.00 | Whitehat Education Technology LLC |
| 8/16/2024 | Tangible Play | Wells Fargo Bank | $150,000.00 | Byju's Beta, Inc. |
| 8/23/2024 | Epic | Wells Fargo Bank | $150,000.00 | Whitehat Education Technology LLC |
| 9/4/2024 | Epic | Wells Fargo Bank | $16,000.00 | Whitehat Education Technology LLC |
| 9/10/2024 | Epic | Wells Fargo Bank | $300,000.00 | Whitehat Education Technology LLC |
| 9/10/2024 | Epic | Wells Fargo Bank | $1,000,000.00 | Whitehat Education Technology LLC |
| 9/17/2024 | Epic | Wells Fargo Bank | $500,000.00 | Whitehat Education Technology LLC |
| 9/25/2024 | Epic | Stripe | $201,565.07 | Whitehat Education Technology LLC |
| 10/2/2024 | Epic | Stripe | $9,999.00 | Whitehat Education Technology LLC |
| 10/3/2023 | Epic | Apple | $1,049,033.00 | Voizzit Information Technology LLC |
| 10/3/2023 | Tangible Play | Apple | $14,719.00 | Voizzit Information Technology LLC |
| 10/7/2024 | Epic | Stripe | $484,992.50 | Whitehat Education Technology LLC |

| Date | Transferor (Debtor) | Debtor Account | Amount | Transferee |
|---|---|---|---|---|
| 10/9/2024 | Epic | Stripe | $156,320.30 | Whitehat Education Technology LLC |
| | | *Total:* | $6,782,833.87 | |

In addition, the Chapter 11 Trustee blocked several additional attempted transfers out of Epic's Stripe account.

### b.    The Intercompany Loans and Transfers

The Chapter 11 Trustee identified numerous executed intercompany loan agreements from 2019 through 2023 in which Epic and Tangible Play were identified as lenders or borrowers, summarized in the below chart:

| Agreement Date | Lender | Borrower | Stated Amount |
|---|---|---|---|
| 4/8/2019 | BYJU's Inc. | Tangible Play | $50,000,000.00 |
| 4/8/2019 | BYJU's Inc. | Tangible Play | $25,000,000.00 |
| 11/1/2020 | Whitehat Education Technology LLC | Tangible Play | $20,000,000.00 |
| 12/28/2020 | Tangible Play | BYJU's Inc. | $50,000,000.00 |
| 6/14/2021 | Tangible Play | BYJU's Pte Ltd. | $7,500,000.00 (SGD) |
| 11/14/2021 | BYJU's Inc. | Tangible Play | $14,000,000.00 |
| 12/1/2021 | BYJU's Alpha | Tangible Play | $300,000,000.00 |
| 3/18/2022 | Epic | Whitehat Education | $10,000,000.00 |
| 1/14/2023 | Whitehat Education Technology LLC | Tangible Play | $6,000,000.00 |
| 1/30/2023 | BYJU's Pte Ltd. | Tangible Play | $10,000,000.00 |
| 2/20/2023 | BYJU's Learning Company FZCO Dubai | Tangible Play | $80,000,000.00 |

| Agreement Date | Lender | Borrower | Stated Amount |
|---|---|---|---|
| 7/14/2023 | Epic | Geogebra GMBH | $140,000.00 |

None of the witnesses examined by the Chapter 11 Trustee could explain why there were so many intercompany loan agreements, and none were involved in the negotiation of the intercompany loan agreements (despite the fact that certain of the witnesses the Chapter 11 Trustee examined executed such agreements). For most of the intercompany loan agreements, none of the witnesses examined by the Chapter 11 Trustee could identify any specific bases for the loans, nor did they know whether the loans were made or repaid.

Tangible Play's former chief operating officer and acting chief financial officer recalled that the April 2019 $25,000,000 loan from BYJU's Inc. was a line of credit for Tangible Play's business operations. He did not know whether the line was drawn or paid back, and he was unfamiliar with the other loans. He also described feeling pushed out by the T&L team because he asked too many questions. Tangible Play's former chief operating officer confirmed that the T&L team wanted both him and the acting chief financial officer to leave the company. He further stated that after his departure, the T&L India team took over management of Tangible Play's finances.

Tangible Play's former chief operating officer, who signed certain of the intercompany loan agreements on behalf of Tangible Play, testified that he did not know why he signed the intercompany loan agreements or whether Tangible Play ever received or loaned the money indicated by the terms of the agreement. He explained that because T&L owned Tangible Play, he signed whatever he was asked to sign by the T&L finance team. Other Tangible Play witnesses provided similar evidence—they did not know why the loans were executed or whether the amounts were funded, and all of the decision making was made by the T&L finance team in India.

The witnesses the Chapter 11 Trustee examined with respect to the Epic intercompany loans provided similar testimony. As a general matter, they did not know why the intercompany loans were documented, they were not involved in negotiations of the intercompany loans, and they did not know whether the intercompany loans were ultimately funded or paid.

Similarly, the bank records obtained by the Chapter 11 Trustee revealed numerous intercompany transfers, both between Epic and Tangible Play, and also among those Debtors and BYJU's Inc., BYJU's Alpha, T&L, Whitehat Education Technology LLC, and other T&L affiliates. However, these transfers were not consistent with the amounts or dates specified in the intercompany loan agreements. In addition, the former Tangible Play and Epic employees the Chapter 11 Trustee interviewed or deposed could not identify any significant transfers that complied with the terms of those agreements. On the contrary, former employees indicated that intercompany transfers were made when liquidity was tight, with funds moved between entities to address short-term cash flow needs. The Chapter 11 Trustee has found no evidence that these intercompany transfers benefited the Debtor entity making the transfer. In fact, there could be no

benefit, as at the time the intercompany transfers were made, the Debtor entity making the transfer was unable to pay its bills and had significant outstanding debts.

c.    The Merchant Cash Advance Loans

As T&L entities experienced cash constraints, the Debtors' management was tasked with securing short-term financing and capital. MCA Loans became a source of short-term financing primarily in 2023. MCA Loans are loans where the borrower takes a loan and pays the lender back at a much higher dollar amount based on future company cash flows.

The Chapter 11 Trustee identified numerous executed MCA loan agreements from 2022 through 2023. The MCA loan agreements often listed Tangible Play as the main borrower but included Epic, Neuron Fuel and other T&L entities as additional borrowers or guarantors. The MCA loan agreements are summarized in the below chart:

| Agreement Date | Lender | Borrower | Loan Debtor Received | Amount Debtor Paid for Loan |
|---|---|---|---|---|
| 11/27/2022 | Cobalt Funding Solutions | Epic | $1,000,000.00 | $1,400,000.00 |
| 1/12/2023 | City Capital NY | Tangible Play | $4,000,000.00 | $5,996,000 |
| 1/16/2023 | Alva Advance | Tangible Play | $2,500,000.00 | $3,750,000 |
| 1/16/2023 | Alva Advance | Tangible Play | $2,575,000.00 | $3,862,500.00 |
| 2/7/2023 | Riverside Capital NY | Tangible Play | $8,000,000.00 | $10,000,000 |
| 2/7/2023 | City Capital NY | Tangible Play | $5,000,000.00 | $7,495,000.00 |
| 2/27/2023 | 24 Capital | Tangible Play | $2,500,000.00 | $3,750,000.00 |
| 3/1/2023 | Riverside Capital NY | Tangible Play | $10,500,000.00 | $15,750,500.00 |
| 3/3/2023 | Alva Advance | Tangible Play | $4,100,000.00 | $6,050,000.00 |
| 3/16/2023 | Infusion Capital Group | Tangible Play | $6,250,000.00 | $8,750,000.00 |
| 3/28/2023 | Fidi Capital | Neuron Fuel | $5,000,000.00 | $7,495,000.00 |
| 3/30/2023 | Progressive Capital | Tangible Play | $17,000,000.00 | $23,561,830.00 |
| 5/1/2023 | Redstone Advance Inc. | Tangible Play | $12,000,000.00 | $19,800,000.00 |

| Agreement Date | Lender | Borrower | Loan Debtor Received | Amount Debtor Paid for Loan |
|---|---|---|---|---|
| 5/4/2023 | Cheetah Capital | Tangible Play | $5,500,000.00 | $9,075,000.00 |
| 5/4/2023 | Secure Capital | Tangible Play | $5,500,000.00 | $9,075,000.00 |
| 7/17/2023 | American Funding | Tangible Play and BYJU's Alpha | $3,000,000.00 | $4,650,000.00 |
| 7/19/2023 | Symplifi | Tangible Play | $2,500,000.000 | $4,125,000.00 |
| 7/20/2023 | Redstone Advance Inc. | Tangible Play | $16,250,000.00 | $19,250,000.00 |
| 8/8/2023 | Shift Capital | Tangible Play | $2,000,000.00 | $3,000,000.00 |
| 8/16/2023 | Coldwater Capital | Tangible Play | $5,000,000.00 | $7,495,000.00 |

While Tangible Play was typically the MCA Loan borrower, the MCA loan agreements were most often signed by a former Epic officer and Riju Ravindran. Some agreements were also signed by Riju Ravindran and Byju Raveendran. Several MCA Loans were also personally guaranteed by the former Epic officer. He testified that Byju Raveendran asked him to sign the agreements, and he also testified that his concerns about personally guaranteeing the agreements ultimately led him to leave Epic.

One witness testified that he warned Byju Raveendran and Riju Ravindran that MCA Loans were high risk for the company. Despite the warning, Byju and Riju were confident they would be able to pay the money back to the lenders. Another witness likened MCA Loans to "shark loans" or "paycheck loans" that charged high interest rates. The witness testified that he understood the purchase price on the agreement to be the amount of the loan and the purchased amount was the amount that would be paid back to the lender.

The witnesses the Chapter 11 Trustee examined also revealed inconsistent practices when it came to MCA Loan proceeds and repayments. One witness testified that when loan proceeds were received, a portion of the funds would often be transferred to entities other than the borrower. This would be the case even when an agreement was signed specifically to help address cash flow issues at an entity like Tangible Play.  Another witness testified that an entity that received the MCA Loan proceeds might not be the entity that paid off the MCA Loan balance. In one instance, an MCA lender withdrew more money than authorized under the MCA agreement for a monthly payment, which caused additional short term cash constraints. This led T&L entities to route future MCA payments from one bank account (Whitehat Education Technology LLC's account at Silicon Valley Bank) going forward.

  d. **T&L's and Byju Raveendran's Ongoing Attempts to Control the Debtors**

The Chapter 11 Trustee's investigation also confirmed that T&L, and Byju Raveendran specifically, continued to attempt to exert control over the Debtors and their businesses after the involuntary petitions were filed, and even after the Chapter 11 Trustee was appointed.

In addition to the many stay violations described in Section III.B.6, the Chapter 11 Trustee's investigation revealed that Byju and Riju Ravindran were in direct contact with the Debtors' employees and senior management. For example, days after the involuntary petitions were filed, Riju Ravindran directed a senior employee at Tangible Play to open new bank accounts at Wells Fargo for each of the Debtors and Whitehat Education Technology LLC, and shortly thereafter for BYJU's Beta, Inc. These accounts were never disclosed to the Petitioning Lender Creditors, in violation of the 303(f) Order. Then, in July, August, and September, that same employee transferred more than a million dollars from the Debtors' accounts to non-Debtor Whitehat Education Technology LLC, again in violation of the 303(f) Order, and then transferred funds from Whitehat Education Technology LLC to other T&L affiliates. Upon the Chapter 11 Trustee's discovery of these transfers, she immediately terminated the employee.

Documents produced by witnesses included multiple WhatsApp communications and text messages demonstrating that Byju Raveendran and other T&L insiders remained in contact with the Debtors' former and current employees post-petition. For example, in late October 2024, the employee the Chapter 11 Trustee terminated contacted another former employee to relay that Byju had "something big he is excited about" and in early November, Byju "was expecting the big deal to be finalized." As another example, a former Tangible Play executive had numerous WhatsApp communications with Byju Raveendran through at least until October 2024, despite having left T&L in 2023. After speaking in late October 2024, Byju Raveendran messaged the former T&L insider, "Dont worry", to which the former insider replied, "Love you. You will come back strong."

The documents provided by witnesses also reflect that Byju Raveendran and Riju Ravindran, along with other T&L insiders, either affirmatively deleted certain WhatsApp messages after the commencement of the bankruptcy or utilized WhatsApp's 'disappearing messages' function.

### 8.    Post-Petition Operations.

Following her appointment, the Chapter 11 Trustee operated each of the Debtors' businesses. Reports detailing the results of her operations for each month up through the closing of the Purchase Agreements, described below, can be found at D.I. 375, 376, 377, 378, 379, 380, 419, 420, 421, 441, 442, 443, 522, 523, 524, 576, 577, 578, 639, 640, 641, 720, 721, 722, 787, 788, and 789.

### 9.    Pre-Petition Financial Statements.

Prior to the filing of these Chapter 11 Cases, T&L moved all of the financial operations of the Debtors to its India offices.  As such, the Chapter 11 Trustee did not have access to pre-petition financial records for the Debtors. Through her investigation, the Chapter 11 Trustee has attempted to locate this information but to date T&L, Byju Raveendran, and Riju Ravindran,

along with other T&L insiders, have been uncooperative. Accordingly, the Chapter 11 Trustee is unable to provide prepetition financial statements as part of this Disclosure Statement.

10. **The Sale Process.**

On January 7, 2025, the Chapter 11 Trustee filed the *Trustee's Motion for Entry of an Order (I) Approving Bid Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets, (II) Scheduling Bid Deadlines and an Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (V) Granting Related Relief* [D.I. 433] setting forth certain bid procedures for the marketing and sale of the assets of the Debtors, which the Bankruptcy Court granted on January 8, 2025 [D.I. 474] (the "**Bid Procedures Order**"). The proposed procedures included conventional provisions such as the option of entering into a stalking horse agreement and providing a break-up fee and expense reimbursement, scheduled a preliminary auction date, and set a sale hearing date.

On January 8, 2025, the Bankruptcy Court approved the Chapter 11 Trustee's retention of SC&H to provide investment banking and advisory services with respect to the marketing and sale of Neuron Fuel's assets [D.I. 436], and Moelis to provide investment banking and advisory services with respect to the marketing and sale of Epic's assets [D.I. 437].

a. **Sale of Epic Assets**

Consistent with the Bid Procedures Order, Moelis conducted a marketing process to solicit interest from potential strategic or financial buyers in purchasing the assets of Epic. Moelis contacted and sent materials to one hundred seventeen (117) potential acquirers (collectively, the "**Epic Interested Parties**"). Ultimately fifty-eight (58) Epic Interested Parties executed non-disclosure agreements, ten (10) Epic Interested Parties executed indications of interest and five (5) Epic Interested Parties submitted written bids by the submission deadline. Pursuant to the Bid Procedures Order, four Epic Interested Parties were designated as Qualified Bidders.

On May 7-8, 12-13, and 15, 2025, the Chapter 11 Trustee conducted an auction for the sale of the Epic assets. The "baseline bid" at the commencement of the auction was a bid valued by the Chapter 11 Trustee at $72.7 million. The bidding went through multiple rounds over the course of four days. On May 13, 2025, Hy Ruby Limited submitted a cash bid in the amount of $95.1 million, less cure costs. Following the conclusion of the bidding, the Chapter 11 Trustee determined that the final bid submitted by Hy Ruby Limited was the highest or otherwise best bid.

On May 15, 2025, the Chapter 11 Trustee and Hy Ruby Limited executed, subject to Bankruptcy Court approval, the Epic Purchase Agreement. On May 15, 2025, the Chapter 11 Trustee filed the *Notice of Successful Bidder at Auction for Epic! Creations, Inc. Assets* [D.I. 693] naming Hy Ruby Limited as the successful bidder

On May 20, 2025, the Bankruptcy Court entered the Epic Sale Order, and on May 27, 2025, the sale of the Epic assets to Hy Ruby Limited pursuant to the Epic Purchase Agreement closed.

### b. Sale of Neuron Fuel Assets

Consistent with the Bid Procedures Order, SC&H conducted a marketing process to solicit interest from potential strategic or financial buyers in purchasing the assets of Neuron Fuel. SC&H contacted and sent materials to 159 potential acquirers (collectively, the "**Neuron Fuel Interested Parties**"). Ultimately, (i) thirty-two (32) Neuron Fuel Interested Parties executed non-disclosure agreements, (ii) thirty (30) Neuron Fuel Interested Parties conducted active due diligence, and (iii) two (2) Neuron Fuel Interested Parties, Tynker Holdings, LLC ("**Tynker Holdings**") and Future Minds Group, Inc. ("**Future Minds**") submitted written bids by the deadline for doing so. Pursuant to the Bid Procedures Order, Tynker Holdings and Future Minds were qualified as bidders.

On May 6, 2025, the Chapter 11 Trustee conducted an auction for the sale of the Neuron Fuel assets. The "baseline bid" at the commencement of the auction was Future Minds' bid. Future Minds bid $800,000 plus assumption of the cure costs for executory contracts to be assumed, which the Chapter 11 Trustee estimated would total $17,000. The bidding went through forty-eight (48) rounds.

Following the conclusion of the bidding, the Chapter 11 Trustee determined that the final bid submitted by Tynker Holdings was the highest and best bid, valued at $2,310,000 ($2,150,000 in cash consideration plus the assumption of the cure costs and $160,000 in non-cash additional consideration). The Chapter 11 Trustee declared Tynker Holdings to be the successful bidder and Future Minds the back-up bidder

On May 6, 2025, the Chapter 11 Trustee and Tynker Holdings executed, subject to Bankruptcy Court approval, the Neuron Fuel Purchase Agreement.  On May 7, 2025, in accordance with the Bid Procedures Order, the Chapter 11 Trustee filed the *Notice of Successful Bidder at Auction for Neuron Fuel, Inc. Assets* [D.I. 673] naming Tynker Holdings as the successful bidder and Future Minds as the back-up bidder.

On May 20, 2025, the Bankruptcy Court entered the Neuron Fuel Sale Order, and on May 30, 2025, the sale of the Neuron Fuel assets to Tynker Holdings pursuant to the Neuron Fuel Purchase Agreement closed.

### c. Marketing of Tangible Play Assets

Consistent with the Bid Procedures Order, SC&H conducted a marketing process to solicit interest from potential strategic or financial buyers in purchasing the assets of Tangible Play. SC&H contacted and sent materials to 158 potential acquirers (collectively, the "**Tangible Play Interested Parties**"). Thirty (30) of the Tangible Play Interested parties executed

non-disclosure agreements but only one (1) potential bidder emerged. Ultimately, that party decided not to proceed with a transaction, citing to the costs of maintaining the business and addressing operational needs given the uncertain market conditions. In consultation with SC&H and her other advisors, as well as with the DIP Agent and the Prepetition Agent, the Chapter 11 Trustee determined, in an exercise of her business judgment, that the best path forward was to liquidate Tangible Play and to abandon the Tangible Play inventory which, without the ongoing functionality of Tangible Play' Osmo applications, was worthless. Accordingly, on April 21, 2025, the Chapter 11 Trustee filed an omnibus motion to reject Tangible Play's logistics services agreements and to abandon personal property [D.I. 645], and the Bankruptcy Court entered an order approving those rejections, effective as of April 21, 2025, on May 12, 2025 [D.I. 678].

### 11.  Claims Review and Reconciliation Process

On February 5, 2025, the Chapter 11 Trustee filed the *Chapter 11 Trustee's Motion for an Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Claims Under 11 U.S.C. §§ 507(a)(3) through (a)(10) and 503 (b)(9), (II) Approving the Form for Filing Proof of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [D.I. 506]. On February 21, 2025, the Bankruptcy Court entered the Bar Date Order [D.I. 530] establishing March 26, 2025 as the General Bar Date and the Governmental Bar Date and setting additional Bar Dates.

All Creditors holding or wishing to assert unsecured or Secured, priority or nonpriority Claims (as defined in section 101(5) of the Bankruptcy Code) against the Debtors or the Debtors' Estates, accruing prior to the Petition Date, including Claims arising under section 503(b)(9) of the Bankruptcy Code, were required to file a separate, completed, and executed Proof of Claim form on account of each such Claim, together with accompanying documentation by the General Bar Date. Governmental Units, as defined by section 101(27) of the Bankruptcy Code, must submit Claims by the Governmental Bar Date.

A total of 167 unsecured Proofs of Claim were filed prior to the General Bar Date (81 Proofs of Claim filed against Epic, 36 Proofs of Claim filed against Neuron Fuel, and 50 Proofs of Claim filed against Tangible Play). The Chapter 11 Trustee and her Professionals have commenced the Claims review and reconciliation process.[5] At this time, the Chapter 11 Trustee believes that the total dollar amount of filed Proofs of Claim is inflated, inaccurate, and not reflective of the Debtors' actual liability to their Creditors. The Chapter 11 Trustee's Claims review is ongoing and the Chapter 11 Trustee's assessments are subject to change.

### C.  Summary of Treatment of Claims and Interests Under the Plan

The following chart summarizes the classification and treatment of the Classes of Claims and Interests:

---

[5]    According to the Claims Register in the Debtors' Chapter 11 Cases, additional Proofs of Claim were filed after the General Bar Date. The late claims are deemed Disputed and the Chapter 11 Trustee reserve all rights to object to such late Claims on timeliness and all other applicable grounds.

1.    **Claims and Interests**[6]

| In re Saga Formations, Inc., In re Pajeau, Inc., and In re Tangible Play, Inc. | | | | |
|---|---|---|---|---|
| **Class** | **Claims and Interests** | **Status** | **Voting Rights** | **Estimated Recovery to Holders of Allowed Claims** |
| Class 1 | Other Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) | 100% |
| Class 2 | Other Priority Claims | Unimpaired | Not entitled to vote (presumed to accept) | 100% |
| Class 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote | 2%-5% |
| Class 4 | General Unsecured Claims | Impaired | Not entitled to vote (deemed to reject) | 0% |
| Class 5 | Intercompany Claims | Impaired | Not entitled to vote (deemed to reject) | 0% |
| Class 6 | 510(b) Claims | Impaired | Not entitled to vote (deemed to reject) | 0% |
| Class 7 | Interests | Impaired | Not entitled to vote (deemed to reject) | 0% |

**D.    Retained Causes of Action**

The Bankruptcy Code preserves the Chapter 11 Trustee's rights to prosecute Claims and Causes of Action that exist outside of bankruptcy and also empowers the Chapter 11 Trustee to prosecute certain Claims that are established by the Bankruptcy Code, including Claims to, inter alia, avoid and recover certain preferential transfers and fraudulent conveyances. The Plan provides for all Retained Causes of Action to vest in the Wind-Down Debtors.

The vesting of the Retained Causes of Action in the Wind-Down Debtors, and the Plan Administrator's investigation and prosecution of the Retained Causes of Action, is a critical and integral component of the Plan. The Retained Causes of Action, which are set forth in greater detail in the Schedule of Retained Causes of Action in the Plan Supplement, include the Adversary Proceedings and Causes of Action against T&L, Byju Raveendran, Riju Ravindran, other T&L insiders, the Voizzit Entities, Rajendran Vellapalath, and insiders of the Debtors, including but not limited to the list of individuals and Entities that comprise the Excluded Parties. The Retained Causes of Action relate to, among other things, (i) the fraudulent conduct and siphoning of assets that led to the filing of the involuntary petitions and continued to occur during these Chapter 11 Cases, both of which have been investigated by the Chapter 11 Trustee

---

[6]    This Plan, although proposed jointly for administrative convenience, constitutes a separate chapter 11 plan for each Debtor, and the classifications and treatment of Claims and Interests apply to each individual Debtor.

and the Prepetition Agent during the Chapter 11 Cases, and (ii) the Alpha Funds, and there is a close nexus between the Retained Causes of Action and the implementation, consummation, execution, and administration of this Plan. **Specifically, as set forth in the definition of Retained Causes of Action, the Retained Causes of Action include Causes of Action arising out of or in connection with: (a) the efforts of Byju Raveendran, Riju Ravindran, the Voizzit Entities, Rajendran Vellapalath, or the Debtors' insiders, including Vinay Ravindra, or any of their respective Affiliates or associates, to (i) transfer or take the Debtors' assets either before the Petition Date or during the Chapter 11 cases or (ii) disrupt or impair the Chapter 11 Cases; (b) the Alpha Funds; or (c) any breach of fiduciary duties by the Debtors' current or former directors or officers**. The circumstances underlying the aforementioned Retained Causes of Action are partially set forth in Article III.B.6-7, *supra*.

The Retained Causes of Action and related rights constitute substantially all the Retained Assets that will be vested in the Wind-Down Debtors for the benefit of Holders of Allowed claims entitled to the Distributable Proceeds. It is expected that the Holders of Allowed Class 3 Claims would not vote in favor of the Plan absent the Plan Administrator's express responsibility and authority to investigate and pursue any and all such Retained Causes of Action in order to facilitate and maximize Distributions to Holders of such Claims. It is understood that the Holders of Allowed Class 3 Claims believe that the Plan Administrator will have the right under applicable Third Circuit law to pursue the Retained Causes of Actions, including, without limitation, the specifically-identified Retained Causes of Action, in front of the Bankruptcy Court. It is the Chapter 11 Trustee's understanding that this Article III.D, including the Bankruptcy Court's retention of jurisdiction with respect to the Retained Causes of Action, will be a material inducement for the Holders of Allowed Class 3 Claims to vote in favor of the Plan, particularly in light of the Bankruptcy Court's familiarity with the facts and circumstances giving rise to the Retained Causes of Action. As such, the Plan Administrator's ability to pursue the Retained Causes of Action is fundamental to the implementation of the Plan and administration of the Estates.

For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior Final Order of the Bankruptcy Court or the Plan, the Wind-Down Debtors (including the Plan Administrator and the Wind-Down Debtors Oversight Committee) specifically retain and reserve the right to assert, after the Effective Date, any and all of the Retained Causes of Action and related rights, whether or not asserted as of the Effective Date (and whether or not listed on the Schedule of Retained Causes of Action), and all proceeds of the foregoing. All Claims and Causes of Action against Excluded Parties are expressly preserved, are not released, and are an integral part of this Plan.

## E.    Certain Federal Income Tax Consequences

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN. NEITHER THE CHAPTER 11 TRUSTEE NOR THE CHAPTER 11 TRUSTEE'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING

THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTORS OR ANY CREDITOR.

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to U.S. Holders of Claims and Equity Interests. This discussion is based on the relevant provisions of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the applicable Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service ("**IRS**"), all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each U.S. Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the U.S. Holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the U.S. Holders of Claims or Equity Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Equity Interests as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments). This discussion does not address the tax consequences to U.S. Holders of Claims who did not acquire such Claims at the issue price on original issue and U.S. Holders that do not hold Claims or Equity Interests as a "capital asset" within the meaning of Section 1221 of the Tax Code. No aspect of foreign, state, local, or estate and gift taxation is addressed.

For purposes of this discussion, the term "**U.S. Holder**" means a Holder of a Claim or (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the Tax Code) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U. S. person for U. S. federal income tax purposes, or (iv) an estate, the income of which is includible in gross income for U. S. federal income tax purposes regardless of its source.

In the case of a Holder that is classified as a partnership for U. S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership.

**EACH U.S. HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH U.S. HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

### 1.    Tax Consequences to U.S. Holders of Claims

A creditor that receives a distribution in satisfaction of its Claim will generally recognize a gain or loss in an amount equal to the difference between (i) the amount of cash received by such creditor in respect of its Claim (excluding any cash received in respect of a Claim for accrued interest) and (ii) the creditor's tax basis in its Claim. The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other things, the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a bad debt deduction (or charged a reserve for bad debts) with respect to the Claim.

For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the Claimant but may, as discussed below, result in a loss.  Conversely, if the Claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Claimant generally would be required to include the amount of the distribution in income when received. A Holder of a Claim may defer losses until the resolution of all contingencies relating to its Claim, including the liquidation of any Debtor.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE ~~AMENDED~~ PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN UNSECURED CLAIM AS A RESULT OF THE PLAN.

### 2.    Tax Consequences to the Debtors

#### a.    Cancellation of Indebtedness Income and Guaranty Claims

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("**COD Income**") realized during the taxable year. Section

108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code or the taxpayer is insolvent at the time the COD Income arises.

Where COD Income is excluded from taxable income IRC Section 108 requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer or, in the case of a pass-through entity, the owner of such entity if such owner is insolvent and permitted to exclude such COD Income from taxable income. The tax attributes of the taxpayer or, in the case of a pass-through entity, the owner of such entity, that may be subject to reduction include the net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and passive activity loss carryovers. Section 108 of the IRC further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction. Alternatively, where a corporate taxpayer makes a payment on account of a guaranty entered into in the course of a trade or business, the corporate taxpayer generally does not realize COD Income but instead recognizes a worthless debt deduction in the amount of the payment.

Under the Plan, Holders of certain Allowed Claims are expected to receive less than full payment in respect of their Claims, and Holders of General Unsecured Claims, Subordinated Claims and Disallowed Claims are expected to receive no payment. The Debtors' discharge of Allowed Claims that are in the nature of guaranty claims are expected to give rise to a worthless debt deduction for the Debtors.  The Debtors' satisfaction of their own liabilities (not as guarantors) to the Holders of Claims in excess of the amount satisfied by Distributions under the Plan will be canceled, and therefore is expected to result in COD Income to the Debtors.

### b.    Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS: (I) INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN; (II) NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL; AND (III) FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES TO EACH HOLDER ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT WITH SUCH HOLDERS' TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

### F.    Certain Risk Factors to be Considered

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT, REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN.  ALTHOUGH THERE ARE MANY RISK FACTORS DISCUSSED BELOW, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE

ONLY RISKS PRESENT IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

1.     **The Chapter 11 Trustee May Not Be Able to Secure Confirmation of the Plan**.

There is risk that the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may deny confirmation of the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and requires that (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  While the Chapter 11 Trustee cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Chapter 11 Trustee believes that the Plan will satisfy the statutory requirements for confirmation and that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, the Plan will need to be revised (either in whole or in part). The Chapter 11 Trustee, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.

Further, if the Plan is not confirmed by the requisite majorities in number and amount as required by section 1126 of the Bankruptcy Code, or if any of the other Confirmation requirements imposed by the Bankruptcy Code are not met, the Chapter 11 Cases may not have sufficient funding to proceed, which may result in conversion to a case under Chapter 7 of the Bankruptcy Code or dismissal.

2.     **Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims**. While the Chapter 11 Trustee has undertaken her best efforts to estimate the amount of Claims in each Class correctly, the estimate of Allowed Claims and recoveries for Holders of Allowed Claims are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement.. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

3.     **Distributions from Retained Causes of Action Are Not Guaranteed**. Pursuant to the Plan, all Retained Causes of Action that have not been previously released will vest in the Wind-Down Debtors. The Retained Causes of Action include Causes of Action which are not released or waived pursuant to the Plan or otherwise. The Plan does not guaranty any Distributions to Creditors from Retained Causes of Action.

## G.  Cramdown

Pursuant to section 1129(a)(10) of the Bankruptcy Code, the Chapter 11 Trustee intends to seek confirmation of the Plan pursuant to the provisions of section 1129(b) of the Bankruptcy Code with respect to those Classes of Claims that are deemed to reject the Plan.

## H.  Feasibility

Under Section 1129(a)(11) of the Bankruptcy Code, in order for a plan to be confirmed, the Bankruptcy Court must find that Confirmation of such plan is not likely to be followed by the liquidation or need for further reorganization of the Debtors unless contemplated by the plan.

Here, the Plan provides for the liquidation and Distribution of the proceeds of the Debtors' remaining assets. Accordingly, the Chapter 11 Trustee believes all Chapter 11 plan obligations will be satisfied without the need for further reorganization of the Debtors.

## I.  Best Interests Test and Alternatives to the Plan

Section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court determine that a plan accepted by the requisite number of Creditors in an Impaired Class provides each such member of each Impaired Class of Claims and Interests a recovery that has value, on the Effective Date, at least equal to the value of the recovery that each such Creditor would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Code further requires that the Bankruptcy Court determine that a plan is in the best interests of each Holder of a Claim or interest in any such Impaired Class which has not voted to accept the plan. Thus, if an Impaired Class does not vote unanimously to confirm the plan, the best interests test requires that the Bankruptcy Court find that the plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or interest that has a value, on the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors was liquidated under Chapter 7 of the Bankruptcy Code.

Here, the Chapter 11 Trustee believes that the Plan satisfies the best interests test as the Liquidation Analysis, attached hereto as Exhibit A (the "**Liquidation Analysis**"), demonstrates that the recoveries expected to be available to Holders of Allowed Claims under the Plan will be equal to or greater than the recoveries expected in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code.

In a typical Chapter 7 case, a trustee is elected or appointed to liquidate a Debtors' assets for Distribution to Creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, Secured Creditors are paid first from the proceeds of sales of the properties securing their Liens. If any assets are remaining in the bankruptcy estate after satisfaction of Secured Creditors' Claims from their collateral, administrative expenses (including those incurred by a Chapter 7 trustee) are next to receive payment. Unsecured Creditors are paid from any remaining proceeds, according to their respective priorities. Unsecured Creditors with the same priority share in proportion to the amount of their allowed Claims in relationship to the total amount of

allowed Claims held by all unsecured Creditors with the same priority. Finally, equity interest Holders receive the balance that remains, if any, after all Creditors are paid.

Here, substantially all of the Epic and Neuron Fuel assets, excluding the Retained Causes of Action, were sold pursuant to the Purchase Agreements. A liquidation under Chapter 7 of the Bankruptcy Code would liquidate the Debtors' remaining assets, but the Plan provides the best source of recovery for Holders of Class 3 Claims and meets the best interests of creditors test for all Holders of Claims and Interests for several reasons. First, because all the remaining assets of the Estates are subject to the liens of the Holders of Class 3 Claims and the total amount owed to the Holders of Class 3 Claims greatly exceeds any expected recovery, there is no possibility that there will be any funds in either a Chapter 7 case or a Chapter 11 Case for any Class other than the Holders of Class 3 Claims. For this reason, the best interests of creditors test is satisfied for Holders of Class 4, 5, 6 and 7 Claims and Interests. Second, with respect to the Holders of Class 3 Claims, the best interests of creditors test is satisfied because liquidation under Chapter 7 of the Bankruptcy Code would not provide for a timely Distribution of liquidation proceeds as a Chapter 7 trustee would most likely be required to wait until the Chapter 7 Cases are closed to make Distributions to Holders of Class 3 Claims. Third, in addition to realizing the time value of money, the Holders of Class 3 Claims will likely receive more under the Plan because of the additional costs imposed under Chapter 7, including the learning curve a new trustee would require.

At this time, there are no alternative plans available to the Estates. The Chapter 11 Trustee believes that the Plan provides the greatest possible value under the circumstances and has the greatest chance of being confirmed and consummated.

THE CHAPTER 11 TRUSTEE BELIEVES THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE CHAPTER 11 TRUSTEE OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

## J.      Releases

Article X of this Plan contains certain releases, exculpations, and injunctions. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtors.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT**

**AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

Under the voting procedures described in Article VII of this Plan, the Chapter 11 Trustee believes that these releases, exculpations, and injunctions are considered consensual under applicable bankruptcy law.

The Plan provides releases by the Debtors and their Estates in favor of the Released Parties. The Chapter 11 Trustee is not aware of any potential Claims or Causes of Action against the Released Parties or any of their respective firms, direct and indirect current and former Affiliates, subsidiaries, partners (including general partners and limited partners), investors, managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, investment bankers, Professionals, advisors, and representatives, each in their capacity as such.

Under the ~~Releases~~releases set forth in this Plan, the Debtors and their Estates are providing releases in favor of the Released Parties: (a) the current Prepetition Term Loan Lenders; (b) the Prepetition Agent; (c) the DIP Lenders; (d) the DIP Agent; (e) the Petitioning Lender Creditors, and each of their Related Parties, but solely in their capacity as such.

## K.    Administrative Claims

Proofs of Claim requesting payment of Administrative Claims must be filed no later than the Administrative Claims Bar Date. Holders of Administrative Claims that do not file Proofs of Claim requesting the allowance and payment thereof on or before the applicable Administrative ~~Expense~~Claims Bar Date shall permanently be barred from asserting such Administrative Claims against the Debtors, the Wind-Down Debtors, or their respective Estates. This provision does not apply to 28 U.S.C. § 1930 obligations, including U. S. Trustee fees and court costs, which are payable as a condition to Confirmation.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, to the extent an Allowed Administrative Claim was not otherwise paid in full or satisfied during the Chapter 11 Cases or assumed under a Purchase Agreement, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) shall, in full and final satisfaction of its Allowed Administrative Claim, receive an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:

    a.  if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter);

    b.  if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter;

c.   if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim;

d.   at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Chapter 11 Trustee or the Wind-Down Debtors, as applicable; or

e.   at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

For the avoidance of doubt, any Allowed Administrative Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser and shall not be an obligation of the Debtors or the Wind-Down Debtors, as applicable, and no reserve shall be established on account of such claim.

## L.    DIP Facility Claims

The DIP Facility Claims have been satisfied in full, excluding liabilities for indemnification and any other provisions of the Loan Documents which, by their terms, expressly survive. Accordingly, the Holders of the DIP Facility Claims shall not be entitled to any further distribution under this Plan.

## M.    Professional Fee Claims

All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered before the Effective Date (including compensation requested by any Professional or other Entity for making a substantial contribution in the Chapter 11 Case) shall file an application for final allowance of compensation and reimbursement of expenses no later than forty-five days after the Effective Date.

The objection deadline for final fee applications will be twenty-one (21) days after they are filed and a final fee hearing to determine the allowance of Professional Fee Claims (the "**Final Fee Hearing**") shall be held as soon as practicable after such objection deadlines pass. The Chapter 11 Trustee's counsel shall file a notice of the Final Fee Hearing. Such notice shall be served upon counsel for the Prepetition Term Loan Lenders, the Prepetition Agent, all Professionals, the U.S. Trustee, and all parties on the Bankruptcy Rule 2002 service list.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court.

Until payment of all Allowed Professional Fee Claims, the Professional Fees Escrow Account shall not be considered ~~Liquidating Trust~~ Wind-Down Debtor Assets or otherwise property of the ~~Liquidating Trust~~ Wind-Down Debtors, the Debtors, or their Estates. The

Professional Fees Escrow Account shall be treated as a trust account for the benefit of Holders of Professional Fee Claims and for no other parties until all Allowed Professional Fee Claims to have been paid in full. No other liens, claims, or interests shall encumber the Professional Fees Escrow Account. When all Allowed Professional Fee Claims have been paid in full, any amounts remaining in the Professional Fees Escrow Account, if any, shall become Retained Assets and Distributable Proceeds to be distributed by the Wind-Down Debtors in accordance with the terms of the Plan and the Plan Administrator Agreement.

## N.    Priority Tax Claims

All final requests for payment of Priority Tax Claims must be Filed no later than the applicable Claims Bar Date.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, to the extent an Allowed Priority Tax Claim was not otherwise paid in full or satisfied during the Chapter 11 Cases or assumed under a Purchase Agreement, each Holder of an Allowed Priority Tax Claim shall, in full and final satisfaction of its Allowed Priority Tax Claim, be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

For the avoidance of doubt, any Allowed Priority Tax Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser and shall not be an obligation of the Debtors or the Wind-Down Debtors, as applicable, and no reserve shall be established on account of such claim.

The Chapter 11 Trustee estimates that the aggregate amount of Allowed Priority Tax Claims does not exceed approximately $426,608.

## O.    Statutory Fees

All fees due and payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors or the Wind-Down Debtors, as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

Statutory Fees due and payable prior to the Effective Date shall be paid by the Chapter 11 Trustee on the Effective Date. After the Effective Date, the Wind-Down Debtors, the Plan Administrator (only in their capacity as Plan Administrator and with no personal liability), or any Entity making disbursements on behalf of any of the Wind-Down Debtors, or making disbursements on account of an obligation of any Debtor or Wind-Down Debtor, shall be liable to pay any and all Statutory Fees when due and payable. The Chapter 11 Trustee shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Wind-Down Debtors, the Plan Administrator, or any Entity making disbursements on behalf of the Wind-Down Debtors, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The Wind-Down Debtors and the Plan Administrator (only in their capacity as Plan Administrator and with no personal liability) shall remain obligated to pay Statutory Fees to the office of the U.S. Trustee until the earliest of a particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be

required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

## ARTICLE IV:
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    Classification of Claims and Interests

The below categories of Claims and Interests classify such Claims and Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to sections 1122 and 1123 of the Bankruptcy Code.

### 1.    Class Identification

The classification of Claims and Interests against the Debtors pursuant to the Combined Plan and Disclosure Statement is as follows:

### a.    Claims and Interests

| *In re Saga Formations, Inc., In re Pajeau, Inc., and In re Tangible Play, Inc.* | | | |
|---|---|---|---|
| **Class** | **Claims and Interests** | **Status** | **Voting Rights** |
| Class 1 | Other Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not entitled to vote (presumed to accept) |
| Class 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Not entitled to vote (deemed to reject) |
| Class 5 | Intercompany Claims | Impaired | Not entitled to vote (deemed to reject) |
| Class 6 | 510(b) Claims | Impaired | Not entitled to vote (deemed to reject) |
| Class 7 | Interests | Impaired | Not entitled to vote (deemed to reject) |

### B.    Treatment of Claims and Interests

### 1.    Treatment of Claims and Interests

### a.    Class 1 – Other Secured Claims

i.    *Classification*: Class 1 consists of all Other Secured Claims, if any. The Chapter 11 Trustee is unaware of any Other Secured Claims.

ii.    *Allowance*: Notwithstanding anything in the Combined Plan and Disclosure Statement to the contrary, an Other Secured Claim, if

56

existing, may only become Allowed by Final Order of the Bankruptcy Court.

iii. *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, ~~in full and final satisfaction of such Allowed Other Secured Claim,~~ each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Wind-Down Debtor, as applicable, with the Consent of the Agent: (a) payment in full in Cash of its Allowed Other Secured Claim; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. For the avoidance of doubt, any Allowed Other Secured Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser and shall not be an obligation of the Debtors, the Estates or the Wind-Down Debtors.

iv. *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

b. **Class 2 – Other Priority Claims**

i. *Classification:* Class 2 consists of all Other Priority Claims, if any. The Chapter 11 Trustee estimates that Other Priority Claims total $756.00 for Epic, $0.00 for Neuron Fuel, and $57,988.00 for Tangible Play.

ii. *Treatment:* Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, ~~in full and final satisfaction of such Allowed Other Priority Claim,~~ each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Wind-Down Debtor, as applicable, with the Consent of the Agent: (a) payment in full in Cash of its Allowed Other Priority Claim; or (b) such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code. For the avoidance of doubt, any Allowed Other Priority Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser and shall not be an obligation of the Debtors, the Estates or the Wind-Down Debtors.

iii. *Voting:* Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted

the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

c.    **Class 3 – Prepetition Term Loan Claims**

i.    *Classification*: Class 3 consists of all Prepetition Term Loan Claims.

ii.    *Allowance*: The Prepetition Term Loan Claims shall be deemed Allowed in the aggregate principal amount of $1,189,513,685.00, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Prepetition Credit Agreement.

iii.    *Treatment*: On the Effective Date, each Holder of an Allowed Prepetition Term Loan Claim shall receive (a) its *pro rata* share of the Prepetition Term Loan Effective Date Distribution, if any, and (b) its *pro rata* share of the Distributable Proceeds, in each case up to the Allowed amount of such Holder's Prepetition Term Loan Claims until such Claims are paid in full in Cash; *provided* that any Prepetition Term Loan Effective Date Distribution and any Distributable Proceeds available on account of the Prepetition Term Loan Claims shall be distributed to the Prepetition Agent, which shall further distribute such amounts in accordance with the terms of the Intercreditor Agreement. Unless and until all Allowed Prepetition Term Loan Claims have been paid in full in Cash, and notwithstanding anything to the contrary herein, the Prepetition Term Loan Facility shall be deemed to remain an outstanding obligation of the Debtors or the Wind-Down Debtors, as applicable, for all purposes, including ~~distributions~~Distributions to be made on account of such Claims hereunder and in accordance with the Intercreditor Agreement.

iv.    *Claims Against Non-Debtor Guarantors*: For the avoidance of doubt, notwithstanding the treatment of Class 3 Prepetition Term Loan Claims hereunder, no Claims or Causes of Action against any non-Debtor (including, for the avoidance of doubt, T&L, Byju's Pte. Ltd., and Great Learning Education Pte Ltd.) shall be deemed discharged, released, satisfied, settled, or otherwise extinguished, and, for the avoidance of doubt, the Prepetition Credit Agreement, the Onshore Guarantee Deed,~~ the~~ (as defined in the Prepetition Credit Agreement), the Prepetition Security Agreement, any related loan documents and ancillary documents, and all of the rights and obligations thereunder shall survive post-Effective Date, and nothing herein, including, without limitation, the dissolution of the Debtors or Wind-Down Debtors, as applicable, or Alpha, shall

be construed as discharging, satisfying, reducing, limiting, modifying, or otherwise affecting the liability of any non-Debtor party thereto or obligor thereunder, including, for the avoidance of doubt, the liability of any non-Debtor Guarantor (as defined in the Prepetition Credit Agreement); *provided*, that the guarantees arising under the Onshore Guarantee Deed (as defined in the Prepetition Credit Agreement) shall be reduced on a dollar-for-dollar basis only to the extent of any Cash distributionsDistributions actually received by Holders of Prepetition Term Loan Claims pursuant to the terms of the Plan and as applied in accordance with the priority set forth in the Prepetition Credit Agreement.

v.      *Voting*: Class 3 is Impaired under the Plan.  Holders of Allowed Prepetition Term Loan Claims are entitled to vote to accept or reject the Plan.

**d.      Class 4 – General Unsecured Claims**

i.      *Classification*: Class 4 consists of all General Unsecured Claims.

ii.      *Treatment*: In full and final satisfaction of the General Unsecured Claims, onOn the Effective Date, all Allowed General Unsecured Claims shall be cancelled, released, and extinguished, and will be of no further force or effect, without any distribution on account of such Claims.

iii.      *Voting*: Class 4 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**e.      Class 5 – Intercompany Claims**

i.      *Classification:* Class 5 consists of all Intercompany Claims.

ii.      *Treatment*: In full and final satisfaction of the Intercompany Claims, onOn the Effective Date, all Allowed Intercompany Claims shall be cancelled, released, and extinguished, and will be of no further force or effect, without any distribution on account of such Claims. For the avoidance of doubt, the treatment of Class 5 Intercompany Claims under the Plan pertains only to Intercompany Claims against any Debtor and shall in no way release, alter, impair, or otherwise impact the vesting of all Avoidance Actions and other Retained Causes of Action (including all Claims and Causes of Action that a Debtor may have against a non-Debtor Affiliate) in the Wind-Down Debtors, which shall be entitled to pursue such Claims and Causes of Action against any current or

former non-Debtor Affiliate of the Debtors or the Wind-Down Debtors as set forth herein and in the Plan Administrator Agreement.

iii.  *Voting:* Class 5 is Impaired under the Plan. Holders of Allowed Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**f.    Class 6 – Section 510(b) Claims**

i.  *Classification*: Class 6 consists of all Section 510(b) Claims, if any.

ii.  *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

iii.  *Treatment*: ~~In full and final satisfaction of the Section 510(b) Claims, on~~On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished, and will be of no further force or effect, without any distribution on account of such claims.

iv.  *Voting*: Class 6 is Impaired under the Plan. Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**g.    Class 7 – Interests**

i.  *Classification*: Class 7 consists of all Interests.

ii.  *Treatment*: ~~In full and final satisfaction of the Interests (including the Intercompany Interests), on~~On the Effective Date, all Interests (including Intercompany Interests) shall be cancelled, released, and extinguished, and will be of no further force or effect, without any distribution on account of such Claims. For the avoidance of doubt, the treatment of Class 7 Interests under the Plan pertains only to any Interest in any Debtor and shall in no way release, alter, impair, or otherwise impact the vesting of all Retained Assets in the Wind-Down Debtors, which shall be entitled to retain ownership of, dispose of, or otherwise monetize such Retained Assets, including any Interest that any Debtor has in any non-Debtor, as set forth elsewhere herein and in the Plan Administrator Agreement.

iii. *Voting*: Class 7 is Impaired under the Plan. Holders of Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

## C.    Impaired Claims and Equity Interests

Under the Plan, Holders of Claims in Classes 3, 4, 5, 6, and 7 of each of the Debtors are the Impaired Classes pursuant to section 1124 of the Bankruptcy Code because the Plan alters the legal, equitable, or contractual rights of the Holders of such Claims treated in such Class.

## D.    Confirmation Pursuant to Sections 1129(a)(10) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Combined Plan and Disclosure Statement by an Impaired Class of Claims.

## E.    No Unfair Discrimination

The Chapter 11 Trustee believes the treatment of Claims and Interests described in this Plan is fair and equitable and does not discriminate unfairly. The proposed treatment of Claims and Interests provides that each Holder of such Claim or Interest will be treated identically within their respective Class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Interest.

## F.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero ($0) dollars as of the date of the Combined Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE V: THE WIND-DOWN DEBTORS

## A.    Establishment of the Wind-Down Debtors

The Wind-Down Debtors will be established, formed, and merged on the Effective Date. The Wind Down Debtors shall be the successors in interest to the Debtors, and the Wind-Down Debtors shall be successors to each Debtor and its respective Estate's right, title, and interest to the Wind-Down Debtor Assets. The Wind-Down Debtors will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Debtors shall be managed by the Plan Administrator and shall be subject to the oversight of the Wind-Down Debtors Oversight Committee. The Wind-Down Debtors shall be administered in accordance with the terms of the Plan and the Plan Administrator Agreement. The Wind-Down Debtors

shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

**B.      Vesting of the Wind-Down Debtor Assets in the Wind-Down Debtors**

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall irrevocably vest in the Wind-Down Debtors.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior Final Order of the Bankruptcy Court or the Plan, the Wind-Down Debtors specifically retain and reserve the right to assert, after the Effective Date, any and all of the Retained Causes of Action and related rights, whether or not asserted as of the Effective Date (and whether or not listed on the Schedule of Retained Causes of Action), and all proceeds of the foregoing, subject to the terms of the Plan.  For the avoidance of doubt, nothing in this section shall limit the transfer of the Retained Causes of Action to the Wind-Down Debtors.

**C.      Wind-Down Debtors' Rights With Respect to Disputes and Litigation**

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtors shall, with the consent of the Wind-Down Debtors Oversight Committee, have the right to pursue or not to pursue, compromise or settle any dispute with respect to the Wind-Down Debtor Assets.  On and after the Effective Date, the Wind-Down Debtors may, without further Bankruptcy Court approval but with the consent of the Wind-Down Debtors Oversight Committee, commence, litigate, and settle any Retained Causes of Action or Claims relating to any Wind-Down Debtor Assets or rights to payment or Claims that belong to the Debtors or their Estates as of the Effective Date or are instituted by the Wind-Down Debtors on or after the Effective Date, except as otherwise expressly provided herein. Holders of Allowed Class 3 Claims expect that the Wind-Down Debtors will investigate and pursue the Retained Causes of Action, including, without limitation, the specifically-identified Retained Causes of Action in the definition thereof. The Wind-Down Debtors shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtors shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Chapter 11 Trustee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset without the need for filing any motion for such relief.  On the Effective Date, the Debtors and the Plan Administrator shall have established the Wind-Down Debtors pursuant hereto.

**D.      Governance of the Wind-Down Debtors**

On the Effective Date, the terms of the Debtors' existing boards of directors or managers, if any, shall expire, and the Chapter 11 Trustee shall be discharged. The Plan Administrator shall be immediately and automatically deemed appointed by the Debtors or the Wind-Down Debtors, as applicable, as the sole director and the sole officer of each of the Wind-Down Debtors, and the Plan Administrator shall succeed to the powers of the Debtors' directors and officers and the

Chapter 11 Trustee.  Without limitations on the foregoing, the Plan Administrator shall have the sole authority to act on behalf of the Wind-Down Debtors subject to coordination with and, where applicable, consent of the Wind-Down Debtors Oversight Committee.

**E.      The Wind-Down Debtors' Transfer of Privileges**

For the avoidance of doubt, any attorney-client privilege, work-product privilege, joint interest privilege, or other privilege or immunity attaching to any documents or communications that belonged to the Debtors, was invoked by the Chapter 11 Trustee in her capacity as representative of the Estates, or otherwise operated for the benefit of the Debtors or their Estates before the Effective Date (including, for the avoidance of doubt, those relating to the Retained Causes of Action) shall vest in the Wind-Down Debtors.

**F.      Bankruptcy Rule 2004**

For the avoidance of doubt, from and after the Effective Date, the Wind-Down Debtors shall be vested with the Debtors' and the Chapter 11 Trustee's rights, as such rights existed before the Effective Date, to conduct discovery and oral examinations (including document discovery and depositions) of any party under Bankruptcy Rule 2004 against any Person or Entity in furtherance of the Wind-Down, including the investigation or prosecution of actual or potential Causes of Action, including the Retained Causes of Action, and, for the avoidance of doubt, the collectability of damages for such Causes of Action, and the Bankruptcy Court shall retain jurisdiction to order examinations (including examinations under Bankruptcy Rule 2004) against any Person or Entity, and to hear all matters with respect to the same.

**G.      Cooperation with the Plan Administrator; Books and Records**

The Debtors, the Chapter 11 Trustee, any and all parties previously in control of the Debtors or the Wind-Down Debtors, any Purchaser (in accordance with the applicable Purchase Agreement), and the advisors to any of the foregoing, as applicable, shall, upon reasonable notice, cooperate with the Plan Administrator and the Wind-Down Debtors Oversight Committee in the administration of the Wind-Down Debtors, including, but not limited to providing the Plan Administrator and its advisors reasonable access to personnel and books and records and former employees or Professionals hired by the Debtors, to the extent the Debtors, the Chapter 11 Trustee, or the Purchaser(s), as applicable, have such information and/or documents, to enable the Plan Administrator to perform its duties under the Plan and the Plan Administrator Agreement.  Such access and documents shall be provided to the Wind-Down Debtors and Plan Administrator without charge except as may be provided for in accordance with the terms of a Purchase Agreement.

The books and records maintained by the Plan Administrator and any records of the Debtors or Wind-Down Debtors may be disposed of by the Plan Administrator at the later of (a) such time as the Plan Administrator determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Wind-Down, (b) upon the termination and completion of the Wind-Down, or (c) as otherwise required under applicable Law.

### H.    Vesting of Wind-Down Debtors' Assets

Except as otherwise provided in the Confirmation Order, the Plan, or any Purchase Agreement, as applicable, and notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, all Retained Causes of Action, and any property retained by any of the Debtors pursuant to the Plan or any Purchase Agreement shall irrevocably vest in and be granted and assigned to each respective Wind-Down Debtor, as applicable, free and clear of all Liens, Claims, charges, other encumbrances, and Interests for the purposes of winding down the Wind-Down Debtors, subject only to the Allowed Claims as set forth herein and the expenses of the Wind-Down Debtors as set forth herein and in the Plan Supplement.  Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtors.

On and after the Effective Date, except as otherwise provided in any Purchase Agreement, any Sale Order, or the Plan, each of the Wind-Down Debtors (subject to the rights and approval of the Wind-Down Debtors Oversight Committee where applicable), as applicable, may use, acquire, or dispose of property, enter into transactions, agreements, understandings, or arrangements, whether in or outside of the ordinary course of business, and execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

### I.    Expenses of Wind-Down Debtors

The expenses of the Wind-Down Debtors shall be paid from the Wind-Down Debtor Assets, including the Wind-Down Financing Facility, without further notice or approval from the Bankruptcy Court.

### J.    Wind-Down Financing Facility

On or after the Confirmation Date, the Plan Administrator shall be authorized to enter into a financing facility to be used to fund the Wind-Down, including, for the avoidance of doubt, the pursuit of the Retained Causes of Action (the "**Wind-Down Financing Facility**"). The documents memorializing the terms of the Wind-Down Financing Facility (the "**Definitive Documentation**") shall be Filed with the Plan Supplement.

The Plan Administrator may draw upon the Wind-Down Financing Facility to fund the administration of the Wind-Down Debtors, including for the payment of the ongoing fees of the Plan Administrator, the Wind-Down Debtors Oversight Committee, the Plan Administrator's counsel, the Wind-Down Debtors Oversight Committee's counsel, and any other professionals retained by the Wind-Down Debtors, the Plan Administrator, or the Wind-Down Debtors Oversight Committee from time to time as well as litigation and other expenses necessary or advisable to pursue the Retained Causes of Action or otherwise effectuate the Wind-Down.

**K.      Wind-Down Debtors Oversight Committee**

**1.      Selection of Wind-Down Debtors Oversight Committee**

The members of the Wind-Down Debtors Oversight Committee shall be identified in the Plan Supplement. The Wind-Down Debtors Oversight Committee shall be entitled to retain professionals, paid by the Wind-Down Debtors, to advise the Wind-Down Debtors Oversight Committee, which professionals may be Professionals or other advisors who previously advised the Chapter 11 Trustee, the Prepetition Agent, and/or the Prepetition Term Loan Lenders.

**2.      Rights, Powers, Duties, and Responsibilities of the Wind-Down Debtors Oversight Committee**

The Wind-Down Debtors Oversight Committee shall have the responsibility to review and advise the Plan Administrator (and the Liquidating Trust, if formed) with respect to the liquidation and distribution of the Wind-Down Debtor Assets in accordance with the Plan, the Plan Administrator Agreement, and the Confirmation Order.

On and after the Effective Date, subject in each instance to the terms and conditions of the Plan, the Confirmation Order and any further order of the Bankruptcy Court, the Wind-Down Debtors Oversight Committee shall have the rights, powers, duties and responsibilities to oversee the Plan Administrator and the Wind-Down of the Wind-Down Debtors.    The Wind-Down Debtors Oversight Committee shall stay informed (through any means determined to be appropriate by the Wind-Down Debtors Oversight Committee in coordination with the Plan Administrator and any professionals of each of the foregoing) regarding the administration of the Wind-Down and shall assist the Plan Administrator in developing a strategy to maximize the value of the Wind-Down Debtor Assets for the benefit of the Holders of Claims entitled to distributions from the Wind-Down Debtors under the Plan.  The Wind-Down Debtors Oversight Committee shall maintain an affirmative consent right over any final decisions or actions that the Wind-Down Debtors Oversight Committee and/or the Plan Administrator determine to be material to the administration of the Wind-Down, including, for the avoidance of doubt, (a) making any material distributions to the Holders of Claims (including any reserves withheld from such distribution), (b) determining to prosecute, enforce, settle or abandon any material Retained Causes of Action, (c) determining to sell, otherwise monetize, or abandon any material Wind-Down Debtor Assets, (d) establishing any Litigation Trust or similar vehicle, and (e) entering into any financing arrangement.  For the avoidance of doubt, the Plan Administrator shall have the sole discretion to make decisions or take actions with respect to any immaterial or *de minimis* Retained Causes of Action and other Wind-Down Debtor Assets; *provided* that the Wind-Down Debtors Oversight Committee may determine in its sole discretion to require its consent or otherwise issue a direction with respect to any matters relevant to the Wind-Down.

**L.      Manner of Wind-Down Distributions**

After the Effective Date, the Plan Administrator shall make distributions on account of the Holders of Allowed Claims entitled to the Distributable Proceeds in accordance with the Plan and the Plan Administrator Agreement; *provided, however*, that prior to making any such distribution, the Plan Administrator shall, after consultation with the Wind-Down Debtors

Oversight Committee, and taking into account the availability, where applicable, of Cash already on hand or scheduled to be received, determine such amounts that are (a) necessary to satisfy current accrued fees and expenses of the Wind-Down Debtors, (b) necessary to satisfy near-term anticipated fees and expenses of the Wind-Down Debtors, and (c) required to satisfy amounts outstanding under the Wind-Down Financing Facility, if applicable.  With respect to all payments and distributions made under the Plan, the Plan Administrator shall cause the Wind-Down Debtors to comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority and, in the event the Plan Administrator retains accountants or other professionals, shall have the right to rely on the advice of such in connection with all tax and reporting matters.

Distributable Proceeds distributed for the benefit of the Holders of Prepetition Term Loan Claims shall be made to the Prepetition Agent. The Prepetition Agent shall apply the proceeds in accordance with the Intercreditor Agreement.

**M.     Termination of the Wind-Down Debtors**

The Wind-Down Debtors will terminate on the earlier of the date that: (a)(i) the final liquidation, administration, and distribution of the Wind-Down Debtor Assets in accordance with the terms of the Plan, and the full performance of all other duties and functions as set forth in the Plan and the Plan Administrator Agreement has occurred; and (ii) the Chapter 11 Case of each Debtor has been closed; or (b) the Plan Administrator determines in its reasonable judgment (with the consent of the Wind-Down Debtors Oversight Committee) that the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to the Plan Administrator under the Plan and the Confirmation Order.  After (x) the final distributions pursuant to the Plan, (y) the Filing by or on behalf of the Wind-Down Debtors of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Plan Administrator, the Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions.

**N.     Distribution of Excess Reserves by the Wind-Down Debtors**

Once all applicable Claims or other amounts have been paid in full, the Excess Reserves shall become Retained Assets and Distributable Proceeds to be distributed by the Wind-Down Debtors in accordance with the terms of this Plan and the Plan Administrator Agreement.

## ARTICLE VI: PLAN ADMINISTRATOR

**A.     Plan Administrator Agreement**

The powers, rights, and duties of the Plan Administrator shall be memorialized in the Plan Administrator Agreement, which shall be filed with the Plan Supplement.

**B.     Appointment of the Plan Administrator**

The Plan Administrator shall be identified in the Plan Supplement.  The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.  The Plan Administrator shall

serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Retained Causes of Action belonging to the Estates.

## C.    The Term of the Plan Administrator

The Plan Administrator shall serve in such capacity through the earlier of (a) the date on which the Wind-Down Debtors are dissolved and (b) the date on which the Plan Administrator resigns, is terminated, or is otherwise unable to serve.  The terms and conditions surrounding the resignation or termination of the Plan Administrator and appointment of an interim and permanent Plan Administrator shall be set forth in the Plan Administrator Agreement to be Filed with the Plan Supplement.

If the Wind-Down Debtors Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of counsel to the Plan Administrator or another party in interest, shall approve a successor to serve as the Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further action or approval, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

## D.    Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator's authority shall be subject to the Wind-Down Debtors Oversight Committee, to the extent set forth in the Plan Administrator Agreement. The Plan Administrator and members of the Wind-Down Debtors Oversight Committee shall make themselves reasonably available for consultation by the Holders of Claims entitled to the Distributable Proceeds.

## E.    Plan Administrator Responsibilities

Responsibilities of the Plan Administrator shall include, but are not limited to (all without further order of the Bankruptcy Court), in each case subject to the consent of the Wind-Down Debtors Oversight Committee to the extent such consent is required pursuant to the Plan, the Confirmation Order, or the Plan Administrator Agreement:

1.    implementing the Wind-Down and making distributions contemplated by the Plan;

2.    marshalling, collecting, marketing for sale, liquidating and winding down any of the Debtors' assets constituting the Wind-Down Debtor Assets;

3.      overseeing the accounts of the Debtors and the Wind-Down Debtors and the Wind-Down and dissolution of the Debtors and the Wind-Down Debtors;

4.      implementing, pursuing, and adhering to the terms of the Plan, the Confirmation Order, any Purchase Agreement and Sale Order, and any related documents;

5.      receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtors to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtors to invest any moneys held as Wind-Down Debtor Assets;

6.      opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtors, including, in the Plan Administrator's discretion, separate bank accounts for each of the Debtors;

7.      establishing a Liquidating Trust in accordance with the terms of the Plan, the Confirmation Order, and the Plan Administrator Agreement, to the extent that the Plan Administrator, with the consent of the Wind-Down Debtors Oversight Committee, deems it to be reasonably necessary or beneficial in effectuating the Wind-Down;

8.      entering into any agreement or executing any document or instrument required by or consistent with the Plan or the Confirmation Order, and performing all obligations thereunder;

9.      protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Retained Causes of Action) vested in the Wind-Down Debtors by any method deemed appropriate, including, without limitation, by judicial proceedings, including before the Bankruptcy Court, or otherwise;

10.     reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

11.     seeking the examination of any Person or Entity pursuant to Federal Rule of Bankruptcy Procedure 2004;

12.     entering into a financing facility, including the Wind-Down Financing Facility, to pursue the Retained Causes of Action, including, without limitation, the specifically-identified Retained Causes of Action, or otherwise facilitate the Wind-Down;

13.     retaining professionals, disbursing agents, and other agents, independent contractors, and third parties on behalf of the Wind-Down Debtors, the Plan Administrator and/or the Wind-Down Debtors Oversight Committee, and paying the reasonable compensation thereof;

14.    paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets;

15.    investigating, reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Retained Causes of Action;

16.    reviewing and compelling turnover of the Debtors or the Wind Down Debtors' property;

17.    calculating and making all distributions to the Holders of Allowed Claims against each Debtor, as provided for in, or contemplated by, the Plan;

18.    withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of its agents or professionals, may be required to be withheld from such distribution under the income tax or other Laws of the United States or of any state or political subdivision thereof;

19.    in reliance upon the Debtors' Schedules, the official register of Claims maintained in the Chapter 11 Cases, and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and  Interests required to be administered by the Wind-Down Debtors;

20.    making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtors, and filing tax returns for the Debtors, the Wind Down Debtors, or the Liquidating Trust (if applicable) pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtors, as applicable; *provided, however*, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

21.    abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

22.    seeking a determination of tax liability or refund under Bankruptcy Code section 505;

23.    establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtors as may be necessary and appropriate

for the proper operation of matters incident to the Debtors or the Wind Down Debtors;

24.     purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

25.     undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtors', the Liquidating Trust's (if applicable), or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

26.     retaining, terminating, appointing, hiring, or otherwise employing employees, personnel, management, and directors at any of the Wind-Down Debtors to the extent necessary to carry out the purposes of the Plan, including, without limitation, to address any disputes between the Wind-Down Debtors;

27.     invoking any attorney-client privilege, work-product privilege, joint interest privilege, or other privilege or immunity attaching to any documents or communications that belong to the Wind-Down Debtors;

28.     exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, any Purchase Agreement, and the Plan Administrator Agreement; and

29.     taking all other actions consistent with the provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtors.

## F.     Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for actual fraud, willful misconduct, or gross negligence, in all respects by the Chapter 11 Trustee and the Debtors. The Plan Administrator may obtain, at the expense of the Debtors or the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance. The Plan Administrator may rely upon written information previously generated by the Chapter 11 Trustee and the Debtors. For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator, in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

## ARTICLE VII: CONFIRMATION PROCEDURES

**A.    Confirmation Procedures**

**1.    Combined Hearing**

The Combined Hearing before the Bankruptcy Court has been scheduled for September 24, 2025 at 11:00 a.m. (prevailing Eastern Time) at the United States Bankruptcy Court, 824 North Market Street, Wilmington, Delaware 19801 to consider (a) approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Combined Hearing or via a notice Filed on the docket.

**2.    Procedure for Objections**

Any objection to approval or confirmation of the Plan must (i) be in writing, (ii) comply with the Bankruptcy Code and the Bankruptcy Rules, (iii) state the name and address of the objecting party and the amount and nature of their Claim or Interest; (iv) state with particularity the legal and factual basis for such objection, and, if practicable, a proposed modification to the Plan that would resolve such objection. Any such objection must be filed by **September 9, 2025 at 4:00 p.m. (prevailing Eastern Time)** with the Bankruptcy Court and served on counsel to the Chapter 11 Trustee, counsel to the Prepetition Administrative Agent and the Prepetition Collateral Agent, the U.S. Trustee, and all parties who have filed a request for notice in these cases. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.

**3.    Requirements for Confirmation**

The Bankruptcy Court will confirm the Plan only if the requirements of section 1129 of the Bankruptcy Code are met. As set forth in this Plan, the Chapter 11 Trustee believes that the Plan: (a) meets the cramdown requirements; (b) meets the feasibility requirements for a chapter 11 plan of liquidation; (c) is in the best interests of Creditors; (d) has been proposed in good faith; and (e) meets all other technical requirements imposed by the Bankruptcy Code. Additionally, pursuant to section 1126 of the Bankruptcy Code, under the Plan, only Holders of Claims in Impaired Classes are entitled to vote.

**B.    Solicitation and Voting Procedures**

**1.    Eligibility to Vote on the Plan**

Except as otherwise ordered by the Bankruptcy Court, only Holders of Claims in Class 3 for each of the Debtors may vote on the Plan pursuant to section 1126 of the Bankruptcy Code. To vote on the Plan, a Holder must hold a Claim in Class 3 that is identified on the applicable Debtor's Schedules and is not listed as Disputed, unliquidated, or contingent.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3 FOR EACH OF THE DEBTORS.**

**2.      Solicitation Package**

Accompanying the Plan for the purposes of soliciting votes on the Plan are Solicitation Packages, which contain copies of: (a) the form of ballot substantially in one of the forms attached to the Interim Approval and Procedures Order as Exhibit 2; (b) the Combined Notice substantially in the form attached to the Interim Approval and Procedures Order as Exhibit 1; (c) either a paper copy or a copy in "pdf" format on flash drive of the Combined Plan and Disclosure Statement (fully compiled with all exhibits attached, at the Chapter 11 Trustee's and Voting Agent's discretion); (d) either a paper copy or a copy in "pdf" format on flash drive of the Interim Approval and Procedures Order without exhibits; (e) any other documents and materials that the Debtors deem appropriate; and (f) such other information as the Bankruptcy Court may direct or approve.

Holders of Claims in non-Voting Classes will receive packages consisting of the Combined Notice substantially in the form attached to the Interim Approval and Procedures Order as Exhibit 1, setting forth: (a) the non-Voting Classes; (b) a summary of the treatment of Claims and Interests under the Plan; (c) the date and time of the Combined Hearing; (d) the deadline and procedures for filing objections; and (e) the deadline for filing Administrative ~~Expense~~ Claims set forth in the Plan; and (f) information regarding where to obtain a copy of the Combined Plan and Disclosure Statement.

**3.      Voting Procedures and Voting Deadline**

The Voting Record Date for determining which Holders of Claims in Class 3 for each of the Debtors may vote on the Plan is the date of entry of the Interim Approval and Procedures Order.

The Voting Deadline by which the Voting Agent must **RECEIVE** original Ballots by mail, overnight delivery, hand delivery, or for electronic Ballots, the deadline by which such electronic Ballots must be submitted, is September 9, 2025 at 4:00 p.m. (prevailing Eastern Time).

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed. Please carefully review the Ballot instructions and complete the Ballot by: (a) indicating your acceptance or rejection of the Plan; and (b) signing and returning the Ballot to the Voting Agent. If you are a member of a Voting Class and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Chapter 11 Trustee's counsel.

The following Ballots will not be counted or considered: (a) any Ballot received after the Voting Deadline, unless the Chapter 11 Trustee or the Bankruptcy Court grants an extension to the Voting Deadline with respect to such Ballot; (b) any Ballot that is illegible or contains insufficient information; (c) any Ballot cast by a Person or Entity that does not hold a Claim in a Voting Class; (d) any Ballot cast for a Claim designated as unliquidated, contingent, or Disputed

or as zero (0) or unknown in amount; (e) any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan; (f) simultaneous duplicative Ballots voted inconsistently; (g) Ballots partially rejecting and partially accepting the Plan; (h) any Ballot received other than the official form sent by the Voting Agent; (i) any unsigned Ballot; or (j) any Ballot that is submitted by facsimile.

### 4.     Presumed Acceptance and Deemed Rejection

Holders of Claims in Classes 1 and 2 for each of the Debtors are Unimpaired, thus under section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to have accepted the Plan, and the votes of the Holders of such Claims shall not be solicited.

Holders of Claims in Class 3 of each of the Debtors are Impaired and entitled to vote to accept or reject the Plan.

Holders of Claims in Classes 4, 5, 6, and 7 of each of the Debtors are not entitled to receive any Distribution under the Plan and thus, pursuant to section 1126(g) of the Bankruptcy Code, Classes 4, 5, 6, and 7 Claims for each of the Debtors are conclusively deemed to have rejected the Plan and the votes of these Holders therefore shall not be solicited

### 5.     Acceptance by Impaired Classes

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one (1) Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. The Chapter 11 Trustee urges that you vote to accept the Plan.

**YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL OR E-MAIL THE BALLOT ATTACHED TO THE NOTICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

### ARTICLE VIII: IMPLEMENTATION AND EXECUTION OF THE PLAN

**A.     Effective Date**

The Effective Date shall not occur until the conditions for the Effective Date set forth in Article XI hereof are satisfied or otherwise waived in accordance with the terms of this Plan. Upon occurrence of the Effective Date, the Wind-Down Debtors shall file the Notice of Effective Date.

**B.     Establishment and Funding of Plan Reserves**

As soon as practical following Confirmation and no later than the Effective Date, the Chapter 11 Trustee or the Wind-Down Debtors (as applicable) shall establish the following reserves (the "**Plan Reserves**"), in each case with the Consent of the Agent, and solely to the

extent of any estimated amounts owing in connection therewith: (a) the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount; (b) the Administrative Claims Reserve with Cash equal to the Administrative Claims Amount; (c) the Priority Tax Claims Reserve with Cash equal to the Priority Tax Claims Amount; (d) the Other Secured Claims Reserve with Cash equal to the Other Secured Claims Amount; and (f) the Other Priority Claims Reserve equal to the Other Priority Claims Amount.

## C.    Wind-Down Transactions

Upon the entry of the Confirmation Order, the Chapter 11 Trustee, Debtors and the Plan Administrator, in consultation with the Prepetition Administrative Agent, without further order of the Bankruptcy Court, are authorized to take all actions as may be necessary or appropriate to effect any Wind-Down Transactions and all other transactions described in, approved by, contemplated by, or necessary to effectuate or in connection with the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including: (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (c) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (d) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state Law.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including any Wind-Down Transactions.

## D.    Corporate Action

On the Effective Date, all matters and actions provided for under the Plan that would otherwise require approval of the Debtors or the Chapter 11 Trustee shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the Debtors or the Chapter 11 Trustee.

## E.    Exemption from Certain Taxes and Fees

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, the Sale Transactions, any related documentation, or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax,

conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### F.    Termination of the Consumer Privacy Ombudsman

To the extent not already addressed in any Order of this Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the Consumer Privacy Ombudsman in connection with the Chapter 11 Cases shall be terminated on the Effective Date. For the avoidance of doubt, the rights of the Consumer Privacy Ombudsman to file any and all Claims are preserved. Upon termination, the Consumer Privacy Ombudsman shall dispose of any documents provided to her in the course of her reporting with the exception of any documents the Consumer Privacy Ombudsman may be required to retain in accordance with any applicable policies or Law.

Prior to issuing or serving upon the Consumer Privacy Ombudsman any formal or informal discovery request, including, but not limited to, any subpoena, request for production of documents, requests for admissions, interrogatories, subpoenas duces tecum, requests for testimony, or any other discovery of any kind whatsoever in any way related to the Chapter 11 Trustee, the Debtors, the Chapter 11 Cases, the Consumer Privacy Ombudsman's evaluation, or her reports (collectively, the "**Discovery**"), any creditor or party-in interest in the Chapter 11 Cases must first file an appropriate pleading with this Court to request permission to initiate the Discovery.

### G.    Provisions Governing Distributions Under the Plan

#### 1.    Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the Effective Date Distribution that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein from the Wind-Down Debtors, the Chapter 11 Trustee on behalf of the Estates, or the Plan Administrator, as applicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions provided in the Plan set forth in Article VIII.G. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim,

receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

Upon the Effective Date, all debts and obligations of the Debtors, their Estates, and the Wind-Down Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Debtors and Wind-Down Debtors shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Confirmation Order.

## 2. Delivery of Distribution on Prepetition Term Loan Claims

Notwithstanding any provision of the Plan to the contrary, all distributions on account of Allowed Prepetition Term Loan Claims shall be governed by the Intercreditor Agreement and shall be deemed completed when made to the Prepetition Administrative Agent, which shall be deemed the Holder of their respective portion of the Allowed Prepetition Term Loan Claims, solely for purposes of distributions to be made hereunder. The Prepetition Administrative Agent shall hold or direct such distributions for the benefit of the respective Holders of Allowed Prepetition Term Loan Claims or other applicable parties pursuant to the Intercreditor Agreement. As soon as practicable following compliance with the requirements set forth in this Article VIII.G, the Prepetition Administrative Agent shall arrange to deliver or direct the delivery of such distributions in accordance with the terms and provisions of the Intercreditor Agreement.

## 3. Distributable Proceeds

Any Distributions from the Distributable Proceeds provided for under the Plan shall be made in accordance with the terms and provisions of the Plan Administrator Agreement.

## 4. De Minimis Distributions; Rounding of Payments

Whenever payment or distribution of a fraction of a dollar of value in the form of Cash would otherwise be called for, the actual payment or distribution may, in the discretion of the Plan Administrator, reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one-half of one dollar and a rounding up of such fraction to the nearest whole dollar if the amount is one-half or more of one dollar. Notwithstanding anything herein to the contrary, the Plan Administrator shall not be required to make a Distribution if the amount to be distributed is or has an economic value of less than one hundred dollars ($100). Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions.

## 5. Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Wind-Down Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. The Wind-Down Debtors and Plan Administrator shall be entitled to deduct any U.S. or non-U.S. federal, state or local withholding taxes from any payments made with respect to Allowed Claims, as appropriate. A Holder of an Allowed Claim entitled to receive a Distribution pursuant to the Plan may not receive any Distribution under the Plan unless such Holder has provided to the Plan Administrator such Holder's taxpayer identification number and such other information and certification as may be deemed necessary

for the Wind-Down Debtors to comply with applicable tax reporting and withholding laws (including an IRS Form W-9 or (if the holder is a non-U.S. Person) an appropriate IRS Form W-8 (unless such Person is exempt from information reporting requirements under the Tax Code)) and so notifies the Plan Administrator. If such Holder does not provide such taxpayer identification number and such other information within the time and in the manner reasonably required by the Plan Administrator, such Holder may forfeit its interest in any Distribution and may not receive any Distribution under the Plan. Any amounts withheld pursuant hereto may be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. In connection with any Distribution under the Plan, the Wind-Down Debtors and Plan Administrator may take whatever actions are necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations.

Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

## H.    Resolution of Disputed Claims

### 1.    Allowance of Claims

After the Effective Date, the Wind-Down Debtors shall have and retain any and all rights and defenses the Debtors or the Chapter 11 Trustee had with respect to any Claim or Interest immediately before the Effective Date except for such rights and defenses assigned or transferred in accordance with any Purchase Agreement.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed or listed at zero or any other Claim for which a Proof of Claim was required to be timely filed pursuant to the Bar Date Order, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or a Final Order is not considered Allowed and shall be expunged without further action by the Chapter 11 Trustee, Debtors, Wind-Down Debtors, or Plan Administrator, as applicable, and without further notice to any party or action, approval, or order of the Bankruptcy Court.

### 2.    Prosecution of Objections to Claims

The Chapter 11 Trustee (prior to the Effective Date with the Consent of the Agent) and the Wind-Down Debtors (following the Effective Date), shall have the authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.   Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of (a) the Effective Date, or (b) the applicable Claims Bar Date, shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Wind-Down Debtor, as applicable, without the need for any objection by the Chapter 11 Trustee, Wind-Down

~~Debtors, or Plan Administrator, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.~~ are deemed Disputed.

### 3. Deadline to File Objections to Claims

Unless a different time is set by an order of the Bankruptcy Court or otherwise established pursuant to the Combined Plan and Disclosure Statement, all objections to Claims and Interests must be filed by the Claims Objection Deadline; provided that no such objection may be filed with respect to any Claim after a Final Order has been entered Allowing such Claim.

### 4. Amendments to Claims

On or after the Effective Date, a Claim may not be amended without the prior authorization of the Bankruptcy Court or the Plan Administrator. Any such unauthorized new or amended Claim Filed shall be deemed Disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

## I. Disallowance of Certain Claims Subject to Avoidance or Recovery

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Wind-Down Debtors, shall be deemed Disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Estates or Wind-Down Debtors hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estates by that Entity have been turned over or paid to the Chapter 11 Trustee or Wind-Down Debtors, as applicable.

## ARTICLE IX:
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A. Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, each Executory Contract or Unexpired Lease shall be deemed automatically rejected by the Chapter 11 Trustee unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (a) are otherwise provided for in the Plan, such as being specifically assumed in connection with confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) have been previously assumed, assumed and assigned, or rejected by the Chapter 11 Trustee pursuant to any Bankruptcy Court order; (c) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; or (d) are a contract, release, or other agreement or document entered into in connection with the Plan.

**B.**        **Assumption of D&O Insurance Policies**

The Chapter 11 Trustee shall be deemed to have assumed all of the D&O Liability Insurance Policies, pursuant to section 365(a) of the Bankruptcy Code, effective as of the Effective Date (whether or not such policies are listed on the Schedule of Assumed Executory Contracts and Unexpired Leases), and coverage for defense and indemnity under any of the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in a Final Order, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed; *provided, however*, that the Holder(s) of a Claim for an indemnity obligation shall look only to the D&O Liability Insurance Policies for recovery and not the Debtors, the Estates, the Chapter 11 Trustee, or the Wind-Down Debtors.

**C.**        **Rejection Damages Bar Date**

If the rejection of an Executory Contract pursuant to Article IX.A gives rise to a Claim by the other party or parties to such Executory Contract or Unexpired Lease, such Claim shall be ~~forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Wind-Down Debtors, or their respective successors or properties~~<u>deemed Disputed</u> unless a Proof of Claim is filed with the Bankruptcy Court and served on the Plan Administrator by the Rejection Bar Date.

**D.**        **Indemnification Obligations**

Any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person pursuant to the Debtors' organizational documents, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any Claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtors shall not survive Confirmation of the Plan; *provided*, *however*, that nothing impairs the right of any Person with a right to indemnity, reimbursement, or limitation of liability as set forth above to pursue any available insurance, although the Chapter 11 Trustee is not aware of any that would apply to such obligations.

Any Claim based on the Debtors' indemnification obligations shall be a Disputed Claim and subject to any objection under section 502(e)(1)(B) of the Bankruptcy Code. The Debtors' indemnification obligations shall not apply to or cover any Claims, suits, or actions against a

Person that result in a Final Order determining that such Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing, or breach of the duty of loyalty.

## ARTICLE X:
## EXCULPATION, RELEASES, AND INJUNCTIONS

**A.  Exculpation**

**Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable Law, none of the Exculpated Parties shall have or incur any liability for any Exculpated Claim, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, including, without limitation (1) the negotiation, formulation, or preparation of the Combined Plan and Disclosure Statement or any contract, instrument, document, or other agreement entered into pursuant thereto, (2) any Distributions made pursuant to or in accordance with the Combined Plan and Disclosure Statement, (3) the exercise of their respective business judgment and the performance of their respective fiduciary obligations, (4) the administration of the Estates, (5) the pursuit of confirmation of the Plan, and (6) the Sale Transactions;** *provided* **that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, actual fraud, or gross negligence. The Bankruptcy Court shall act as a gate-keeper with respect to any Claim or Cause of Action that any Person wants to bring against an Exculpated Party and the provisions of** *Barton v. Barbour,* **104 U.S. 126 (1881), shall apply to require prior Bankruptcy Court approval before any such Claim or Cause of Action may be brought. Notwithstanding anything to the contrary contained herein, nothing in this Article X.A shall release or exculpate any Exculpated Party for any act or omission arising before the Petition Date or after the Effective Date.**

**B.  Plan Injunction**

**Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable Law, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, compromised and settled pursuant to the Plan, or are exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Chapter 11 Trustee, the Estates, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Exculpated Parties, or their respective property (collectively, the "Enjoined Actions"): (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such released, compromised, settled, or Exculpated Claim or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such released, compromised, settled, or Exculpated Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estate of such**

**Entities on account of or in connection with or with respect to any such released, compromised, settled, or Exculpated Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such entities on account of or in connection with or with respect to any such released, compromised, settled, or exculpated Claims or Interests unless such entity has timely filed a Proof of Claim with the Bankruptcy Court preserving such right of setoff, subrogation, or recoupment; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such released, compromised, settled, or Exculpated Claims or Interests;** *provided* **that the foregoing injunction does not enjoin any actions to enforce obligations arising on or after the Effective Date under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**C.      Injunction Related to Releases and Exculpation**

**To the maximum extent permitted under applicable Law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to this Plan, including, without limitation, the Causes of Action released or exculpated in this Plan.**

**D.      Debtors' and Estates' Releases**

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed to be, conclusively, absolutely, unconditionally, irrevocably, and forever released by each of the Debtors, their Estates, the Chapter 11 Trustee, and the Wind-Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action~~, directly or~~ derivatively, by, through, or for~~, or because of~~ the foregoing Entities, from any and all Claims, and Causes of Action, including any derivative claims asserted by or assertable on behalf of any of the Debtors, their Estates, the Chapter 11 Trustee, or the Wind-Down Debtors, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, contingent or noncontingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise that the Chapter 11 Trustee, the Debtors, their Estates, or the Wind-Down Debtors would have been legally entitled to assert in their own right or otherwise (whether individually or collectively) or on behalf of the Holder of any Claim or Interest based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the Chapter 11 Cases and any related adversary proceedings, intercompany transactions between or among each Debtor, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of, as applicable, the Disclosure Statement, the Plan Administrator Agreement, the Sale Transactions,

the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities and any beneficial trust interests pursuant to the Plan, or the distribution of property under the Plan (including the Retained Assets and Distributable Proceeds) or any other related agreement, or upon any act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Claims or Causes of Action included in the Schedule of Retained Causes of Action, or (c) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence. For the avoidance of doubt, the Debtor Release does not release any Excluded Party from any Claim or Cause of Action of any kind whatsoever (including the Retained Causes of Action) whether arising before or after the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) essential to the Confirmation of the Plan; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (d) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after reasonable investigation by the Chapter 11 Trustee and the Debtors, as applicable, and after due notice and opportunity for a hearing; and (g) a bar to any of the Debtors, the Wind-Down Debtors, the Debtors' Estates, or the Chapter 11 Trustee asserting any Claim or Cause of Action released pursuant to the Debtor Release.

For the avoidance of doubt, unless expressly released pursuant to the terms of the Plan, nothing herein shall discharge, release, or otherwise modify the liability of any non-Debtor party for any obligations of any kind whatsoever whether arising before or after the Effective Date.

## E.    Compromises and Settlements

Pursuant to Bankruptcy Rule 9019(a), the Chapter 11 Trustee may compromise and settle (a) Claims against the Debtors and (b) Claims that the Estates have against other Persons or Entities. The Chapter 11 Trustee expressly reserves the right (with Bankruptcy Court approval,

following appropriate notice and opportunity for a hearing) to compromise and settle Claims against the Debtors or the Estates and Claims that the Estates may have against other Persons and Entities at any time up to and including the Effective Date. After the Effective Date, the Wind-Down Debtors and the Plan Administrator, as applicable, may compromise and settle any Claims without needing to obtain Bankruptcy Court approval pursuant to Bankruptcy Rule 9019(a).

## F.      Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that the Estates hold or may hold against any Entity shall vest upon the Effective Date in the Wind-Down Debtors.

Unless a Cause of Action against a Holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan and/or any Final Order (including the Confirmation Order), the Wind-Down Debtors and the Plan Administrator expressly reserve such Retained Causes of Action for later investigation and/or adjudication by the Plan Administrator (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Chapter 11 Trustee may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Chapter 11 Trustee at this time, or facts or circumstances that may change or be different from those the Chapter 11 Trustee now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order). In addition, the Wind-Down Debtors and the Plan Administrator expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which a Debtor is a defendant or interested party against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtors have incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtors or a transfer or money or property of the Debtors, or that has transacted business with the Debtors, or that has leased property from the Debtors, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Plan Administrator subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a Proof of Claim against the Debtors in the Chapter 11 Cases; (ii) the Chapter 11 Trustee has objected to any such Entity's Proof of Claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Chapter 11 Trustee has objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Chapter 11 Trustee as Disputed, contingent, or unliquidated; or (vi) the Chapter 11 Trustee has identified any potential Claim or Cause of Action against such Entity herein.

**G.      No Discharge of Debtors or Wind-Down Debtors**

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan will not provide for discharge of the Debtors or the Wind-Down Debtors.

## ARTICLE XI:
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

**A.      Conditions Precedent to the Effective Date**

It shall be a condition precedent to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI.B hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order;

2.      all documents necessary to consummate the Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date) contained therein shall have been satisfied or waived in accordance therewith;

3.      the Chapter 11 Trustee and the Debtors, as applicable, shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

4.      the Plan Reserves (including the Professional Fee Escrow Account) shall have been established and funded;

5.      the Plan Administrator Agreement and all other documents necessary to effectuate the Wind-Down shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date) contained therein shall have been satisfied or waived in accordance therewith; and

6.      the Definitive Documentation related to the Wind-Down Financing Facility shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date) contained therein shall have been satisfied or waived in accordance therewith.

**B.      Waiver of Conditions**

The conditions to the Effective Date set forth in this Article XI may be waived or extended only by the Chapter 11 Trustee, with Consent of the Agent, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or Consummate the Plan.

**C.      Effect of Failure of All Conditions**

If the Effective Date does not occur, the Combined Plan and Disclosure Statement shall be null and void in all respects, and nothing contained in the Combined Plan and Disclosure

Statement ~~or the Disclosure Statement~~ shall: (1) constitute a waiver or release of any claims by the Chapter 11 Trustee, the Debtors, any Holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Chapter 11 Trustee, the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Chapter 11 Trustee, Debtor, any Holders of Claims or Interests, or any other Entity in any respect.

## ARTICLE XII: RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order, substantial consummation of the Plan, and occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, the Plan, the Plan Administrator Agreement, and the Wind-Down to the fullest extent permitted by law, including, among other things, jurisdiction:

1. To the extent not otherwise determined by the Plan, to determine (a) the allowance, classification, or priority of Claims upon objection by any party-in-interest entitled to file an objection, or (b) the validity, extent, priority, and non-avoidability of consensual and nonconsensual Liens and other encumbrances against assets of the Estates, and the Wind-Down Debtor Assets;

2. To protect the assets or property of the Estates, the Wind-Down Debtor Assets, including Causes of Action, from Claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any assets of the Estates or the Wind-Down Debtor Assets;

3. To approve, as may be necessary or appropriate, any Claims settlement entered into or setoff exercised by the Plan Administrator;

4. To resolve any dispute or matter arising under or in connection with the Plan Administrator Agreement;

5. To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

6. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

7. To issue such orders in aid of execution and Consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

8. To consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

9.      To hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under sections 330 or 503 of the Bankruptcy Code;

10.      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

11.      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Sale Orders;

12.      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

13.      To hear any other matter not inconsistent with the Bankruptcy Code;

14.      To enter a final decree;

15.      To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and Plan Administrator Agreement;

16.      To decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

17.      To issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

18.      To determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Plan;

19.      To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

20.      To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

21.      To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, or the Combined Hearing; and

22.      To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

Notwithstanding anything else in the Plan, the Bankruptcy Court shall retain jurisdiction over all Retained Causes of Action, including, without limitation, the specifically-identified

Retained Causes of Action, and any cases, controversies, suits, disputes, or Causes of Action that may arise in connection therewith; *provided*, for the avoidance of doubt, the Wind-Down Debtors and the Plan Administrator shall have the power and authority to bring any action in any court of competent jurisdiction to prosecute any Retained Causes of Action.

## ARTICLE XIII: MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Subject to Article XI hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Combined Plan and Disclosure Statement shall be immediately effective and enforceable and deemed binding upon the Chapter 11 Trustee, the Debtors, the Estates, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are presumed to have accepted or deemed to have rejected the Combined Plan and Disclosure Statement), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Combined Plan and Disclosure Statement, each Entity acquiring property under the Combined Plan and Disclosure Statement, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### B.    Reservation of Rights

Except as expressly set forth in the Combined Plan and Disclosure Statement, the Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur, and none of the Filing of the Combined Plan and Disclosure Statement, any statement or provision contained in the Combined Plan and Disclosure Statement, or the taking of any action by any Debtor with respect to the Combined Plan and Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### C.    Modification, Withdrawal, or Revocation of the Combined Plan and Disclosure Statement

The Chapter 11 Trustee reserves the right, in accordance with the Bankruptcy Code to amend, modify, or withdraw this Combined Plan and Disclosure Statement prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Chapter 11 Trustee may, upon order, amend, or modify this Combined Plan and Disclosure Statement in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Combined Plan and Disclosure Statement in such manner as may be necessary to carry out the purpose and intent of this Combined Plan and Disclosure Statement. The Chapter 11 Trustee reserves the right to revoke or withdraw the Combined Plan and Disclosure Statement prior to the Confirmation Date and to file subsequent plans of liquidation. If the Chapter 11 Trustee revokes or withdraws the Combined Plan and Disclosure Statement, or if Confirmation or Consummation does not occur, then: (1) the Combined Plan and Disclosure Statement shall be null and void in all respects; (2) any settlement or compromise embodied in

the Combined Plan and Disclosure Statement (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Combined Plan and Disclosure Statement, and any document or agreement executed pursuant to the Combined Plan and Disclosure Statement, shall be deemed null and void; and (3) nothing contained in the Combined Plan and Disclosure Statement shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Chapter 11 Trustee, the Estates, the Debtors, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Chapter 11 Trustee or any other Entity.

**D.      Exhibits/Schedules**

All exhibits and schedules to this Plan are incorporated into and are part of the Plan as if set forth in full herein.

**E.      Plan Supplement**

The Chapter 11 Trustee will file the Plan Supplement at least seven (7) days before the Voting Deadline. The Plan Supplement will contain, among other things, any other disclosures as required by the Bankruptcy Code.

**F.      Filing of Additional Documents**

On or before substantial consummation of the Plan, the Chapter 11 Trustee shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**G.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Combined Plan and Disclosure Statement shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**H.      Governing Law**

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

**I.      Time**

To the extent that any time for the occurrence or happening of an event as set forth in this Plan falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day

**J.      Term of Injunctions or Stays**

Unless otherwise provided in the Combined Plan and Disclosure Statement or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Combined Plan and Disclosure Statement or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Combined Plan and Disclosure Statement or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**K.      Severability**

Should any provision of this Plan be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

**L.      Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Chapter 11 Trustee will be deemed to have solicited votes on the Combined Plan and Disclosure Statement in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code.

**M.      Revocation**

The Chapter 11 Trustee reserves the right to revoke and withdraw the Plan prior to the entry of the Confirmation Order. If the Chapter 11 Trustee revokes or withdraws the Plan, the Plan shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors.

**N.      Conflicts**

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, any related documents (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall be construed to amend, modify, or abrogate any prior Final Order of the Bankruptcy Court in these Chapter 11 Cases.

## O.    No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

## P.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date shall occur. None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Chapter 11 Trustee with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Chapter 11 Trustee, Holders of Claims, or Holders of Interests before the Effective Date.

## Q.    Compromise of Controversies

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, ~~Distribution,~~distribution and other benefits provided under the Plan, the provisions of ~~this~~the Plan that incorporate mutually agreed settlements shall constitute a ~~good faith~~good-faith compromise and settlement of all Claims or controversies resolved pursuant to ~~the Plan~~those provisions and in these Chapter 11 Cases. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements~~,~~ provided for in the applicable Plan provisions and ~~these~~the Chapter 11 Cases~~. The~~, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, ~~the Estate,~~their Estates and all Holders of Claims and Interests against the Debtors. Notwithstanding any other provision in the Plan, the settlements are approved among the parties that have agreed to them (among any other party who has expressly entered into a written settlement), and the treatment of Claims and Interests is being afforded pursuant to confirmation of the Plan by satisfying the requirements of section 1129 of the Bankruptcy Code.

Dated: ~~July 15~~August 1, 2025
Wilmington, Delaware

Respectfully Submitted,

**Claudia Z. Springer, not individually but solely in her capacity as the Chapter 11 Trustee of the Debtors**

*/s/ Claudia Z. Springer*

**EXHIBIT A**
**(Liquidation Analysis)**

**Saga Formations, Inc. (f/k/a Epic! Creations, Inc.)**
**Liquidation Analysis**

Estimated Recovery

| | Recoverable Assets and Expenses | Estimated Value as of | $ Amount | Liquidation Analysis Scenarios | | |
|---|---|---|---|---|---|---|
| | | | | LOW | MID | HIGH |
| a | Cash | 7/11/2025 | $ 25,257,879 | $ 25,257,879 | $ 25,257,879 | $ 25,257,879 |
| | | | *Recovery Rate* | 100% | 100% | 100% |
| b | Accounts Receivable | 7/11/2025 | $ 1,126,835 | $ 845,126 | $ 957,810 | $ 1,126,835 |
| | | | *Recovery Rate* | 75% | 85% | 100% |
| c | Inventory | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 15% | 35% | 50% |
| d | Prepaids/Deposits | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 10% | 15% | 20% |
| e | Office Equipment | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 5% | 10% | 15% |
| f | Computers | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 5% | 8% | 10% |
| g | Leasehold Improvements | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 0% | 0% |
| h | FF&E | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 5% | 10% |
| i | Website | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 5% | 8% | 10% |
| j | Intellectual Property | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | NA | NA | NA |
| k | Costs of Liquidation (includes Chapter 7 professional fees, trustee fees, and liquidation costs) | | $ - | $ 3,132,361 | $ 3,145,883 | $ 3,166,166 |
| | | | *Recovery Rate* | 100% | 100% | 100% |
| **Chapter 7 Priority Claims:** | | | | | | |
| l | Payroll | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 100% | 100% | 100% |
| m | Taxes | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 100% | 100% | 100% |
| | **Estimated Liquidation Proceeds Available for Distribution** | | | **$ 22,970,644** | **$ 23,069,806** | **$ 23,218,548** |
| n | Prepetition Senior Secured Term Loan Claims | 7/11/2025 | $1,189,513,685 | $ 22,970,644 | $ 23,069,806 | $ 23,218,548 |
| | | | *Recovery Rate* | 1.93% | 1.94% | 1.95% |
| | **Net Funds Available for Chapter 11 Administrative Claims, Priority Claims, and Unsecured Claims** | | | **$ -** | **$ -** | **$ -** |
| o | Administrative Claims - Chapter 11 | 7/11/2025 | $ 18,147,526 | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 0% | 0% |
| | **Net Funds Available for Priority Claims and Unsecured Claims** | | | **$ -** | **$ -** | **$ -** |
| p | Priority Unsecured Claims | 7/11/2025 | $ 72,439 | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 0% | 0% |
| | **Net Funds Available for General Unsecured Claims** | | | **$ -** | **$ -** | **$ -** |
| q | General Unsecured Claims | 7/11/2025 | $ 6,549,190 | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 0% | 0% |
| | **Funds Available for Equity & Subordinated Claims** | | | **$ -** | **$ -** | **$ -** |

**Assumptions:**
a) Cash is based on the balance as of 7/11/2025.
b) Accounts Receivable is based on balance Hy Ruby owes the estate for excluded cash in the APA Agreement
n) Prepetition Senior Secured Term Loan Claims is based on the amount set forth in paragraph E(ii) of the Final DIP Order.
o) Administrative Claims include estimated professional fees outstanding and accrued through 7/31, as well as estimated accrued post-petition expenses to be paid. These estimates are based on the budget remaining from wind-down budget submitted in May 2025.
p) Priority Unsecured Claims include estimated priority tax and wage claims.
q) This figure represents the total amount of General Unsecured Claims filed as of the General Bar Date. The Chapter 11 Trustee has not performed a detailed review of the General Unsecured Claims. However, based on a preliminary review, she believes this figure is overstated and includes claims which would be subordinated to unsecured claims or that were satisfied in full or part by the payment of cure amounts.

*The Liquidation Analysis does not include avoidance actions or other potential litigation claims because the ultimate recoveries are inherently speculative and currently unknown, and it is not known whether funding would be available for a chapter 7 trustee to pursue such claims in a hypothetical chapter 7 liquidation. Additionally, any recoveries would be the subject of the adequate protection liens securing the Prepetition Term Loan Lenders' superpriority administrative expense claims or the Liens of the Prepetition Term Loan Lenders.

**Tangible Play, Inc.**
**Liquidation Analysis**

Estimated Recovery

| | Recoverable Assets and Expenses | Estimated Value as of | $ Amount | Liquidation Analysis Scenarios | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | LOW | | MID | HIGH |
| a | Cash | 7/11/2025 | $ 51,435 | | $ 51,435 | $ 51,435 | $ 51,435 | |
| | | | *Recovery Rate* | | *100%* | *100%* | *100%* | |
| b | Accounts Receivable | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *75%* | *85%* | *100%* | |
| c | Inventory | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *15%* | *35%* | *50%* | |
| d | Prepaids/Deposits | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *10%* | *15%* | *20%* | |
| e | Office Equipment | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *5%* | *10%* | *15%* | |
| f | Computers | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *5%* | *8%* | *10%* | |
| g | Leasehold Improvements | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *0%* | *0%* | *0%* | |
| h | FF&E | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *0%* | *5%* | *10%* | |
| i | Website | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *5%* | *8%* | *10%* | |
| j | Intellectual Property | 7/11/2025 | $ 25,000 | | $ 6,250 | $ 12,500 | $ 18,750 | |
| | | | *Recovery Rate* | | *25%* | *50%* | *75%* | |
| k | Costs of Liquidation (includes Chapter 7 professional fees, trustee fees, and liquidation costs) | | $ - | | $ 6,922 | $ 7,672 | 8,422 | |
| | | | *Recovery Rate* | | *100%* | *100%* | *100%* | |

**Chapter 7 Priority Claims:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| l | Payroll | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *100%* | *100%* | *100%* | |
| m | Taxes | 7/11/2025 | $ - | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *100%* | *100%* | *100%* | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Estimated Liquidation Proceeds Available for Distribution** | | | | $ 50,763 | $ 56,263 | $ 61,763 | |
| n | Prepetition Senior Secured Term Loan Claims | 7/11/2025 | $1,189,513,685 | | $ 50,763 | $ 56,263 | $ 61,763 | |
| | | | *Recovery Rate* | | *0.004%* | *0.005%* | *0.005%* | |
| | **Net Funds Available for Chapter 11 Administrative Claims, Priority Claims, and Unsecured Claims** | | | | $ - | $ - | $ - | |
| o | Administrative Claims - Chapter 11 | 7/11/2025 | $ 13,415,946 | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *0%* | *0%* | *0%* | |
| | **Net Funds Available for Priority Claims and Unsecured Claims** | | | | $ - | $ - | $ - | |
| p | Priority Unsecured Claims | 7/11/2025 | $ 58,847 | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *0%* | *0%* | *0%* | |
| | **Net Funds Available for General Unsecured Claims** | | | | $ - | $ - | $ - | |
| q | General Unsecured Claims | 7/11/2025 | $ 38,027,716 | | $ - | $ - | $ - | |
| | | | *Recovery Rate* | | *0%* | *0%* | *0%* | |
| | **Funds Available for Equity & Subordinated Claims** | | | | $ - | $ - | $ - | |

**Assumptions:**

a) Cash is based on the balance as of 7/11/2025.

n) Prepetition Senior Secured Term Loan Claims is based on the amount set forth in paragraph E(ii) of the Final DIP Order.

o) Administrative Claims include estimated professional fees outstanding and accrued through 7/31, as well as estimated accrued post-petition expenses to be paid. These estimates are based on the budget remaining from wind-down budget submitted in May 2025.

p) Priority Unsecured Claims include estimated priority tax and wage claims.

q) This figure represents the total amount of General Unsecured Claims filed as of the General Bar Date. The Chapter 11 Trustee has not performed a detailed review of the General Unsecured Claims. However, based on a preliminary review, she believes this figure is overstated and includes claims which would be subordinated to unsecured claims.

*The Liquidation Analysis does not include avoidance actions or other potential litigation claims because the ultimate recoveries are inherently speculative and currently unknown, and it is not known whether funding would be available for a chapter 7 trustee to pursue such claims in a hypothetical chapter 7 liquidation. Additionally, any recoveries would be the subject of the adequate protection liens securing the Prepetition Term Loan Lenders' superpriority administrative expense claims or the Liens of the Prepetition Term Loan Lenders.

**Pajeau, Inc. (f/k/a Neuron Fuel, Inc.)**
Liquidation Analysis

Estimated Recovery

| | Recoverable Assets and Expenses | Estimated Value as of | $ Amount | Liquidation Analysis Scenarios | | |
|---|---|---|---|---|---|---|
| | | | | LOW | MID | HIGH |
| a | Cash | 7/11/2025 | $ 282,726 | $ 282,726 | $ 282,726 | $ 282,726 |
| | | | *Recovery Rate* | 100% | 100% | 100% |
| b | Accounts Receivable | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 75% | 85% | 100% |
| c | Inventory | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 15% | 35% | 50% |
| d | Prepaids/Deposits | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 10% | 15% | 20% |
| e | Office Equipment | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 5% | 10% | 15% |
| f | Computers | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 5% | 8% | 10% |
| g | Leasehold Improvements | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 0% | 0% |
| h | FF&E | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 5% | 10% |
| i | Website | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 5% | 8% | 10% |
| j | Intellectual Property | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | NA | NA | NA |
| k | Costs of Liquidation (includes Chapter 7 professional fees, trustee fees, and liquidation costs | 7/11/2025 | $ 33,927 | $ 33,927 | $ 33,927 | $ 33,927 |
| | | | *Recovery Rate* | 100% | 100% | 100% |
| **Chapter 7 Priority Claims:** | | | | | | |
| l | Payroll | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 100% | 100% | 100% |
| m | Taxes | 7/11/2025 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | 100% | 100% | 100% |
| | **Estimated Liquidation Proceeds Available for Distribution** | | | $ 248,799 | $ 248,799 | $ 248,799 |
| n | Prepetition Senior Secured Term Loan Claims | 7/11/2025 | $1,189,513,685 | $ 248,799 | $ 248,799 | $ 248,799 |
| | | | *Recovery Rate* | 0.02% | 0.02% | 0.02% |
| | **Net Funds Available for Chapter 11 Administrative Claims, Priority Claims, and Unsecured Claims** | | | $ - | $ - | $ - |
| o | Administrative Claims - Chapter 11 | | $ 11,688,921 | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 0% | 0% |
| | **Net Funds Available for Priority Claims and Unsecured Claims** | | | $ - | $ - | $ - |
| p | Priority Unsecured Claims | 7/11/2025 | $ 1,179 | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 0% | 0% |
| | **Net Funds Available for General Unsecured Claims** | | | $ - | $ - | $ - |
| q | General Unsecured Claims | 7/11/2025 | $ 36,841,031 | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 0% | 0% |
| | **Funds Available for Equity & Subordinated Claims** | | | $ - | $ - | $ - |

Assumptions:
a) Cash is based on the balance as of 7/11/2025.
n) Prepetition Senior Secured Term Loan Claims is based on the amount set forth in
paragraph E(ii) of the Final DIP Order.
o) Administrative Claims include estimated professional fees outstanding and accrued through 7/31, as well as estimated accrued post-petition expenses to be paid. These estimates are based on
the budget remaining from wind-down budget submitted in May 2025.
p) Priority Unsecured Claims include estimated priority tax and wage claims.
q) This figure represents the total amount of General Unsecured Claims filed as of the
General Bar Date. The Chapter 11 Trustee has not performed a detailed review of the
General Unsecured Claims. However, based on a preliminary review, she believes this
figure is overstated and includes claims which would be subordinated to unsecured claims
or that were satisfied in full or part by the payment of cure amounts.

*The Liquidation Analysis does not include avoidance actions or other potential litigation
claims because the ultimate recoveries are inherently speculative and currently unknown,
and it is not known whether funding would be available for a chapter 7 trustee to pursue
such claims in a hypothetical chapter 7 liquidation. Additionally, any recoveries would be
the subject of the adequate protection liens securing the Prepetition Term Loan Lenders'
superpriority administrative expense claims or the Liens of the Prepetition Term Loan
Lenders.

| Summary report: | |
| :---: | :---: |
| **Litera Compare for Word 11.8.0.56 Document comparison done on 8/1/2025 12:57:52 PM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Epic Creations - Combined DS and Chapter 11 Plan (filing version).docx | |
| **Modified filename:** Epic Creations - Filed Version of Combined DS and Chapter 11 Plan (filing version) (4898-1485-8841.4).docx | |
| **Changes:** | |
| Add | 163 |
| Delete | 160 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 323 |