**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SAGA FORMATIONS, INC., *et al.*,[1] | Case No. 24-11161 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: TBD (if necessary)** |
| | **Obj. Deadline: August 6, 2026 at 4:00 p.m. (ET)** |

**MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AND LOCAL BANKRUPTCY RULE 2004-1 DIRECTING THE PRODUCTION OF DOCUMENTS AND THE EXAMINATION OF THE DEBTORS' BANKS AND MCA LENDERS**

Timothy Pohl, in his sole capacity as the plan administrator (the "Plan Administrator") for the above-captioned post-effective date debtors (the "Debtors") hereby submits this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), authorizing the request for production of documents and the examination of twenty-six of the Debtors' Merchant Cash Advance lenders (collectively, the "MCA Lenders") and three banks used by the Debtors (the "Banks" and together with the MCA Lenders, the "Transaction Participants")[2], pursuant to rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). In support of this Motion, the Plan Administrator respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Saga Formations, Inc. f/k/a Epic Creations, Inc. (9113), Pajeau, Inc. f/k/a Neuron Fuel, Inc. (8758), and Tangible Play, Inc. (9331).

[2] The Transaction Participants are listed in **Exhibit B** which is attached hereto.

## PRELIMINARY STATEMENT

1. The Debtors' bankruptcy cases were commenced on an involuntary basis in June 2024 after several of the Debtors' creditors uncovered evidence suggesting that hundreds of millions of dollars had been improperly transferred out of the Debtors' control as part of an international fraud scheme.

2. During this same time period, from 2022 through 2024, the Debtors obtained approximately $171 million in financing through Merchant Cash Advance facilities (the "MCAs," and each, an "MCA"). MCAs are typically associated with high effective interest rates and aggressive, short-term repayment structures, with funding that is often disbursed very quickly—sometimes within a single day.[3] The Plan Administrator believes the Debtors repaid approximately $250 million on account of these MCAs.

3. Through this Motion, the Plan Administrator seeks discovery into the facts and circumstances surrounding the MCA transactions, including related financial records and other evidence concerning the conduct of the MCA Lenders in order to evaluate whether viable causes of action exist that could generate meaningful recoveries for the benefit of the Debtors' estates.

## JURISDICTION AND VENUE

4. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28. U.S.C. § 157(b)(2), and the Debtors confirms their consent, pursuant to rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court,

[3] Haegele, B., *What is a Merchant Cash Advance?*, The Wall Street Journal (Oct. 21, 2025), https://www.wsj.com/buyside/personal-finance/business-loans/merchant-cash-advance (last visited June 16, 2026).

absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The statutory and legal predicates for the relief requested herein are Bankruptcy Rule 2004 and Local Rule 2004-1.

## BACKGROUND

### A. General Background

7. The Debtors are three U.S.-based companies that formerly operated in the educational technology sector. Between 2019 and 2021, Think and Learn (T&L), an Indian corporation co-founded by Byju Raveendran, acquired each of the Debtors. T&L was widely regarded as a company committed to expanding access to education through technology and was managed by a close-knit leadership group that included Mr. Raveendran and his brother, Riju Ravindran.

8. BYJU's Alpha, a Delaware corporation, was formed by T&L as a special purpose vehicle with the intent of obtaining financing from Western markets. In November 2021, BYJU's Alpha borrowed approximately $1.2 billion in term loans, and over the next several months, each of the Debtors executed guarantees in connection with those obligations.

9. Within four months of entering into the term loans, BYJU's Alpha defaulted on its covenants. Despite a series of amendments and attempts to cure the defaults, on March 3, 2023, GLAS, as collateral agent for the term loan lenders, exercised its right to transfer the pledged equity of BYJU's Alpha to itself and thereby became BYJU's Alpha's sole shareholder. Thereafter, on February 1, 2024, BYJU's Alpha commenced a voluntary chapter 11 case, *In re BYJU's Alpha*, Case No. 24-10140 in the Court.

10. After GLAS assumed control of BYJU's Alpha, the term loan lenders elected to undertake their own investigation, that uncovered, among other findings, a $533 million transfer from BYJU's Alpha to a sham hedge fund—subsequently routed to a T&L affiliate controlled by Riju Ravindran—along with tens of millions of dollars in additional transfers from the Debtors' accounts to other T&L affiliates. During the same time, the Debtors, as guarantors to the $1.2 billion in term loans, faced mounting debt and increasingly constrained liquidity. *See* Plan, Art. III.3.

11. On June 4 or 5, 2024, (the "Petition Date"), involuntary petitions were filed against each of the Debtors under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

12. On September 16, 2024, the involuntary petitions were granted pursuant to the Court's *Order for Relief in Involuntary Cases and Appointing Chapter 11 Trustee* [D.I. 147], and the Court directed the appointment of a chapter 11 trustee (the "Chapter 11 Trustee").

13. Following her appointment, the Chapter 11 Trustee conducted a sale process for each of the Debtors. With respect to Debtors Epic and Neuron Fuel, the Debtors' sale efforts were successful, and the Court approved a sale of the Epic assets for $95.1 million [D.I. 724] and the Neuron Fuel assets for $2.31 million [D.I. 723]. Despite extensive outreach, the Tangible Play assets failed to attract a viable bidder, leading the Chapter 11 Trustee to determine that abandonment of the Tangible Play assets was the most appropriate outcome. *See* D.I. 645 and 678.

14. On October 29, 2025, the Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Amended Combined Disclosure Statement and Chapter 11 Plan for the Estates of Saga Formations, Inc., Pajeau, Inc., and Tangible Play, Inc.* [D.I. 1009] (the "Confirmation Order"). The Confirmation Order confirmed the *Second Amended Combined*

*Disclosure Statement and Chapter 11 Plan for the Estates of Saga Formations, Inc., Pajeau, Inc., and Tangible Play, Inc.* [D.I. 971] (as amended, supplemented, or modified from time to time, the "Plan").

15. On March 31, 2026 the Plan went effective [D.I. 1148] (the "Effective Date").

16. Under the Plan, the Plan Administrator is charged with, among other things, "investigating, reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Retained Causes of Action[.]"[4]

## B. The Merchant Cash Advances

17. Throughout 2022 and 2023, the Debtors executed over 40 MCAs with approximately 26 different MCA Lenders. Overall, the Debtors borrowed approximately $171 million but repaid roughly $250 million, which equates to an implied average annual percentage rate of about 300%[5]. *See* **Exhibit C**.

18. Most of the borrowings were over $1 million each and on repayment terms that were typically less than 90 days. For example, one of the MCAs required the Debtors to repay

[4] The Plan defines Retained Causes of Action as all Claims and Causes of Action (including, for the avoidance of doubt, the Adversary Proceedings and the Avoidance Actions) belonging to the Chapter 11 Trustee, any of the Debtors, or their respective Estates, including, but not limited to, all Causes of Action enumerated on the Schedule of Retained Causes of Action which shall be filed with the Plan Supplement, all of which shall vest in the Wind-Down Debtors pursuant to the terms of the Plan and be deemed an integral part thereof. For the avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action against the Excluded Parties, whether or not listed on the Schedule of Retained Causes of Action. For the further avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action arising out of or in connection with: (a) the efforts of Byju Raveendran, Riju Ravindran, the Voizzit Entities, Rajendran Vellapalath, or the Debtors insiders, including Vinay Ravindra, or any of their respective Affiliates or associates, to transfer or take the Debtors' assets either before the Petition Date or during the Chapter 11 Cases, (b) the efforts of Byju Raveendran, Riju Ravindran, the Voizzit Entities, Rajendran Vellapalath, or the Debtors' insiders, including Vinay Ravindra, or any of their respective Affiliates or associates, to disrupt or impair the Chapter 11 Cases, (c) the Alpha Funds, and (d) any breach of fiduciary duties by the Debtors' current or former directors or officers, with the exception of the Chapter 11 Trustee or any individual appointed as a director or officer by the Chapter 11 Trustee. Retained Causes of Action shall not include any Causes of Action that are (x) settled, released, or exculpated under the Plan or (y) expressly sold or assigned to any Purchaser, as set forth in the applicable Purchase Agreement, pursuant to the applicable Sale Order. See Plan at II.A.132.

[5] *See* **Exhibit C**. The average APR was averaged from the MCAs listed in Exhibit C, column "Calc. APR".

$7.5 million on a borrowing of $5 million in 60 business days in daily payments of $250,000 per day. Another MCA required the Debtors to make $3.75 million in repayments over just 9 business days on a borrowing of $2.5 million for an implied annual percentage rate of 1659%[6].

19. When the MCA Lenders did not receive timely daily payments, several of them resorted to harassment and threats against the Debtors, as chronicled in the Debtors' messaging platform logs.

*2024-05-14 07:00:32* **from Gekko Lender**

Gm Jon. We need a wire today

*2024-05-14 09:24:07* **from Amerifi [Lender]**

I'm sick and tired of begging for wires

*2024-05-14 09:24:17* **from Amerifi [Lender]**

We hitting Ars amazon whatever we can

*2024-05-14 09:24:21* **from Amerifi [Lender]**

Enough is enough . . .

*2024-05-14 09:42:58* **from Amerifi [Lender]**

I agree. We will teach them a lesson

*2024-05-14 09:48:30* **from Amerifi [Lender]**

I'm going after full balance no more this B's 20k a week

*2024-05-14 09:48:54* **from Amerifi [Lender]**

Gonna shut down all their websites . . .

*2024-05-14 09:54:41* **from Amerifi [Lender]**

I'm going full force . . .

*2024-05-14 10:03:38* **to Amerifi/Gekko**

---

[6] ((3,750,000-2,500,000)/(2,500,000))*(365/11).

There is no money being paid to employees

*2024-05-14 10:03:49* **from Amerifi [Lender]**

Tell him to sell his house

*2024-05-14 10:03:54* **from Amerifi [Lender]**

I don't care

Debtors' WhatsApp Logs, April 2024-July 2024.

20. Additionally, upon information and belief, the Debtors made repayments in excess of the amounts required by the MCA agreements. The Plan Administrator believes that in several cases, funds were never fully advanced, or daily payments were pulled from the Debtors' bank accounts after the MCAs were fully repaid or settled.

*2023-04-17 09:49:05* **to Byju's US loan payments**

What is the status of the extra $15k debit from 2 weeks ago that we worked to cancel for SVB WHJ. Did it get refunded? Do we need Sandhya to help call SVB today to push?

*2023-04-17 10:29:08* **from Nirav @ byjus Accounting**

we have been talking to SVB directly. Spoke to them on Friday as well. they said it would happen in couple of days

*2023-04-17 10:33:46* **from Hari Sirigala**

Hi Jon, the same kind of $15k debited by MCA Servicing LLC on 4th April 2023 from Tangible Play -Citibank as well, we are also following up with the bank for further credit

*2023-04-17 10:44:18* **to Byju's US loan payments**

Yes, this $15k is the one I was referring to and that Nirav said they are talking with SVB about. Was there another one from MCA Servicing LLC? We need to block them.

*2023-04-17 10:47:06* **from Hari Sirigala**

Yes Jon, one $15k debit from WHJ SVB and one more $15k from Tangible Play Citibank . . .

*2023-04-21 11:49:54* **to Byju's US loan payments**

3) we need to reverse and claim fraud on the $25k MCA loan pulls that were done on Cit[i]bank and on SVB WHJ. It is straight fraud and we need to push the bank to investigate

*2023-04-21 11:51:53* **from Hari Sirigala**

Yes we have submitted documents toCitibank for reversal, they are yet to revers[e] . . .

*2023-04-21 12:37:35* **to Byju's US loan payments**

Here is evidence that Citycapital received $750k this week for M-W

*2023-04-21 18:02:30* **from Nirav @ byjus Accounting**

svb it happened once 15000.. we have called bank few times wrote to them.. they r assuring it would be reversed but still waiting . . .

*2023-04-18 11:41:29* **from Hari Sirigala**

Hi Jon, $ 46,875/- EMI debiting from WHJ JPM and $ 25,000/- EMI debiting from Alpha JPM still daily, kindly check and confirm . . .

*2023-04-18 11:43:30* **to Byju's US loan payments**

I don't think the $25k for Alpha should be happening; the settlements are being negotiated now/today . . .

*2023-09-01 11:47:34* **from Hari Sirigala**

Symplifi & Redstone double pulled today (1st Sep 2023) but as of now not reversed . . .

*2023-09-13 10:03:01* **from Hari Sirigala**

Hi Jon, Shift Capital- EMI double pulled on 12th and 13th Sep 2023, Please do the needful

*2023-09-13 10:07:09* **to Byju's US loan payments**

Thanks. Yes, I am on it.

*2023-09-14 09:11:58* **from Hari Sirigala**

Hi Jon, 14th also double EMI pulled by Shift Capital, do the needful

Debtors' WhatsApp Logs (internal employees only), April 2023-October 2023.

21. The Plan Administrator believes that, in at least one instance, an MCA Lender proceeded with funding after agreeing to cancel the transaction, subsequently initiating daily payment withdrawals. The MCA Lender also demanded an additional $700,000 in funding fees as a condition for rescinding the funding: "On 3/2 in the morning the 24 capital underwriter I had been working with confirmed that the CEO agreed we would cancel the deal . . . Then Shane texted me and told me that he believes they funded . . . He said the only way we could send it back is if we also give them $700k funding fee." Email from jonnaseath@tangibleplay.com, *24 Capital – Privileged Confidential* (April 24, 2023).

22. The Plan Administrator also believes that payments in excess of the amounts owed (to include "default fees" and other non-principal amounts) were prioritized over payments to other creditors during a time when the Debtors were insolvent:

> *2024-07-09 15:59:29* **from Amerifi [Lender]**
>
> 50k default fee Gekko
>
> 50k default fee Amerifi
>
> *2024-07-10 11:40:24* **to Amerifi/Gekko**
>
> Byju's wired Amerifi and Geko $100k on Nov 2nd when cash became available and to make up for days that week when payments were not made. Gekko continued to debit from an account that had no money in it, in addition to the wires that were being sent and they were reversed in the first 2 weeks of November . . . Most employees haven't been paid this month again, many employees have been let go in the last 6 months, and many (like me) have been paid 1/2 of our compensation [sic]. I pushed hard to get you guys paid off, before I am personally getting paid off. I made sure that you have been paid with whatever cash came in.
>
> *2024-07-10 11:41:48* **from Amerifi [Lender]**
>
> Ok we need to cover the remaining default fee balance
>
> *2024-07-10 11:42:13* **from Amerifi [Lender]**
>
> Ucc can't be removed without it being paid

Debtors' WhatsApp Logs, April 2024-July 2024.

23. Based on the information he has, the Plan Administrator believes some of the MCAs and/or actions by the MCA Lenders may give rise to valuable claims.

**RELIEF REQUESTED**

24. Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1, the Plan Administrator seeks authorization to issue (1) subpoenas to compel the production of documents, and (2) subpoenas for oral examinations to the Transaction Participants. The subpoenas to the MCA Lenders will be substantially in the form attached as **Exhibit D**. The subpoenas to the Banks will be substantially in the form attached as **Exhibit E**.

25. The Plan Administrator seeks to conduct the requested examinations of the Transaction Participants in connection with the following areas of discovery[7]: (i) information relevant to the Debtors' transfers to and from the MCA Lenders, (ii) information regarding the disposition of the MCAs, and (iii) information regarding the Debtors' bank account balances during the periods in which the loans were originated and repaid.

26. The requested discovery is sought in aid of the Plan Administrator's post-effective-date duties to implement the Plan, investigate the Retained Causes of Action, and maximize value for the Debtors' estates and their creditors.

[7] This present request for Bankruptcy Rule 2004 discovery is without prejudice to the Plan Administrator's right to request additional Bankruptcy Rule 2004 discovery as it obtains additional information on the MCAs. *See Vara v. Cowan (In re Cowan)*, 2019 WL 5615968, at *4 (Bankr. D.N.J. Oct. 23, 2019) (authorizing the Chapter 7 Trustee to conduct two Rule 2004 examinations of the debtor).

## BASIS FOR RELIEF

### A. The Plan Administrator is a Party in Interest and the List of Examinees is Proper under Bankruptcy Rule 2004

27. Bankruptcy Rule 2004 provides that "on a party in interest's motion, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). Under Bankruptcy Code section 1109, a party in interest includes "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee[.]" 11 U.S.C. § 1109(b). The list in Section 1109(b) is not an exhaustive list, however. *See In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir.1985) (holding that courts are required to determine on a case-by-case basis "whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation.").

28. The Plan Administrator qualifies as a party in interest under section 1109(b) because he is a representative of the estate, having been appointed under section 1123 of the Bankruptcy Code. Plan, Art. VI.D. ("The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code."); *see In re Mabvax Therapeutics Holdings, Inc.*, No. 19-10603 (JTD), 2023 WL 4038575, at *4 (Bankr. D. Del. June 15, 2023) (stating that a plan administrator appointed pursuant to Section 1123 is a "representative of the estate"); *In re 5171 Campbells Land Co., Inc.,* 641 B.R. 576, 584 (Bankr. W.D. Pa. 2022) (under confirmed plan, plan administrator became estate representative and was provided the powers of a trustee, which allowed the plan administrator to pursue recoveries similar to a trustee). Generally, an estate representative is a party in interest. *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 733 (D.N.J. 2013) (stating that the estate

representative generally has the authority to bring claims on behalf of the debtor that are based on both the Bankruptcy Code and applicable state law.)

29. Potential examinees under Bankruptcy Rule 2004 include "third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate." *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016). Here, the Plan Administrator seeks information from the Debtors' banks because each MCA transaction required the MCA Lender to be granted direct access to the Debtors' bank account(s) for purposes of withdrawing daily repayment amounts. As a result, the banks' records of transfers to and from the MCA Lenders should provide a reliable record of the actual amounts advanced and repaid under the MCA agreements. In addition, the account balance information is likely to shed light on the Debtors' financial condition and liquidity during the relevant period. The Plan Administrator also seeks discovery from the MCA Lenders themselves, who may be able to provide information regarding the disbursements and repayments associated with the MCAs. Such information bears directly on the Debtors' acts, conduct, and financial affairs, and is therefore well within the permissible scope of Rule 2004.

**B. The Plan Administrator May Seek Information Regarding the Debtors' Financial Condition and Matters that May Affect the Administration of the Estates**

30. Bankruptcy Rule 2004 provides that examinations are allowed when they are related "to the debtor's liabilities and financial condition" and "any matter that may affect the administration of the debtor's estate." Fed. R. Bankr. P. 2004(a)-(b).

31. A Rule 2004 examination is designed to permit interested parties to discover assets, examine transactions, and to determine whether wrongdoing has occurred." *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009); *see also In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (E.D. Pa. 1990) (noting the breadth of Rule 2004's scope is designed to discover

assets "which might be intentionally concealed or overlooked in ignorance or haste"). Additionally, Bankruptcy Rule 2004 examinations are allowed for various purposes, including the ability to "unearth funds." *In re GHR Energy Corp.*, 33 B.R. 451, 453 (Bankr. D. Mass. 1983) (citing *In re Foerst*, 93 F. 190, 191 (S.D.N.Y. 1899)).

32. The scope of Rule 2004 examination is "broad and unfettered," as compared to traditional discovery, which "focuses on the issues germane to the dispute." *In re Millennium Lab Holdings II*, 562 B.R. at 626. Courts recognize that parties in interest may use Bankruptcy Rule 2004 as an investigative tool. *In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("the investigation of potential claims on behalf of a debtor is not an improper use of Rule 2004 discovery"); *see Cruisephone, Inc. v. Cruise Ships Catering and Services N.V. (In re Cruisephone, Inc.*), 278 B.R. 325, 329 (Bankr. E.D.N.Y. 2002) (debtor in possession permitted to conduct Rule 2004 discovery of creditor for purposes of determining whether the estate had causes of action based on breach of contract and tortious interference with contract).

33. Good cause for a Rule 2004 examination exists when there is a reasonable basis for the examination and the subject matter of the examination is necessary to establish the movant's claim. *See In re Millenium Lab Holdings II, LLC*, 562 B.R. 614, 627 (Bankr. D. Del. 2016) (citing *ePlus Inc. v. Katz (In re Metiom, Inc.*), 318 B.R. 263, 268 (S.D.N.Y. 2004)).

34. The examinations sought here fall well within the broad and unfettered scope of discovery authorized by Bankruptcy Rule 2004 and are sought in furtherance of the Plan Administrator's post-effective-date duties under the Plan, including the investigation and prosecution of Retained Causes of Action. Based on the information currently available, the Plan Administrator believes there may be viable causes of action arising from the MCAs, including fraudulent transfer, fraud, breach of contract, and claims based on usury.

35. The Plan Administrator seeks information concerning the Debtors' liabilities and financial condition at the time the transfers to the MCA Lenders were made, as the issue of insolvency bears directly on potential causes of action. The Plan Administrator also seeks information related to the origination, funding, and repayment of the MCA obligations to determine whether the Debtors actually received the amounts purportedly borrowed, whether the MCAs were repaid in full, and whether transfers were made in excess of contractual or lawful amounts owed. Such information is directly relevant to the Plan Administrator's implementation of the Plan and his efforts to maximize value for the Debtors' estates and creditors.

36. Moreover, T&L, Byju Raveendran and Riju Ravindran have undertaken extensive efforts to withhold information and avoid producing books and records in this case. *See* Plan, Art. III.9. In light of these obstructions and the potential for valuable claims, the Plan Administrator appropriately seeks discovery from the Transaction Participants in order to develop a complete and accurate understanding of the circumstances surrounding the borrowings, funding, and repayments.

**CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 2004-1**

37. In accordance with Local Rule 2004-1(a), prior to filing this Motion, the Plan Administrator sent correspondence to the Transaction Parties to inquire whether they would voluntarily appear and/or produce documents. The Plan Administrator seeks to use the relief requested in this Motion only with respect to those Transaction Parties with whom he is unable to reach an agreement. Accordingly, the Plan Administrator has satisfied his meet and confer obligations under Local Rule 2004-1(a).

WHEREFORE, for all of the above reasons, the Plan Administrator respectfully requests that the Court enter the Proposed Order and grant the Debtors such other and further relief as is just and proper.

Dated: July 23, 2026
Wilmington, Delaware

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Kate Scherling (admitted pro hac vice)
Benjamin Finestone (admitted *pro hac vice*)
Daniel Holzman (admitted *pro hac vice*)
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
susheelkirpalani@quinnemanuel.com
katescherling@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com

*Counsel for the Plan Administrator*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com

*Counsel for the Plan Administrator*