**REDACTED PUBLIC VERSION OF D.I. 1222**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SAGA FORMATIONS, INC.,[1] | ) | Case No. 24-11161 (BLS) |
| Debtor. | ) | |
| | ) | **Docket Ref. Nos: 1204, 1213** |

**REPLY IN SUPPORT OF PLAN ADMINISTRATOR'S MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AND LOCAL BANKRUPTCY RULE 2004-1 DIRECTING THE PRODUCTION OF DOCUMENTS AND THE EXAMINATION OF THE DEBTORS' BANKS AND MCA LENDERS**

Timothy Pohl, in his sole capacity as the plan administrator (the "Plan Administrator") for the above-captioned post-effective date debtor and certain debtor affiliates (the "Debtors") hereby submits this reply (this "Reply") in support of the *Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Production of Documents and the Examination of the Debtors' Banks and MCA Lenders* [Docket No. 1204] (the "Rule 2004 Motion"), and in response to *Shift Capital, Inc.'s Objection to the Plan Administrator's Motion Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 Directing the Production of Documents and Examination of Debtors' Banks and MCA Lenders* [Docket No. 1213] (the "Objection") filed by Shift Capital, Inc. ("Shift"). For the reasons set forth herein, the Plan Administrator respectfully

[1] The last four digits of Saga Formations, Inc. f/k/a Epic Creations, Inc. federal tax identification number are 9113. In addition to the foregoing Debtor, the "Debtors" include certain affiliated entities, a complete list of which, including the last four digits of their federal tax identification numbers and addresses, may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/epiccreations. All motions, contested matters, and adversary proceedings that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of Saga Formations, Inc., Case No. 24-11161 (BLS).

requests that the Court overrule the Objection and enter an order substantially in the form attached hereto as **Exhibit A**.

## PRELIMINARY STATEMENT[2]

1. The Objection rests on three related propositions: that Shift's voluntary production purportedly establishes that its dealings were exclusively with non-debtor Whitehat Education Technology LLC; that the Plan Administrator therefore has no viable estate claim against Shift and cannot establish good cause for further discovery; and that the requested examination would improperly investigate non-estate matters while imposing burdens disproportionate to any potential benefit.

2. First, Shift's premise that it dealt exclusively with a non-debtor is contradicted by its own documents. Debtor Tangible Play, Inc. was a direct party to the Shift MCA, and Debtors Epic! Creations, Inc. and Neuron Fuel, Inc. executed guaranties supporting that Agreement.[3] Shift's representatives also communicated directly and extensively with an employee of Tangible Play regarding the Shift MCA and related payment demands. Moreover, Shift's incomplete production does not account for all payments made under the Shift MCA, including a substantial settlement payment transmitted through a PayPal account whose holder remains unidentified. These facts establish a direct nexus between Shift, the Debtors, and the obligations under investigation, and provide ample cause for further discovery. They do not, as Shift contends, conclusively eliminate any potential estate claim.

3. Second, neither the passage of funds through accounts nominally held by non-debtors nor the Plan Administrator's inability to identify a completed theory of liability before

---

[2] Capitalized terms used but not defined in this section shall have the meanings ascribed to them herein.

[3] A copy of the Shift MCA agreement is attached hereto as **Exhibit B**.

obtaining discovery places the requested examination beyond Rule 2004. Shift relies on the portion of *Millennium Lab* denying discovery sought by a lender trust investigating claims contributed by non-debtor lenders. The Plan Administrator asserts no such claims. Every claim under investigation here is a Retained Cause of Action that belonged to the Debtors or their Estates and vested in the Wind-Down Debtors under the Plan. The non-debtor accounts are not the subject of an unrelated investigation into Whitehat's private affairs; they are part of the path through which obligations incurred by the Debtors were funded and repaid. Tracing those transactions therefore falls squarely within the Plan Administrator's responsibility to investigate potential estate claims. Nor is the requested discovery disproportionate: it is confined to a single MCA relationship, discrete categories of documents, and limited examination topics, and Shift has already located and produced many of the relevant materials.

4. Accordingly, the Plan Administrator respectfully submits that Shift's Objection lacks merit and should be overruled, and that the Court should authorize the requested Rule 2004 examination so that the relevant facts and payment flows can be fully investigated.

## BACKGROUND

5. On June 4 and 5, 2024, (the "Petition Date"), involuntary petitions were filed against each of the Debtors under Chapter 11 of title 11 of the United States Code. On September 16, 2024, the involuntary petitions were granted pursuant to the Court's *Order for Relief in Involuntary Cases and Appointing Chapter 11 Trustee* [D.I. 147], and the Court directed the appointment of a chapter 11 trustee (the "Chapter 11 Trustee").

6. Following her appointment, the Chapter 11 Trustee conducted a sale process for each of the Debtors. The Court subsequently approved a sale of the Epic! Creations, Inc. assets for $95.1 million [D.I. 724] and the Neuron Fuel, Inc. assets for $2.31 million [D.I. 723]. The

Tangible Play, Inc. assets failed to attract a viable bidder, leading the Chapter 11 Trustee to determine that abandonment of the Tangible Play, Inc. assets was the most appropriate outcome. *See* D.I. 645 and 678.

7. On October 29, 2025, the Court entered the confirmation order [D.I. 1009] (the "Confirmation Order"), confirming the *Second Amended Combined Disclosure Statement and Chapter 11 Plan for the Estates of Saga Formations, Inc., Pajeau, Inc., and Tangible Play, Inc.* [D.I. 971] (as amended, supplemented, or modified from time to time, the "Plan"). On March 31, 2026, the Plan went effective [D.I. 1148].

8. Under the Plan, the Plan Administrator is charged with, among other things, "investigating, reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Retained Causes of Action[.]"[4]

9. As part of his investigation related to the Retained Causes of Action, the Plan Administrator has determined that throughout 2022 and 2023, the Debtors executed over 40 Merchant Cash Advance ("MCA") agreements with approximately 26 different Merchant Cash

---

[4] The Plan defines Retained Causes of Action as all Claims and Causes of Action (including, for the avoidance of doubt, the Adversary Proceedings and the Avoidance Actions) belonging to the Chapter 11 Trustee, any of the Debtors, or their respective Estates, including, but not limited to, all Causes of Action enumerated on the Schedule of Retained Causes of Action which shall be filed with the Plan Supplement, all of which shall vest in the Wind-Down Debtors pursuant to the terms of the Plan and be deemed an integral part thereof. For the avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action against the Excluded Parties, whether or not listed on the Schedule of Retained Causes of Action. For the further avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action arising out of or in connection with: (a) the efforts of Byju Raveendran, Riju Ravindran, the Voizzit Entities, Rajendran Vellapalath, or the Debtors insiders, including Vinay Ravindra, or any of their respective Affiliates or associates, to transfer or take the Debtors' assets either before the Petition Date or during the Chapter 11 Cases, (b) the efforts of Byju Raveendran, Riju Ravindran, the Voizzit Entities, Rajendran Vellapalath, or the Debtors' insiders, including Vinay Ravindra, or any of their respective Affiliates or associates, to disrupt or impair the Chapter 11 Cases, (c) the Alpha Funds, and (d) any breach of fiduciary duties by the Debtors' current or former directors or officers, with the exception of the Chapter 11 Trustee or any individual appointed as a director or officer by the Chapter 11 Trustee. Retained Causes of Action shall not include any Causes of Action that are (x) settled, released, or exculpated under the Plan or (y) expressly sold or assigned to any Purchaser, as set forth in the applicable Purchase Agreement, pursuant to the applicable Sale Order. *See* Plan at II.A.132.

Advance lenders (the "MCA Lenders"). Overall, the Debtors borrowed approximately $171 million but repaid roughly $250 million. Shift is one of the MCA Lenders.

10. On or about July 1, 2026, the Plan Administrator sent out letters, pursuant to Rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), requesting documents and communications from several parties believed to possess information relevant to the MCAs, including the MCA Lenders and the Debtors' banks.

11. On July 23, 2026, the Plan Administrator filed the Rule 2004 Motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 2004-1.

12. Around the same time, Shift's counsel contacted the Plan Administrator's counsel to discuss the Plan Administrator's request and the possible production of documents. As a result of the ongoing discussions, the Plan Administrator agreed to several extensions of the Rule 2004 Motion objection deadline as it pertained to Shift. Shift ultimately produced certain documents including (i) a copy of the MCA Agreement between Shift and Debtor Tangible Play, Inc., (ii) six (6) emails between Shift representatives and an employee of Debtor Tangible Play, Inc., (iii) a payment history showing payments to Shift from several bank accounts and a PayPal account, (iv) twelve (12) bank statements belonging to the Debtors, and (v) one (1) bank statement in the name of a non-debtor.

13. On August 13, 2026, the Plan Administrator, through undersigned counsel, submitted a Certification of Counsel and a revised form of order excluding Shift from the scope of the Rule 2004 Motion [Docket No. 1206]. On August 27, 2026, the Court entered the order

granting the Rule 2004 Motion (the "Omnibus 2004 Order") [Docket No. 1212] with respect to all parties except for Shift.

14. After several discussions between the Plan Administrator and Shift, no agreement as to the Rule 2004 Motion was reached. Shift filed its Objection on September 1, 2026.

## REPLY

### I. The Plan Administrator Has Established Good Cause for the Requested Discovery.

15. The purpose of a Bankruptcy Rule 2004 examination is to "discover the nature and extent of the bankruptcy estate" for the benefit of creditors. *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016) (quoting *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009)). Consistent with that purpose, Rule 2004 permits inquiry into "(A) the debtor's acts, conduct, or property; (B) the debtor's liabilities and financial condition; (C) any matter that may affect the administration of the debtor's estate; or (D) the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b). Courts therefore recognize Rule 2004 as a broad investigatory tool through which a bankruptcy fiduciary may discover assets, examine transactions, and determine whether wrongdoing has occurred. *Millennium Lab*, 562 B.R. at 626.

16. Good cause exists where the requested examination is reasonably related to the movant's duties and necessary to investigate potential claims, or where denying discovery would cause undue hardship or injustice. *See id.* at 627; Objection ¶ 1. The Plan Administrator satisfies that standard. The Debtors entered into more than forty MCAs through which they received approximately $171 million and repaid approximately $250 million. The discovery sought from Shift concerns an obligation incurred and guaranteed by the Debtors under one of those MCAs, the sources and recipients of payments made regarding that obligation, and the identities of the

persons who negotiated, administered, collected, and settled it. That information bears directly on the Debtors' financial condition, their property, and potential Retained Causes of Action.

17. These cases began as involuntary proceedings, and, upon entering the orders for relief, this Court directed the appointment of a Chapter 11 Trustee to displace the individuals then managing the Debtors (the "Former Management"). *See* D.I. 147. The Plan Administrator has succeeded to the Chapter 11 Trustee's investigatory responsibilities, but the Debtors' internal records, to the extent they are even available, were created or maintained under the direction of Former Management. As this Court is well aware, two members of Former Management have each since been held liable to the Debtors' creditors for over $500 million in damages arising from fraudulent transfers and breaches of fiduciary duty involving an affiliated debtor.[5]

18. Shift's records therefore are not cumulative. They may constitute the only independent, reliable evidence of the circumstances surrounding the Shift MCA and the related movement of funds. Without those records, the Plan Administrator cannot reconcile the amounts borrowed and repaid, determine which entity incurred each obligation and funded each repayment, or evaluate potential estate claims before the applicable limitations periods expire. Denying the requested discovery would therefore prejudice the estates and their creditors.

## II. Shift's Reliance on *Millennium Lab* and *Wilcher* Is Misplaced.

19. Shift's reliance on the portion of *Millennium Lab* denying Rule 2004 discovery is misplaced. There, the court denied discovery sought by a lender trust investigating claims

[5] *See In re BYJU's Alpha, Inc.,* No. 24-10140 (JTD), 2025 WL 665294, at *21 (Bankr. D. Del. Feb. 27, 2025) (granting partial summary judgment against Riju Ravindran on claims for actual fraudulent transfer, breach of fiduciary duty, conversion, and declaratory judgment); *BYJU's Alpha, Inc. v. Raveendran*, Adv. No. 25-50526 (BLS), Order (Bankr. D. Del. Dec. 8, 2025) [Adv. D.I. 167] (entering default judgment against Byju Raveendran pursuant to Bankruptcy Rule 7037 following findings that his discovery responses were "incomplete, evasive," and "not even remotely satisfactory," and that his conduct reflected a "strategic pattern of willful failure to comply with discovery").

contributed by non-debtor lenders and asserted against non-debtor third parties. By contrast, the court authorized discovery by the corporate trust, which held the debtors' retained claims and sought to identify estate assets and investigate potential wrongdoing. *Millennium Lab*, 562 B.R. at 628–29. The Plan Administrator occupies the position of the corporate trust: every claim under investigation is a Retained Cause of Action that belonged to the Debtors or their Estates and vested in the Wind-Down Debtors under the Plan. The accounts identified by Shift are not the object of an unrelated investigation into a non-debtor's private affairs; they are part of the path through which obligations incurred by the Debtors were funded and repaid.

20. *In re Wilcher*, 56 B.R. 428, 435 (Bankr. N.D. Ill. 1985), is inapposite for the same reason. *Wilcher* prohibits using Rule 2004 "as a device to launch into a wholesale investigation of a non-debtor's private business affairs." 56 B.R. at 434. The Plan Administrator seeks no such investigation. The requests concern the Shift MCA, the transfers made under it, and its negotiation, administration, collection, and settlement. The requested discovery therefore concerns the Debtors' own contractual obligations and the movement of funds under those obligations, not Whitehat's unrelated affairs.

## III. <u>The Existing Record Establishes a Direct Nexus Between Shift, the Debtors, and the Transactions Under Investigation.</u>

21. Shift's assertion that it dealt exclusively with a non-debtor is contradicted by its own production. First, Debtor Tangible Play, Inc. was a party to the Shift MCA, and Debtors Epic! Creations, Inc. and Neuron Fuel, Inc. guaranteed the obligation. Second, Shift communicated directly and extensively with a Tangible Play employee concerning the MCA and related payment demands. These facts establish Shift's direct contractual and operational nexus to the Debtors. Third, Shift's production does not fully account for the payment flows under the MCA. Although certain transfers passed through accounts bearing a non-debtor's name, the documents support a

reasonable inference that the Debtors exercised control over those accounts or directed their use. Shift's records also identify a substantial settlement payment made through a PayPal account, but Shift has not identified the holder of that account.

22. Courts determine whether funds constitute property of a debtor by examining the debtor's actual dominion and control, not merely the name on the account through which the funds passed. *See In re FBI Wind Down, Inc*., 581 B.R. 116, 130–31 (Bankr. D. Del. 2018) (control "refers not merely to the physical means of exerting control, but the legal right to do so," so that the transferor's "right to use funds … is dispositive over actual ownership," a presumption that holds "even in cases where the account contains commingled funds"); *In re Schwartz*, 2014 WL 2621114, at *5 (Bankr. D.N.J. June 12, 2014) (holding that the debtor exercised sufficient control over accounts not legally titled to him such that the "technicalities of title" were not dispositive when identifying property of the estate); *In re Bankest Cap. Corp.*, 374 B.R. 333, 338–39 (Bankr. S.D. Fla. 2007) (explaining that courts must "look beyond the particular transfers in question to the entire circumstance of the transactions" when determining whether property constitutes "property of the debtor," and emphasizing that the dispositive inquiry is whether the debtor exercised control over the funds at issue).

23. The Plan Administrator cannot determine whether the Debtors exercised such control without the underlying records. Shift cannot defeat that inquiry by relying on account titles while withholding the evidence necessary to test what those titles signify.

## IV. <u>**The Requested Discovery Is Proportional to the Plan Administrator's Legitimate Investigatory Needs.**</u>

24. The requested discovery is narrow. It consists of five document categories and three examination topics directed to Shift's MCA relationship with the Debtors and the related payment flows. Shift already has located and produced the MCA, relevant correspondence, a payment

history, and multiple bank statements. The incremental burden of completing that production is modest when weighed against the Plan Administrator's need to reconcile a material component of an approximately $250 million repayment program.

25. The Plan Administrator also has taken reasonable steps to work with Shift so that this matter could be resolved consensually. He repeatedly extended Shift's objection deadline, met and conferred with Shift, and excluded Shift from the Omnibus 2004 Order while the parties attempted to resolve the dispute.

## V. The Plan Administrator Need Not Establish a Completed Theory of Liability Before Obtaining Rule 2004 Discovery.

26. Shift's contention that the Plan Administrator has not identified a viable claim puts the cart before the horse. Rule 2004 discovery is investigatory in nature, and the court need not require a plan administrator/trustee to identify, much less plead or prove, a specific cause of action before obtaining such discovery. *See In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 624–25 (Bankr. D. Del. 2016) (court need not "speculate over possible causes of action that may be pursued after the investigation is complete"); *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 401–02 (Bankr. W.D. Pa. 2008) (Rule 2004 examination is a pre-suit investigatory device; res judicata objection is premature because the U.S. Trustee was not pursuing a "suit" and might never file one).

27. Nor does the Plan Administrator's possession of some relevant documents eliminate the need for additional discovery. Shift's partial production leaves unresolved the complete flow of payments, the identity of the holder of the PayPal account used for the settlement payment, the Debtors' control over accounts nominally held by non-debtors, and the roles of the participants in negotiating, collecting, and settling the Shift MCA. Those unanswered questions

provide a reasonable basis for further inquiry regardless of whether the investigation ultimately yields a claim.

**CONCLUSION**

The Plan Administrator respectfully requests that the Court overrule the Objection and enter an order substantially in the form attached hereto as **Exhibit A**.

Dated: September 25, 2026
Wilmington, Delaware

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Kate Scherling (admitted pro hac vice)
Benjamin Finestone (admitted *pro hac vice*)
Daniel Holzman (admitted *pro hac vice*)
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
susheelkirpalani@quinnemanuel.com
katescherling@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com

*Counsel for the Plan Administrator*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Katherine Majewski*
Robert S. Brady (Del. No. 2847)
Kevin A. Guerke (Del No. 4096)
Kenneth J. Enos (Del. No. 4544)
Katherine Majewski (Del. No. 7623)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kguerke@ycst.com
kenos@ycst.com
kmajewski@ycst.com

*Counsel for the Plan Administrator*

# Exhibit A

## Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SAGA FORMATIONS, INC.,[1] | ) | Case No. 24-11161 (BLS) |
| Debtor. | ) | |
| | ) | **Docket Ref. Nos: 1204, 1213** |

**ORDER DIRECTING THE PRODUCTION OF DOCUMENTS AND EXAMINATION OF THE DEBTORS' BANKS AND MCA LENDERS PURSUANT TO BANKRUPTCY RULE 2004 AND LOCAL BANKRUPTCY RULE 2004-1**

Upon consideration of the *Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Production of Documents and the Examination of the Debtors' Banks and MCA Lenders* [Docket No. 1204] (the "Rule 2004 Motion")[2] of the Plan Administrator (the "Plan Administrator") for the above-captioned post-effective date debtors (the "Debtors"), for entry of this order (this "Order"), pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1, directing the requested production of documents and examinations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent

[1] The last four digits of Saga Formations, Inc. f/k/a Epic Creations, Inc. federal tax identification number are 9113. In addition to the foregoing Debtor, the "Debtors" include certain affiliated entities, a complete list of which, including the last four digits of their federal tax identification numbers and addresses, may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/epiccreations. All motions, contested matters, and adversary proceedings that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of Saga Formations, Inc., Case No. 24-11161 (BLS).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Rule 2004 Motion.

with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Rule 2004 Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Rule 2004 Motion is in the best interests of the Debtors, their creditors, and other parties in interest; and this Court having found that the Plan Administrator's notice of the Rule 2004 Motion and opportunity for a hearing on the Rule 2004 Motion were appropriate and no other notice need be provided; and this Court having reviewed the Rule 2004 Motion; and this Court having determined that the legal and factual bases set forth in the Rule 2004 Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. The Rule 2004 Motion is GRANTED as set forth herein.

2. The Plan Administrator is authorized to issue subpoenas substantially in the form attached as **Exhibit 1** to Shift Capital, Inc. ("Shift") pursuant to Rule 2004 and Local Rule 2004-1. Shift is directed to (i) produce documents in response to the document requests in the subpoenas within fourteen (14) days of the service of the subpoenas and/or (ii) appear for oral examination and provide testimonies on topics set forth in the subpoenas, upon reasonable notice and, absent other agreement with the Plan Administrator, in no event more than twenty-one (21) days from the date of the service of the subpoenas.

3. Shift must comply with the aforementioned deadlines and participate in good faith in the requested discovery.

4. The Plan Administrator may serve, in due course, pursuant to Bankruptcy Rule 2004, such additional discovery requests, including follow-up requests and oral examinations, as to the same subject matters, upon Shift.

5. This Order is without prejudice to the right of the Plan Administrator to seek further discovery of any other entity.

6. The terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

7. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# **Exhibit 1**

## Notice of Rule 2004 Examination to Shift Capital, Inc.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SAGA FORMATIONS, INC.,[1] | Case No. 24-11161 (BLS) |
| Debtor. | |
| | **Docket Ref. Nos: 1204, 1213** |

**NOTICE OF RULE 2004 EXAMINATION**

**To:**
[•]

**PLEASE TAKE NOTICE** that, pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the U.S. Bankruptcy Court for the District of Delaware (the "Local Rules"), Timothy Pohl, in his sole capacity as the plan administrator (the "Plan Administrator") for the above-captioned post-effective date debtors (the "Debtors"), hereby serves this notice of Rule 2004 Examination (the "Examination").

**PLEASE TAKE NOTICE** that [•] is directed to produce the original, or a copy of, all Documents and Communications responsive to the Requests for Production listed in **Exhibit A** hereto to the undersigned counsel at the offices of **Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801**, or at such other mutually-agreeable location.

[1] The last four digits of Saga Formations, Inc. f/k/a Epic Creations, Inc. federal tax identification number are 9113. In addition to the foregoing Debtor, the "Debtors" include certain affiliated entities, a complete list of which, including the last four digits of their federal tax identification numbers and addresses, may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/epiccreations. All motions, contested matters, and adversary proceedings that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of Saga Formations, Inc., Case No. 24-11161 (BLS).

The documents should be produced on a rolling basis to begin as soon as feasible and to be completed on or before [•].

**PLEASE TAKE NOTICE** that the Plan Administrator will take the oral examination of the person or persons designated by [•] as most knowledgeable on the Topics for Examination listed in **Exhibit A**. The person or persons so designated by [•] is commanded to appear on [•], beginning at [•] (EST), or at such other mutually agreeable date and time. The examination will take place at the offices of **Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801**, or at such other mutually-agreeable location, and will continue from day to day until completed. The examination will be taken before a court reporter authorized by law to administer oaths and may be videotaped.

Dated: [•], 2026
Wilmington, Delaware

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Kate Scherling (admitted pro hac vice)
Benjamin Finestone (admitted *pro hac vice*)
Daniel Holzman (admitted *pro hac vice*)
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
susheelkirpalani@quinnemanuel.com
katescherling@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com

*Counsel for the Plan Administrator*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/*
Robert S. Brady (Del. No. 2847)
Kevin A. Guerke (Del. No. 4096)
Kenneth J. Enos (Del. No. 4544)
Katherine Majewski (Del. No. 7623)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kguerke@ycst.com
kenos@ycst.com
kmajewski@ycst.com

*Counsel for the Plan Administrator*

**EXHIBIT A**
**DEFINITIONS**

1. The term "Communication" shall mean the transmittal of information, in the form of facts, ideas, inquiries, or otherwise, and any response thereto, and therefore includes, but is not limited to, any telephone conversation, face-to-face meeting or conversation, visit, conference, internal or external discussion, emails, texts, electronic data rooms, file sharing, or other similar forms of electronic communication, or exchange of a document or documents. A request for all documents concerning any communication among or between specified parties includes a request for any communication among or between such parties, whether or not such communication included or was directed to any other person.

2. The term "Debtors" shall mean the Debtors, Saga Formations, Inc. f/k/a Epic Creations, Inc., Pajeau, Inc. f/k/a Neuron Fuel, Inc., and Tangible Play, Inc., and any of its directors, officers, consultants, advisors, representatives, agents, attorneys, accountants, employees, and all Persons acting or purporting to act on behalf of any of the foregoing.

3. The term "Document" shall have the same full meaning as in Federal Rule of Bankruptcy Procedure 7034 and Federal Rule of Civil Procedure 34 and includes the original, any draft (whether disseminated or not) and any copy, regardless of origin or location, of any correspondence, letter, memorandum, electronic mail (e-mail), text message, Bloomberg message, messages from messaging platforms (including WhatsApp, Teams, Skype, GoogleChat), statement, summary, outline, contract, agreement, book, pamphlet, periodical, telegram, telecopy, telefax, wire, cable, record, study, report, schedule, diary, desk calendar, organizer, appointment book, photograph, reproduction, map, survey, drawing, chart, model, index, tape, data sheet or data processing card, computerized information, data base or disk (including, without limitation, hard, soft, floppy, or compact), invoice, purchase order, ledger, journal, check (front and back),

check stub, note, bond, assignment, transfer, account statement, tax report, tax schedule, financial statement, workpaper, business form, timesheet, log, inventory, print-out, computer tape, and notes of meetings, conferences, conversations or telephone conversations, and any and all other written, printed, telecopied, telefaxed, transcribed, punched, taped, stored, filmed and graphic matter, however produced or reproduced, and specifically includes any preliminary note, outline, or draft of any of the foregoing in Your custody, possession, or control.

4. The term "Loan Parties" shall mean T&L, BYJU's Alpha, Inc., the Debtors, BYJU's Alpha LLC, BYJU's Bata Inc., BYJU's Inc, BYJU's Beta Inc., Tangible Play, Inc., Intangibles, Epic Creations Ulc, Osmo Networks, Osmo Networks, Inc., Inc., Epic! Creations, Inc., Epic Creations, LLC, Whitehat Education Technology LLC, Neuron Fuel, Inc., Think And Learn Private Limited, Sharma Family Trust, and any party to the MCAs or party that provided a Guaranty of the MCAs.

5. The term "MCA" and "MCAs" shall mean Merchant Cash Advance(s) executed between You and any of the Loan Parties.

6. The term "Person" includes natural persons, partnerships, joint ventures, unincorporated associations, corporations, state, local and federal governments and subdivisions, instrumentalities and agencies thereof, and any other legal entity. Person also includes Your directors, officers, consultants, advisors, representatives, agents, attorneys, accountants, employees, and all Persons acting or purporting to act on behalf of any of the foregoing.

7. The term "T&L" shall refer to the entity Think and Learn Private Ltd. and any of its directors, officers, consultants, advisors, representatives, agents, attorneys, accountants, employees, and all Persons acting or purporting to act on behalf of any of the foregoing.

8. The term "You" and "Your" shall refer to the Person responding to these discovery requests.

9. Whenever necessary to bring within the scope of these requests any information that otherwise might be construed to be outside the scope, (a) "including" shall be read as "including but not limited to"; (b) the present tense shall include the past tense and future tense, the past tense shall include the present tense and future tense, and the future tense shall include the past tense and present tense; (c) the terms "and," "or," and "and/or" shall be interpreted liberally, as conjunctive, disjunctive, or both depending on the context, so that the fullest disclosures of information is achieved; (d) "all" and "any" shall mean "any and all;" (e) reference to any gender includes the other gender; and (f) any term stated in the singular includes the plural and vice versa.

10. The words "concerning" and "concern" each mean having any relationship or connection to, being connected to, commenting on, responding to, containing, constituting, showing, memorializing, describing, analyzing, reflecting, pertaining to, compromising identifying, discussing, evidencing, or otherwise establishing a reasonable, logical, or causal connection.

**INSTRUCTIONS**

1. You are requested to produce all Documents described below that are within Your possession, custody, or control, or in the possession, custody, or control of or any other person or entity acting or purporting to act on Your behalf.

2. Electronically stored information ("ESI") should be produced in its native format, and all metadata and other bibliographic or historical data that relates to such electronically stored information shall also be preserved and produced.

3. You must produce entire Documents including attachments, enclosures, cover letters, memoranda, and appendices. Documents not otherwise responsive to this request are to be produced if such Documents are attached to, or enclosed with, any Document that is responsive.

4. Examples of such Documents include email attachments, routing slips, transmittal memoranda or letters, comments, evaluations, or similar Documents. In the case of email attachments, if either the email or any of its attachments is responsive, produce the email and all of the corresponding attachments.

5. If You object to part of a request, You must state the basis of Your objection, and produce all Documents called for by the portion of the request to which You do not object.

6. If there are no Documents responsive to any particular Document request, the response shall state so in writing.

7. If You claim that the attorney-client privilege, attorney work product doctrine, or any other privilege applies to any Document, the production of which is called for by these requests, then for each such Document, state, among other required information, its date, subject matter, author(s), recipient(s), custodian, and such additional information concerning the claim of privilege or work product doctrine as will permit the adjudication of the propriety of the claim of privilege.

8. The fact that a Document is or has been produced by another party does not relieve You of the obligation to produce Your copy of the same Document, even if the two Documents are identical.

9. These requests shall be deemed continuing requests so as to require supplemental responses if You obtain or discover additional Documents after Your initial production. Such supplemental Documents must be produced promptly upon discovery. The Debtors specifically

reserve the right to make additional requests and to seek supplementary responses and the additional supplementary production of Documents.

10. The foregoing instructions are not intended to limit Your obligations under the Federal Rules of Bankruptcy Procedure or any other applicable rule, regulation, or law. As such, if any of the foregoing instructions is deemed to require the provision of less information than otherwise would be required by the Federal Rules of Bankruptcy Procedure or any other applicable rule, regulation, or law, then such other rule, regulation, or law is to govern in relevant part.

11. Unless otherwise stated in a specific request, these requests seek responsive information and Documents authored, generated, disseminated, drafted, produced, reproduced, received, obtained, or otherwise created or distributed, relating to, or in effect during the period of November 24, 2021 through the present.

## REQUESTS FOR PRODUCTION

1. **Agreements**. All agreements between You and the Loan Parties.

2. **Books and Records**. All books and records of the Debtors in Your possession.

3. **Transfer of Funds**. All Documents and Communications sufficient to show each and every transfer of funds, including their amounts, between or among You, on the one hand, and any of the Loan Parties, on the other hand, including Documents and Communications concerning any consideration provided by You to the Loan Parties in exchange for any such transfers.

4. **Documents and Communications concerning Sales, Servicing, Settlements**. All Documents and Communications concerning negotiations of the MCA(s) between or among You and any of the Loan Parties, including those concerning the execution of MCA agreements, negotiation of MCA(s), origination of MCA(s), refinancing of MCA(s), payment or non-payment of MCA obligations, collection efforts related to the MCA(s), disbursement of MCA(s), fees

related to the MCA(s), final satisfaction and/or payoff of the MCA(s), litigation related to the MCA(s), and settlement of the MCA(s).

5. **Guaranties**. All Documents and Communications concerning any guaranties under the MCA(s), including all correspondence with the guarantors.

**TOPICS FOR EXAMINATION**

1. **Agreements**. All agreements between You and the Loan Parties.

2. **Transfer of Funds**. All transfers or other transactions between or among You, on the one hand, and the Debtors and/or any of the other Loan Parties, on the other hand, including (i) the reason for such transactions, (ii) the Persons involved in, or with knowledge of, such transactions, and (iii) the consideration exchanged for such transactions.

3. **Negotiations and Collection Efforts**. All negotiations between or among You and any of the Loan Parties concerning (i) inception or commencement of MCA(s), (ii) execution of MCA agreement(s), (iii) refinancing of MCA(s), (iv) payment of MCA(s), (v) non-payment of MCA(s), (vi) collection efforts related to MCA(s), (vii) final satisfaction of MCA(s), (viii) settlement of MCA(s), (ix) litigation related to MCA(s), and (x) negotiation of MCA payment terms, missed payments, or upcoming payment

# **Exhibit B**

## **Shift MCA Agreement**

$hift Capital

SHIFT CAPITAL INC
7950 NW 53rd Street, Suite 337, Doral, Florida 33166
[redacted]@shiftcapgrp.com

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated 08/08/2023 by and between SHIFT CAPITAL INC ("SHIFT"), inclusive of its successors and assigns, and each merchant listed below ("Merchant").

Merchant's Legal Name: TANGIBLE PLAY, INC., and all entities listed on the "Merchant List"

D/B/A/: TANGIBLE PLAY Fed ID #: [redacted]

Type of Entity:

☑ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor

Business Address: 195 PAGE MILL ROAD SUITE 105 City: PALO ALTO State: CA Zip: 94306

Contact Address: 3160 DE LA CRUZ City: SANTA CLARA State: CA Zip: 95054

E-mail Address: [redacted]@TANGIBLEPLAY.COM Phone Number: [redacted]

| | |
|---|---|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below). This amount may be paid in installments if there is an Addendum stating that it will be paid in installments.* | $ 2,000,000.00 |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables (defined in Section 1 below) being sold. This amount may be sold in installments if there is an Addendum stating that it will be sold in installments.* | $ 3,000,000.00 |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 27.50 % |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below. This amount may be paid in installments if there is an Addendum stating that it will be paid in installments.* | $ 1,800,000.00 |
| **Net Amount to Be Received Directly by Merchant(s)**<br>*This is the net amount being received directly by Merchant(s) after deduction of applicable fees listed in Section 2 below and the payment of any part of the Purchase Price elsewhere pursuant to any Addendum to this Agreement. This amount may be paid in installments if there is an Addendum stating that it will be paid in installments. If any deduction is being made from the Purchase Price to pay off another obligation by Merchant(s), then the Net Amount to be Received Directly by Merchant(s) is subject to change based on any change in the amount of the other obligation(s) to be paid off.* | $ 1,800,000.00 |
| **Initial Estimated Payment**<br>*This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $ 50,000.00<br>**per** DAY |

**I have read and agree to the terms and conditions set forth above:**

[signature] [signature]

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

### TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to SHIFT (making SHIFT the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to SHIFT. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by SHIFT, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of SHIFT and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for SHIFT and that each Merchant will hold Receivables in trust for SHIFT in its capacity as a fiduciary for SHIFT.

The Receivables Purchased Amount shall be paid to SHIFT by each Merchant irrevocably authorizing only one depositing account acceptable to SHIFT (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as SHIFT receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes SHIFT to ACH debit the specified remittances and any applicable fees listed in Section 2 from the Account on a daily basis as of the next business day after the date of this Agreement and will provide SHIFT with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). SHIFT is not responsible for any overdrafts or rejected transactions that may result from SHIFT's ACH debiting the Specified Percentage amounts under the terms of this Agreement. Each Merchant acknowledges and agrees that until the amount of the Receivables collected by SHIFT exceeds the amount of the Purchase Price, SHIFT will be permitted not treat any amount collected under this Agreement as profit for taxation and accounting purposes.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to SHIFT for the following fees, where applicable:

A. $ 200,000.00 - to cover underwriting, the ACH debit program, and expenses related to the procurement and initiation of the transactions encompassed by this Agreement. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. NSF/Rejected ACH Fee - $50.00 for each time an ACH debit to the Account by SHIFT is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives SHIFT notice no more than one business day in advance that the Account will have insufficient funds to be debited by SHIFT and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by SHIFT or may be collected in addition to any other payment collected by SHIFT under this Agreement.

D. Blocked Account/Default - $2,500.00 - If an Event of Default has taken place under Section 30.

E. UCC Fee - $195.00 – to cover SHIFT filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

F. $ 0.00 - legal compliance with applicable disclosure laws and regulations. This will be deducted from payment of the Purchase Price.

G. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of SHIFT's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Estimated Payments.** Instead of debiting the Specified Percentage of Merchant's Receivables, SHIFT may instead debit an "Estimated Payment" from the Account every DAY. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage. The initial amount of the Estimated Payment is $ 50,000.00, subject to reconciliation as set forth in Section 4. Notwithstanding any provision herein to the contrary, SHIFT is permitted to debit the Account to make up for a previous Estimated Payment that was not debited because SHIFT was closed that day, to make up for any previous Estimated Payment that was not collected because the debit did not clear for any reason, to collect any amount due resulting from a reconciliation as set forth in Section 4, to collect any of the fees listed in Section 2, or to collect any amount due as a result of an Event of Default defined in Section 30.

**I have read a..d agree to the terms and c n iti ns set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**4. Reconciliations**. Any Merchant may contact SHIFT's Reconciliation Department to request that SHIFT conduct a reconciliation in order to ensure that the amount that SHIFT has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. A request for a reconciliation by any Merchant must be made by giving written notice of the request to SHIFT or by sending an e-mail to lindsey@shiftcapgrp.com stating that a reconciliation is being requested. In order to effectuate the reconciliation, any Merchant must produce with its request any and all statements covering the period from the date of this Agreement through the date of the request for a reconciliation and, if available, the login and password for the Account. SHIFT will complete each reconciliation requested by any Merchant within two business days after receipt of proper notice of a request for one accompanied by the information and documents required for it. SHIFT may also conduct a reconciliation on its own at any time by reviewing Merchant(s)'s Receivables covering the period from the date of this Agreement until the date of initiation of the reconciliation, each such reconciliation will be completed within two business days after its initiation, and SHIFT will give each Merchant written notice of the determination made based on the reconciliation within one business day after its completion. If a reconciliation determines that SHIFT collected more than it was entitled to, then SHIFT will credit to the Account all amounts to which SHIFT was not entitled and, if there is an Estimated Payment, decrease the amount of the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If a reconciliation determines that SHIFT collected less than it was entitled to, then SHIFT will debit from the Account all additional amounts to which SHIFT was entitled and, if there is an Estimated Payment, increase the amount of the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. Nothing herein limits the amount of times that a reconciliation may be requested or conducted.

**5. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to SHIFT, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide SHIFT and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize SHIFT and/or its agent(s) to deduct the amounts owed to SHIFT for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to SHIFT by permitting SHIFT to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable as to each Merchant absent SHIFT's written consent until the Receivables Purchased Amount has been paid in full or the Merchant becomes bankrupt or goes out of business without any prior default under this Agreement.

**6. Term of Agreement.** The term of this Agreement is indefinite and shall continue until SHIFT receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 1, 2, 3, 4, 5, 6, 7, 9, 10, 12, 13, 14, 15, 16, 17, 18, 22, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, and 51 shall survive any termination of this Agreement.

**7. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to SHIFT under this Agreement are being made in the ordinary course of each Merchant's business.

**8. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes SHIFT and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to SHIFT any bank or financial statements, tax returns, and other documents and records, as SHIFT deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. SHIFT is authorized to update such information and financial profiles from time to time as it deems appropriate.

**9. Monitoring, Recording, and Electronic Communications.** SHIFT may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between SHIFT and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for SHIFT to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

SHIFT may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the

**I have read a..d agree to the terms and c nditi ns set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives SHIFT permission to call or send a text message to any telephone number given to SHIFT in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives SHIFT permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that SHIFT will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that SHIFT has no liability for any such charges.

**10. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of SHIFT's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. SHIFT may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to SHIFT. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize SHIFT, its agents and representatives, and any credit-reporting agency engaged by SHIFT, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to SHIFT under this Agreement or for SHIFT's ability to determine any Merchant's eligibility to enter into any future agreement with SHIFT. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to SHIFT under the Fair Credit Reporting Act, authorizing SHIFT to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes SHIFT to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to SHIFT under the Fair Credit Reporting Act, authorizing SHIFT to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes SHIFT to obtain such information in accordance with a merchant cash advance application.

**11. Transactional History.** Each Merchant authorizes its bank to provide SHIFT with its banking and/or credit card processing history.

**12. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by SHIFT for monies owed to SHIFT from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by SHIFT.

**13. No Liability.** In no event will SHIFT be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**14. Sale of Receivables.** Each Merchant and SHIFT agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from SHIFT to any Merchant. SHIFT is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in SHIFT not receiving the Receivables Purchased Amount. Any Merchant going bankrupt, going out of business, or experiencing a slowdown in business or a delay in collecting Receivables will not on its own without anything more be considered a breach of this Agreement. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. SHIFT has

**I have read and agree to the terms and conditions set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to SHIFT in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Each Merchant and each Guarantor acknowledges that SHIFT does not purchase, sell, or offer to purchase or sell securities and that this Agreement is not a security, an offer to sell any security, or a solicitation of an offer to buy any security. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**15. Power of Attorney.** Each Merchant irrevocably appoints SHIFT as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to SHIFT for the benefit of each Merchant and only in order to prevent the occurrence of an Event of Default (as described in Section 30). If an Event of Default takes place under Section 30, then each Merchant irrevocably appoints SHIFT as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to SHIFT from each Merchant, including without limitation (i) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 29); (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i); (iii) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to SHIFT; and (iv) to file any claims or take any action or institute any proceeding which SHIFT may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**16. Protections Against Default.** The following Protections 1 through 6 may be invoked by SHIFT, immediately and without notice to any Merchant if any Event of Default listed in Section 30 has occurred.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. SHIFT may enforce the provisions of the Guarantee against Guarantor.

Protection 3. SHIFT may enforce its security interest in the Collateral identified in Section 29.

Protection 4. SHIFT may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. SHIFT may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 6. SHIFT will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor and account debtor(s) of the sale of Receivables hereunder and to direct such credit card processor and account debtor(s) to make payment to SHIFT of all or any portion of the amounts received by such credit card processor and account debtor(s) on behalf of each Merchant. Each Merchant hereby grants to SHIFT an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints SHIFT and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor and account debtor(s) to make payment to SHIFT as contemplated by this Section.

**17. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes SHIFT to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against SHIFT or any of its affiliates relating to any (i) investigation undertaken by or on behalf of SHIFT as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**18. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by SHIFT, including this Agreement and any other SHIFT documents (collectively, "Confidential Information") are proprietary and confidential information of SHIFT. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of SHIFT to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and

**I h v r and agree to the terms and conditions set forth above:**

_______________________ _______________________

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

first agrees in writing to be bound by the terms of this Section 18.

**19. D/B/As.** Each Merchant hereby acknowledges and agrees that SHIFT may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between SHIFT and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**20. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to SHIFT, and future statements which will be furnished hereafter at the request of SHIFT, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise SHIFT of any material adverse change in its financial condition, operation, or ownership that may have an effect on any Merchant's ability to generate Receivables or perform its obligations under this Agreement.

**21. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**22. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**23. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without SHIFT's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**24. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to SHIFT or change any place(s) of its business without giving prior written notice to SHIFT.

**25. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**26. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of SHIFT, other than any for which SHIFT has actual or constructive knowledge or inquiry notice as of the date of this Agreement.

**27. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than SHIFT any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of SHIFT.

**28. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**29. Security Interest.** To secure each Merchant's performance obligations to SHIFT under this Agreement and any future agreement with SHIFT, each Merchant hereby grants to SHIFT a security interest in collateral (the "Collateral"), that

**I have read and agree to the terms and conditions set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to SHIFT under any other agreement between any Merchant or Guarantor and SHIFT (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as SHIFT deems necessary to perfect or maintain SHIFT's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes SHIFT to file any financing statements deemed necessary by SHIFT to perfect or maintain SHIFT's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to SHIFT with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with SHIFT's rights. Each Merchant shall be liable for and SHIFT may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by SHIFT in protecting, preserving, and enforcing SHIFT's security interest and rights. Each Merchant further acknowledges that SHIFT may use another legal name and/or D/B/A or an agent when designating the Secured Party when SHIFT files the above-referenced financing statement(s).

**30. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:

(1) Any representation or warranty by any Merchant to SHIFT proves to have been made intentionally false or misleading in any material respect when made;

(2) Any Merchant causes any ACH debit to the Account by SHIFT to be blocked or stopped without providing any advance written notice to SHIFT with an alternative method for SHIFT to collect the blocked or stopped payment, which notice may be given by e-mail to [redacted]@shiftcapgrp.com;

(3) Any Merchant intentionally prevents SHIFT from collecting any part of the Receivables Purchased Amount; or

(4) Any Merchant causes any ACH debit to the Account by any person or entity other than SHIFT to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide SHIFT with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to [redacted]@shiftcapgrp.com.

**31. Remedies.** In case any Event of Default occurs and is not waived, SHIFT may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of SHIFT in connection with this Agreement, including each Protection listed in Section 16, may be exercised at any time by SHIFT after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In case any Event of Default occurs and is not waived, SHIFT may elect that Merchant(s) be required to pay to SHIFT 25% of the unpaid balance of the Receivables Purchased Amount as liquidated damages for any reasonable expenses incurred by SHIFT in connection with recovering the unpaid balance of the Receivables Purchased Amount ("Reasonable Expenses"), and all Merchant(s) and all Guarantor(s) agree that the Reasonable Expenses bear a reasonable relationship to SHIFT's actual expenses incurred in connection with recovering the unpaid balance of the Receivables Purchased Amount.

**32. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of SHIFT, which consent may be withheld in SHIFT's sole discretion. SHIFT may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 29 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by SHIFT, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or

**I have read and agree to the terms and conditions set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

SHIFT) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between SHIFT and such assignee (the "Assignment Agreement"), have the rights and obligations of SHIFT under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, SHIFT's rights under Section 16 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, SHIFT may disclose all information that SHIFT has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon SHIFT's request.

**33. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement or by text message to the Phone Number listed on the first page of this Agreement if that phone number is for a mobile phone. Each Merchant and each Guarantor must set its spam or junk mail filter to accept e-mails sent by lindsey@shiftcapgrp.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**34. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of Florida, that the Purchase Price is being paid by SHIFT in the State of Florida, that the Receivables Purchased Amount is being delivered to SHIFT in the State of Florida, and that the State of Florida has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement, any dispute or claim relating hereto, whether sounding in contract, tort, law, equity, or otherwise, the relationship between SHIFT and each Merchant, and the relationship between SHIFT and each Guarantor will be governed by and construed in accordance with the laws of the State of Florida, without regard to any applicable principles of conflict of laws. Each Merchant agrees that the provisions of Chapter 22.1 of Title 6.2 of the Virginia Code are not applicable to this Agreement unless a merchant has a principal place of business located in the Commonwealth of Virginia and there is no applicable exemption to the statute. Each Merchant agrees that the provisions of Division 9.5 of the California Financial Code are not applicable to this Agreement if no Business Address listed on the first page of this Agreement or in any addendum hereto is located in the State of California or if there is any applicable exemption to the statute. Each Merchant agrees that the provisions of Chapter 27 of Title 7 of the Utah Code are not applicable to this Agreement if the transactions contemplated by this Agreement are not consummated in the State of Utah.

**35. Venue and Forum Selection.** Any litigation, whether sounding in contract, tort, law, equity, or otherwise, relating to this Agreement or involving SHIFT on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Broward or Miami-Dade in the State of Florida (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. Notwithstanding any provision in this Agreement to the contrary, in addition to the Acceptable Forums, any application to obtain injunctive relief in aid of arbitration or to confirm an arbitration award for an arbitration conducted in the State of New York may be made in the Supreme Court of New York for Nassau County or the Civil Court of the City of New York for New York County and any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to SHIFT may be commenced and maintained in any other court that would otherwise be of competent jurisdiction, and each Merchant and each Guarantor agree that those courts are convenient, submit to the jurisdiction of those courts, waive any and all objections to the jurisdiction or venue of those courts, and may oppose any motion or application made by any party to transfer any such litigation to an Acceptable Forum.

**36. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**37. Counterclaim Waiver.** In any litigation or arbitration commenced by SHIFT, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**I hav r n agree to the terms and conditions set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**38. Costs and Legal Fees.** If an Event of Default occurs or SHIFT prevails in any litigation or arbitration with any Merchant or any Guarantor, then each Merchant and each Guarantor must pay SHIFT's reasonable attorney fees, which may include a contingency fee, as well as administrative or filing fees and arbitrator compensation in any arbitration, expert witness fees, and costs of suit.

**39. Prejudgment and Postjudgment Interest.** If SHIFT becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then SHIFT will be entitled to the recovery of prejudgment interest at a rate of 18% per annum, or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 18% per annum, or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**40. Class Action Waiver.** SHIFT, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**41. Arbitration.** Any action or dispute, whether sounding in contract, tort, law, equity, or otherwise, relating to this Agreement or involving SHIFT on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration in the State of New York. A judgment of the court shall be entered upon the award made pursuant to the arbitration. The arbitration will be administered either by the American Arbitration Association under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.adr.org, by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, by JAMS under its Streamlined Arbitration Rules & Procedures as are in effect at that time, which rules are available at www.jamsadr.com, by Mediation And Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org, or by Resolute Systems, LLC under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.resolutesystems.com. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and no other arbitral forum specified herein may be used. As a prerequisite to making a motion to compel arbitration in any litigation, the party making the motion must first file a demand for arbitration with the chosen arbitral tribunal and pay all required filing and/or administrative fees. If the American Arbitration Association is selected, then notwithstanding any provision to the contrary in its Commercial Arbitration Rules, the Expedited Procedures will always apply and its Procedures for Large, Complex Commercial Disputes will not apply. Notwithstanding any provision to the contrary in the arbitration rules of the arbitral forum selected, the arbitration will be heard by one arbitrator and not by a panel of arbitrators, any arbitration hearing relating to this Agreement must be held in the Counties of Nassau, New York, Queens, or Kings in the State of New York, any party, representative, or witness in an arbitration hearing will be permitted to attend, participate, and testify remotely by telephone or video conferencing, and the arbitrator appointed will not be required to be a national of a country other than that of the parties to the arbitration.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under the arbitration laws of the State in which the arbitration is being conducted, the laws of the State of Florida, or the laws of the jurisdiction in which the application is made, and the application will be governed by and construed in accordance with the laws under which the application is made, without regard to any applicable principles of conflict of laws. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of SHIFT and by any party to a lawsuit in which SHIFT and any Merchant or any Guarantor are parties.

**42. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to SHIFT by any Merchant or any Guarantor,

**I h v r nd agree to the terms and conditions set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by SHIFT demonstrating that SHIFT was provided with notice of a change in the Contact Address.

**43. Survival of Representations, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated unless specified otherwise in this Agreement.

**44. Waiver.** No failure on the part of SHIFT to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**45. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to SHIFT by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of SHIFT. Each Merchant and each Guarantor acknowledge that SHIFT is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify SHIFT and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that SHIFT does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**46. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**47. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**48. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**I have read and agree to the terms and conditions set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

**49. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**50. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein.

**51. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

**EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT**

**FOR THE MERCHANT/OWNER (#1)**

By: CHERIAN THOMAS (Print Name) OWNER (Print Title) [signature] (Signature)

SS# [redacted] ______________ Driver License Number NA

**FOR THE MERCHANT/OWNER (#2)**

By: RIJU RAVINDRAN (Print Name) OWNER (Print Title) [signature] (Signature)

SS# 1 Driver License Number 1

Approved for SHIFT CAPITAL INC by: ______________________

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated 08/08/2023, of the Standard Merchant Cash Advance Agreement, dated 08/08/2023 ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between SHIFT CAPITAL INC ("SHIFT") and TANGIBLE PLAY, INC., and all entities listed on the "Merchant List" ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to SHIFT in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** SHIFT may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives SHIFT permission to call or send a text message to any telephone number given to SHIFT in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives SHIFT permission to communicate such information to them by e-mail. Each Guarantor agrees that SHIFT will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that SHIFT has no liability for any such charges.

**G3. Guarantor Waivers.** If any Event of Default takes place under the Agreement, then SHIFT may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral or Cross-Collateral SHIFT may hold pursuant to this Guarantee or any other agreement or guarantee. SHIFT does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) SHIFT's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to SHIFT. In addition, SHIFT may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to SHIFT; (ii) if there is more than one Merchant, release a Merchant from its obligations to SHIFT such that at least one Merchant remains obligated to SHIFT; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to SHIFT under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of Florida, that the Purchase Price is being paid by SHIFT in the State of Florida, that the Receivables Purchased Amount is being delivered to SHIFT in the State of Florida, and that the State of Florida has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. The Agreement, this Guarantee, any dispute or claim

**I have read and agree to the terms and conditions set forth above:**

[signature] [signature]

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

relating to the Agreement or this Guarantee, whether sounding in contract, tort, law, equity, or otherwise, the relationship between SHIFT and each Merchant, and the relationship between SHIFT and each Guarantor will be governed by and construed in accordance with the laws of the State of Florida, without regard to any applicable principles of conflict of laws.

**G6. Venue and Forum Selection.** Any litigation, whether sounding in contract, tort, law, equity, or otherwise, relating to this Agreement or this Guarantee or involving SHIFT on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Broward or Miami-Dade in the State of Florida (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. Notwithstanding any provision in the Agreement or this Guarantee to the contrary, in addition to the Acceptable Forums, any application to obtain injunctive relief in aid of arbitration or to confirm an arbitration award for an arbitration conducted in the State of New York may be made in the Supreme Court of New York for Nassau County or the Civil Court of the City of New York for New York County and any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to SHIFT may be commenced and maintained in any other court that would otherwise be of competent jurisdiction, and each Merchant and each Guarantor agree that those courts are convenient, submit to the jurisdiction of those courts, waive any and all objections to the jurisdiction or venue of those courts, and may oppose any motion or application made by any party to transfer any such litigation to an Acceptable Forum.

**G7. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with SHIFT.

**G8. Counterclaim Waiver.** In any litigation or arbitration commenced by SHIFT, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G9. Costs and Legal Fees.** If an Event of Default occurs or SHIFT prevails in any litigation or arbitration with any Merchant or any Guarantor, then each Merchant and/or Guarantor must pay SHIFT's reasonable attorney fees, which may include a contingency fee, as well as administrative or filing fees and arbitrator compensation in any arbitration, expert witness fees, and costs of suit.

**G10. Prejudgment and Postjudgment Interest.** If SHIFT becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then SHIFT will be entitled to the recovery of prejudgment interest at a rate of 18% per annum, or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 18% per annum, or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G11. Class Action Waiver.** SHIFT, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G12. Arbitration.** Any action or dispute, whether sounding in contract, tort, law, equity, or otherwise, relating to the Agreement, this Guarantee, or involving SHIFT on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration in the State of New York. A judgment of the court shall be entered upon the award made pursuant to the arbitration. The arbitration will be administered either by the American Arbitration Association under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.adr.org, by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, by JAMS under its Streamlined Arbitration Rules & Procedures as are in effect at that time, which rules are available at www.jamsadr.com, by Mediation And Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org, or by Resolute Systems, LLC under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.resolutesystems.com. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and no other arbitral forum specified herein may be used. As a prerequisite to making a motion to compel arbitration in any litigation, the party making the motion must first file

**I have read a..d agree to the terms and c nditi ns set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

a demand for arbitration with the chosen arbitral tribunal and pay all required filing and/or administrative fees. If the American Arbitration association is selected, then notwithstanding any provision to the contrary in its Commercial Arbitration Rules, the Expedited Procedures will always apply and its Procedures for Large, Complex Commercial Disputes will never apply. Notwithstanding any provision to the contrary in the arbitration rules of the arbitral forum selected, the arbitration will be heard by one arbitrator and not by a panel of arbitrators, any arbitration relating to the Agreement or this Guarantee must be held in the Counties of Nassau, New York, Queens, or Kings in the State of New York, any party, representative, or witness in an arbitration hearing will be permitted to attend, participate, and testify remotely by telephone or video conferencing, and the arbitrator appointed will not be required to be a national of a country other than that of the parties to the arbitration.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the products of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under the arbitration laws of the State in which the arbitration is being conducted, the laws of the State of Florida, or the laws of the jurisdiction in which the application is made, and the application will be governed by and construed in accordance with the laws under which the application is made, without regard to any applicable principles of conflict of laws. The arbitration agreement contained herein may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of SHIFT and by any party to a lawsuit in which SHIFT and any Merchant or any Guarantor are parties.

**G13. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to SHIFT by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by SHIFT demonstrating that SHIFT was provided with notice of a change in the Contact Address.

**G14. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G15. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, and G19 shall survive any termination of this Guarantee.

**G16. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G17. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**I have read a..d agree to the terms and c nditi ns set forth above:**

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**G18. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**G19. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

**EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS GUARANTEE**

**GUARANTOR (#1)**

By: CHERIAN THOMAS ____________________ ____________________
(Print Name) (Signature)

SS# [redacted] ____________________ Driver License Number NA

**GUARANTOR (#2)**

By: RIJU RAVINDRAN ____________________ ____________________
(Print Name) (Signature)

SS# 1 Driver License Number 1

STANDARD MERCHANT CASH ADVANCE AGREEMENT

# BANK INFORMATION

Dear Merchant,

We look forward to being your funding partner.

You authorize SHIFT CAPITAL INC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SHIFT CAPITAL INC will require viewing access to your bank account each business day.

SHIFT CAPITAL INC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

*** Be sure to indicate capital or lower case letters.**

Name of bank: SILICON VALLEY BANK

Name of account: TANGIBLE PLAY, INC.

Account number: [redacted] Routing number: [redacted]

Bank portal website: ______

Username: ______

Password: ______

Security Question/Answer 1: ______

Security Question/Answer 2: ______

Security Question/Answer 3: ______

Any other information necessary to access your account: ______

If you have any questions please feel free to contact us directly.

**I have read and agree to the terms and conditions set forth above:**

______ ______

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

**DECLARATION OF ORDINARY COURSE OF BUSINESS**

Each undersigned hereby declares the following:

1. I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated 08/08/2023, between Shift Capital Inc and TANGIBLE PLAY, INC., and all entities listed on the "Merchant List" ("Merchant") on behalf of Merchant.

2. This Declaration incorporates by reference the Agreement and every addendum to it.

3. I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.

4. I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.

5. I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.

6. I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.

7. I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.

8. I acknowledge that the payments to be made from any Merchant to Shift Capital Inc under the Agreement are being made in the ordinary course of each Merchant's business.

9. I am aware of each Merchant's right to request a reconciliation of the payments made under the Agreement at any time.

**10. I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on 08/08/2023
(Date)

**FOR THE MERCHANT/OWNER (#1)**

By: CHERIAN THOMAS OWNER
(Print Name) (Print Title) (Signature)

**FOR THE MERCHANT/OWNER (#2)**

By: RIJU RAVINDRAN OWNER
(Print Name) (Print Title) (Signature)



Doc ID: 8ec663dc4444e69d5470e9ee0b11ebce989baefb

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

# BANK INFORMATION

Dear Merchant,

We look forward to being your funding partner.

You authorize SHIFT CAPITAL INC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SHIFT CAPITAL INC will require viewing access to your bank account each business day.

SHIFT CAPITAL INC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

*** Be sure to indicate capital or lower case letters.**

Name of bank: JP MORGAN CHASE BANK N.A.

Name of account: WHITEHAT EDUCATION TECHNOLOGY LLC

Account number: [redacted] Routing number: [redacted]

Bank portal website: ____________________

Username: ____________________

Password: ____________________

Security Question/Answer 1: ____________________

Security Question/Answer 2: ____________________

Security Question/Answer 3: ____________________

Any other information necessary to access your account: ____________________

If you have any questions please feel free to contact us directly.

**I hav r n agree to the terms and conditions set forth above:**

____________________ ____________________

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

Doc ID: 8ec663dc4444e69d5470e9ee0b11ebce989baefb

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

# BANK INFORMATION

Dear Merchant,

We look forward to being your funding partner.

You authorize SHIFT CAPITAL INC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SHIFT CAPITAL INC will require viewing access to your bank account each business day.

SHIFT CAPITAL INC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

*** Be sure to indicate capital or lower case letters.**

Name of bank: JP MORGAN CHASE BANK N.A.

Name of account: BYJU'S ALPHA, INC.

Account number: [redacted] Routing number: [redacted]

Bank portal website: ______________________

Username: ______________________

Password: ______________________

Security Question/Answer 1: ______________________

Security Question/Answer 2: ______________________

Security Question/Answer 3: ______________________

Any other information necessary to access your account: ______________________

If you have any questions please feel free to contact us directly.

**I h v r nd agree to the terms and conditions set forth above:**

______________________ ______________________

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

# BANK INFORMATION

Dear Merchant,

We look forward to being your funding partner.

You authorize SHIFT CAPITAL INC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SHIFT CAPITAL INC will require viewing access to your bank account each business day.

SHIFT CAPITAL INC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

*** Be sure to indicate capital or lower case letters.**

Name of bank: CITI BANK

Name of account: TANGIBLE PLAY INC

Account number: [redacted] Routing number: [redacted]

Bank portal website: ______

Username: ______

Password: ______

Security Question/Answer 1: ______

Security Question/Answer 2: ______

Security Question/Answer 3: ______

Any other information necessary to access your account: ______

If you have any questions please feel free to contact us directly.

**I have read and agree to the terms and conditions set forth above:**

[signature] [signature]

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

# BANK INFORMATION

Dear Merchant,

We look forward to being your funding partner.

You authorize SHIFT CAPITAL INC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SHIFT CAPITAL INC will require viewing access to your bank account each business day.

SHIFT CAPITAL INC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

*** Be sure to indicate capital or lower case letters.**

Name of bank: SILICON VALLEY BANK

Name of account: WHITEHAT EDUCATION TECHNOLOGY LLC

Account number: [redacted] ________ Routing number: [redacted] ________

Bank portal website: ____________________

Username: ____________________

Password: ____________________

Security Question/Answer 1: ____________________

Security Question/Answer 2: ____________________

Security Question/Answer 3: ____________________

Any other information necessary to access your account: ____________________

If you have any questions please feel free to contact us directly.

**I have read a..d agree to the terms and ..nditi ns set forth above:**

____________________

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

# BANK INFORMATION

Dear Merchant,

We look forward to being your funding partner.

You authorize SHIFT CAPITAL INC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SHIFT CAPITAL INC will require viewing access to your bank account each business day.

SHIFT CAPITAL INC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

*** Be sure to indicate capital or lower case letters.**

Name of bank: SILICON VALLEY BANK

Name of account: EPIC! CREATIONS, INC.

Account number: [redacted] Routing number: [redacted]

Bank portal website: ______

Username: ______

Password: ______

Security Question/Answer 1: ______

Security Question/Answer 2: ______

Security Question/Answer 3: ______

Any other information necessary to access your account: ______

If you have any questions please feel free to contact us directly.

**I have read and agree to the terms and conditions set forth above:**

______

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

# BANK INFORMATION

Dear Merchant,

We look forward to being your funding partner.

You authorize SHIFT CAPITAL INC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SHIFT CAPITAL INC will require viewing access to your bank account each business day.

SHIFT CAPITAL INC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

*** Be sure to indicate capital or lower case letters.**

Name of bank: JPMORGAN CHASE BANK, N.A. ______

Name of account: WHITEHAT EDUCATION TECHNOLOGY LLC ______

Account number: [redacted] ______ Routing number: [redacted] ______

Bank portal website: ______

Username: ______

Password: ______

Security Question/Answer 1: ______

Security Question/Answer 2: ______

Security Question/Answer 3: ______

Any other information necessary to access your account: ______

If you have any questions please feel free to contact us directly.

**I have read and agree to the terms and conditions set forth above:**

______ ______

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

# BANK INFORMATION

Dear Merchant,

We look forward to being your funding partner.

You authorize SHIFT CAPITAL INC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SHIFT CAPITAL INC will require viewing access to your bank account each business day.

SHIFT CAPITAL INC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

*** Be sure to indicate capital or lower case letters.**

Name of bank: SILICON VALLEY BANK

Name of account: EPIC! CREATIONS, INC.

Account number: [redacted] ______ Routing number: [redacted] ______

Bank portal website: ______

Username: ______

Password: ______

Security Question/Answer 1: ______

Security Question/Answer 2: ______

Security Question/Answer 3: ______

Any other information necessary to access your account: ______

If you have any questions please feel free to contact us directly.

**I have read and agree to the terms and conditions set forth above:**

______

Name: CHERIAN THOMAS Title: OWNER Date: 08 / 08 / 2023

ver. 6/5/21

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**
**ADDENDUM G**
**ADDITIONAL GUARANTORS**

This is an Addendum, dated 08/08/2023, to the Guarantee of the Standard Merchant Cash Advance Agreement ("Agreement") between SHIFT CAPITAL INC ("SHIFT") and TANGIBLE PLAY, INC., and all entities listed on the "Merchant List" ("Merchant"), dated 08/08/2023. This Addendum incorporates by reference the Agreement and the Guarantee.

The following additional entities and/or people, pursuant to the terms and conditions of the Guarantee, hereby guarantee performance of Merchant's performance of all of the representations, warranties, and covenants made by Merchant to SHIFT in the Agreement, inclusive of all addenda thereto, if any, as may be renewed, amended, extended, or otherwise modified.

**GUARANTOR (#3)**

By: BYJU RAVEENDRAN (Print Name)

Byju (Signature)

SS# 1111111

Driver License Number Aaaaaa



Doc ID: 8ec663dc4444e69d5470e9ee0b11ebce989baefb

Shift Capital

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT – MERCHANT LIST

This is an Addendum, dated 08/08/2023, to the Standard Merchant Cash Advance Agreement ("Agreement") of SHIFT CAPITAL INC ("SHIFT"), dated 08/08/2023. This Addendum incorporates the Agreement by reference. Each Contact Address set forth in this Addendum will be treated as if it is set forth as a Contact Address on Page 1 of the Agreement. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

The following entities and/or sole proprietorships will be a Merchant under the Agreement:

Merchant #1's Legal Name: TANGIBLE PLAY INC.
D/B/A/: TANGIBLE PLAY Fed ID #: ______
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ______ City: ______ State: ______ Zip: ______
Contact Address: ______ City: ______ State: ______ Zip: ______

**FOR MERCHANT #1**

By: CHERIAN THOMAS OWNER ______ (Print Name and Title) ______ (Signature)

Merchant #2's Legal Name: BYJU'S ALPHA, INC
D/B/A/: BYJU'S ALPHA Fed ID #: ______
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ______ City: ______ State: ______ Zip: ______
Contact Address: ______ City: ______ State: ______ Zip: ______

**FOR MERCHANT #2**

By: CHERIAN THOMAS OWNER ______ (Print Name and Title) ______ (Signature)

Merchant #3's Legal Name: TANGIBLE PLAY, INC
D/B/A/: TANGIBLE PLAY Fed ID #: ______
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ______ City: ______ State: ______ Zip: ______
Contact Address: ______ City: ______ State: ______ Zip: ______

**FOR MERCHANT #3**

By: CHERIAN THOMAS OWNER ______ (Print Name and Title) ______ (Signature)



Doc ID: 8ec663dc4444e69d5470e9ee0b11ebce989baefb

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**
**ADDENDUM M**
**MERCHANT LIST**

Merchant #4's Legal Name: BYJU ALPHA
D/B/A/: BYJU ALPHA Fed ID #: ____________
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ____________ City: ________ State: ______ Zip: ______
Contact Address: ____________ City: ________ State: ______ Zip: ______

**FOR MERCHANT #4**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

____________________
(Signature)

Merchant #5's Legal Name: BYJU ALPHA LLC
D/B/A/: BYJU ALPHA Fed ID #: ____________
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ____________ City: ________ State: ______ Zip: ______
Contact Address: ____________ City: ________ State: ______ Zip: ______

**FOR MERCHANT #5**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

____________________
(Signature)

Merchant #6's Legal Name: EPIC! CREATIONS INC
D/B/A/: EPIC! CREATIONS Fed ID #: [redacted]
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ____________ City: ________ State: ______ Zip: ______
Contact Address: ____________ City: ________ State: ______ Zip: ______

**FOR MERCHANT #6**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

____________________
(Signature)

# STANDARD MERCHANT CASH ADVANCE AGREEMENT
## ADDENDUM M
## MERCHANT LIST

Merchant #7's Legal Name: TANGIBLE PLAY INC
D/B/A/: TANGIBLE PLAY Fed ID #: ____________
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ____________ City: ____________ State: ______ Zip: ______
Contact Address: ____________ City: ____________ State: ______ Zip: ______

**FOR MERCHANT #7**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

____________
(Signature)

Merchant #8's Legal Name: THINK AND LEARN PRIVATE LIMITED
D/B/A/: THINK AND LEARN PRIVATE Fed ID #: ____________
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ____________ City: ____________ State: ______ Zip: ______
Contact Address: ____________ City: ____________ State: ______ Zip: ______

**FOR MERCHANT #8**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

____________
(Signature)

Merchant #9's Legal Name: WHITEHAT EDUCATION TECHNOLOGY LLC
D/B/A/: WHITEHAT EDUCATION TECHNOLOGY Fed ID #: [redacted]
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ____________ City: ____________ State: ______ Zip: ______
Contact Address: ____________ City: ____________ State: ______ Zip: ______

**FOR MERCHANT #9**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

____________
(Signature)



Doc ID: 8ec663dc4444e69d5470e9ee0b11ebce989baefb

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**
**ADDENDUM M**
**MERCHANT LIST**

Merchant #10's Legal Name: BYJU'S ALPHA, INC.
D/B/A/: BYJU'S ALPHA Fed ID #: ____
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ____ City: ____ State: ____ Zip: ____
Contact Address: ____ City: ____ State: ____ Zip: ____

**FOR MERCHANT #10**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

____
(Signature)

Merchant #11's Legal Name: BYJU'S INC
D/B/A/: BYJU'S Fed ID #: ____
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ____ City: ____ State: ____ Zip: ____
Contact Address: ____ City: ____ State: ____ Zip: ____

**FOR MERCHANT #11**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

____
(Signature)

Merchant #12's Legal Name: BYJU'S BETA, INC
D/B/A/: BYJU'S BETA Fed ID #: ____
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ____ City: ____ State: ____ Zip: ____
Contact Address: ____ City: ____ State: ____ Zip: ____

**FOR MERCHANT #12**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

____
(Signature)



Doc ID: 8ec663dc4444e69d5470e9ee0b11ebce989baefb

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**
**ADDENDUM M**
**MERCHANT LIST**

Merchant #13's Legal Name: OSMO NETWORKS, INC
D/B/A/: OSMO NETWORKS Fed ID #: ______
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ______ City: ______ State: ______ Zip: ______
Contact Address: ______ City: ______ State: ______ Zip: ______

**FOR MERCHANT #13**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

______
(Signature)

Merchant #14's Legal Name: BYJU'S BATA INC
D/B/A/: BYJU'S BATA INC Fed ID #: ______
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ______ City: ______ State: ______ Zip: ______
Contact Address: ______ City: ______ State: ______ Zip: ______

**FOR MERCHANT #14**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

______
(Signature)

Merchant #15's Legal Name: INTANGIBLES
D/B/A/: INTANGIBLES Fed ID #: ______
Type of Entity: ☐ Corporation ☐ Limited Liability Company ☐ Partnership ☐ Sole Proprietor
Business Address: ______ City: ______ State: ______ Zip: ______
Contact Address: ______ City: ______ State: ______ Zip: ______

**FOR MERCHANT #15**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

______
(Signature)



Doc ID: 8ec663dc4444e69d5470e9ee0b11ebce989baefb

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT – MERCHANT LIST

Merchant #16's Legal Name: BYJU'S ALPHA INC
D/B/A/: BYJU'S ALPHA Fed ID #: [redacted]
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ______ City: ______ State: ______ Zip: ______
Contact Address: ______ City: ______ State: ______ Zip: ______

**FOR MERCHANT #16**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

______ (Signature)

Merchant #17's Legal Name: TANGIBLE PLAY INC
D/B/A/: TANGIBLE PLAY Fed ID #: [redacted]
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ______ City: ______ State: ______ Zip: ______
Contact Address: ______ City: ______ State: ______ Zip: ______

**FOR MERCHANT #17**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

______ (Signature)

Merchant #18's Legal Name: NEURON FUEL INC
D/B/A/: NEURON FUEL Fed ID #: [redacted]
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ______ City: ______ State: ______ Zip: ______
Contact Address: ______ City: ______ State: ______ Zip: ______

**FOR MERCHANT #18**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

______ (Signature)

**ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT – MERCHANT LIST**

Merchant #19's Legal Name: BYJU'S ALPHA INC.
D/B/A/: BYJU'S ALPHA Fed ID #: [redacted]
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ________ City: ________ State: ________ Zip: ________
Contact Address: ________ City: ________ State: ________ Zip: ________

**FOR MERCHANT #19**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

(Signature)

Merchant #20's Legal Name: EPIC CREATIONS ULC
D/B/A/: EPIC CREATIONS ULC Fed ID #: ________
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ________ City: ________ State: ________ Zip: ________
Contact Address: ________ City: ________ State: ________ Zip: ________

**FOR MERCHANT #20**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

(Signature)

Merchant #21's Legal Name: BYJU'S ALPHA, INC
D/B/A/: BYJU'S ALPHA Fed ID #: ________
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ________ City: ________ State: ________ Zip: ________
Contact Address: ________ City: ________ State: ________ Zip: ________

**FOR MERCHANT #21**

By: CHERIAN THOMAS OWNER
(Print Name and Title)

(Signature)



Doc ID: 8ec663dc4444e69d5470e9ee0b11ebce989baefb

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT – MERCHANT LIST

Merchant #22's Legal Name: BYJU'S ALPHA, INC.,
D/B/A/: BYJU'S ALPHA Fed ID #: ____
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ____ City: ____ State: ____ Zip: ____
Contact Address: ____ City: ____ State: ____ Zip: ____

**FOR MERCHANT #22**

By: CHERIAN THOMAS OWNER ____
(Print Name and Title) (Signature)

Merchant #23's Legal Name: ____
D/B/A/: ____ Fed ID #: ____
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ____ City: ____ State: ____ Zip: ____
Contact Address: ____ City: ____ State: ____ Zip: ____

**FOR MERCHANT #23**

By: CHERIAN THOMAS OWNER ____
(Print Name and Title) (Signature)

Merchant #24's Legal Name: ____
D/B/A/: ____ Fed ID #: ____
Type of Entity:
☐ Corporation ☐ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor
Business Address: ____ City: ____ State: ____ Zip: ____
Contact Address: ____ City: ____ State: ____ Zip: ____

**FOR MERCHANT #24**

By: CHERIAN THOMAS OWNER ____
(Print Name and Title) (Signature)

Dropbox Sign

Audit trail

| | |
|---|---|
| **Title** | TANGIBLE PLAY INC SHIFT CONTRACT 8.8.23 |
| **File name** | TANGIBLE PLAY, INC. SHIFT 8.8.23.pdf |
| **Document ID** | 8ec663dc4444e69d5470e9ee0b11ebce989baefb |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | Signed |

## Document History

| | | |
|---|---|---|
| SENT | **08 / 08 / 2023**<br>17:55:08 UTC | Sent for signature to CHERIAN THOMAS [redacted]@tangibleplay.com), RIJU RAVINDRAN [redacted]@byjus.com) and BYJU RAVEENDRAN [redacted]@byjus.com) from [redacted]@shiftcapgrp.com<br>IP: 68.72.6.156 |
| VIEWED | **08 / 08 / 2023**<br>18:07:42 UTC | Viewed by BYJU RAVEENDRAN [redacted]@byjus.com)<br>IP: 106.206.17.89 |
| SIGNED | **08 / 08 / 2023**<br>18:08:46 UTC | Signed by BYJU RAVEENDRAN [redacted]@byjus.com)<br>IP: 106.206.17.89 |
| VIEWED | **08 / 09 / 2023**<br>01:03:45 UTC | Viewed by RIJU RAVINDRAN [redacted]@byjus.com)<br>IP: 122.171.17.94 |
| VIEWED | **08 / 09 / 2023**<br>03:29:18 UTC | Viewed by CHERIAN THOMAS [redacted]@tangibleplay.com)<br>IP: 65.141.61.4 |

Dropbox Sign

Audit trail

| | |
|---|---|
| **Title** | TANGIBLE PLAY INC SHIFT CONTRACT 8.8.23 |
| **File name** | TANGIBLE PLAY, INC. SHIFT 8.8.23.pdf |
| **Document ID** | 8ec663dc4444e69d5470e9ee0b11ebce989baefb |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | Signed |

## Document History

| | | |
|---|---|---|
| SIGNED | **08 / 09 / 2023**<br>03:30:18 UTC | Signed by CHERIAN THOMAS [redacted]@tangibleplay.com)<br>IP: 65.141.61.4 |
| SIGNED | **08 / 09 / 2023**<br>03:40:55 UTC | Signed by RIJU RAVINDRAN [redacted]@byjus.com)<br>IP: 122.171.17.94 |
| COMPLETED | **08 / 09 / 2023**<br>03:40:55 UTC | The document has been completed. |